**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X

LEO P. ROLAND, individually, and on behalf    :
of all others similarly situated,

                                    :

                    Plaintiff,

                                    :

            - against -

                                    :

THE CITY OF NEW YORK,
SARENA TOWNSEND, in her individual           :
capacity, and RUBEN BENITEZ, in his
individual capacity,                        :

                          Defendants.     :

-------------------------------------------------------------- X

**Case No. 24 Civ. 4447**

**CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

Plaintiff Leo P. Roland ("Plaintiff"), individually and on behalf of the classes set forth below, by and through his undersigned counsel, The Dugger Law Firm, PLLC, makes the following allegations against Defendant City of New York (the "Defendant City" or the "City"), Defendant Sarena Townsend ("Defendant Townsend" or "Townsend"), in her individual capacity, and Defendant Ruben Benitez ("Defendant Benitez" or "Benitez"), in his individual capacity (collectively, "Defendants").

## INTRODUCTION

1.       Plaintiff brings class and individual claims against the Defendant City for violations of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"), individual claims for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") against the Defendant City, and individual claims for violations of the NYCHRL against Defendant City, Defendant Townsend, and Defendant Benitez.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §

1331 and 28 U.S.C. § 1343.

3.      This Court has supplemental jurisdiction over Plaintiff's NYCHRL claims

pursuant to 28 U.S.C. § 1367, as those claims are so closely related to Plaintiff's claims under

the FMLA, the Rehabilitation Act, and Title VII, that they form part of the same case or

controversy under Article III of the United States Constitution.

4.      Defendants are subject to personal jurisdiction in New York.

5.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §

1391(b)(2) because a substantial part of the events or omissions giving rise to the claims

occurred within this judicial district, including the unlawful employment practices alleged

herein, and Defendants operate or operated their business within this judicial district as to the

New York City Department of Correction ("DOC").

6.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C.

§§ 2201-2202, 29 U.S.C. § 2617(b), 42 U.S.C. § 2000e-5, 29 U.S.C. § 794a, N.Y.C. Admin.

Code § 8-502.

7.      This Court is empowered to issue injunctive relief pursuant to 29 U.S.C. §

2617(b), 42 U.S.C. § 2000e-5, 29 U.S.C. § 794a, and N.Y.C. Admin. Code § 8-502.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      On August 15, 2022, Plaintiff filed a Class Charge with the Equal Employment

Opportunity Commission ("EEOC"), which was cross-filed with the New York State Division of

Human Rights ("NYSHDR"), alleging individual and class claims of race, national

2

origin/ancestry, gender, and a combination of race, national origin, and/or ancestry plus gender discrimination, and retaliation against Defendant City (DOC).

9.      On October 3, 2022, Plaintiff filed a Second Class Charge of Discrimination with the EEOC, which was cross-filed with the NYSDHR, alleging individual and class claims of disability, race, national origin/ancestry, gender, and a combination of race, national origin, and/or ancestry plus gender discrimination and retaliation against Defendant City (DOC).

10.      On March 25, 2024, the EEOC issued a notice of right to sue for the first Class Charge.

## PARTIES

### A.      Plaintiff Leo P. Roland

11.      Plaintiff is and was a resident of the City of New York and was employed by Defendant City from on or around May 26, 2011 through November 11, 2022, when Defendant City constructively discharged him.

12.      Plaintiff is a Black male.

13.      Plaintiff's ethnicity and/or national origin is Haitian and Puerto Rican.

14.      At all times relevant herein, Plaintiff was employed by the Defendant City in DOC (New York City Department of Correction) until Defendant City constructively discharged him on or about November 11, 2022.

15.      At all times relevant herein, Plaintiff was an individual with multiple disabilities within the meaning of the Rehabilitation Act and the NYCHRL, including: (a) sciatica with back pain and other debilitating symptoms so severe that he was unable work for days; (b) osteoporosis in his knees with debilitating symptoms making him unable to work for days; (c)

3

severe high blood pressure with debilitating symptoms making him unable to work for days; and (d) severe COVID-19 for several days during which time he was unable to work.

16.     At all times relevant herein, Plaintiff was an individual with a "disability" as the term is defined under the Rehabilitation Act and NYCHRL.

17.     Plaintiff had record of disabilities, was regarded as disabled, perceived as disabled, and/or regarded as disabled.

18.     At all times relevant herein, Plaintiff was qualified for the positions he held with Defendants.

19.     At all times during his employment with Defendants, Plaintiff was qualified to perform and could perform the essential functions of his job with and/or without a reasonable accommodation.

20.     At all times relevant herein, Plaintiff was a covered employee within the meaning of Title VII, the Rehabilitation Act, the FMLA, and the NYCHRL.

21.     At all times relevant herein, Plaintiff was a person, natural person, and/or employee within the meaning of the NYCHRL.

22.     At all times relevant herein, Plaintiff was employed by Defendants within the meaning of Title VII, the Rehabilitation Act, the FMLA, and the NYCHRL.

23.     At all times relevant to the Class Action Complaint ("Complaint"), Plaintiff was an FMLA "eligible employee" pursuant to 29 U.S.C. § 2611(2), because he had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, and the total number of employees of Defendant City was fifty or more employees within seventy-five miles of Plaintiff's worksite.

4

24.     At all times relevant to the Complaint, Plaintiff had 12 workweeks of FMLA leave remaining, under any calculation of FMLA leave entitlement permitted by 29 C.F.R. § 825.200.

25.     Plaintiff was entitled to FMLA leave for his serious health condition of bilateral severe osteoarthritis in both knees, requiring recuperation and/or total knee replacement, pursuant to 29 C.F.R. § 825.113(a) and 29 C.F.R. § 825.115(a), (c)-(f).

26.     Plaintiff was also entitled to FMLA leave for his serious health condition(s): (a) sciatica with back pain and other debilitating symptoms so severe that he was unable work for days, (b) osteoporosis in his knees with debilitating symptoms making him unable to work for days, (c) high blood pressure so severe with debilitating symptoms making him unable to work for days, and (d) severe COVID-19 for several days during which time he was unable to work.

**B.     Defendant City**

27.     Defendant City is a municipal corporation or entity created and authorized under the laws of the State of New York.

28.     Upon information and belief, Defendant City manages and finances its divisions, departments and/or agencies, including DOC, DOC's Investigation Division ("ID"), and DOC's Health Management Division ("HMD").

29.     At all times relevant to the Complaint, as well as in the year preceding such relevant times, Defendant City employed more than four persons in its employ as employees and/or independent contractors.

30.     At all times relevant to the Complaint, Defendant City employed more than fifteen persons in its employ as employees.

31.     Upon information and belief, Defendant City regularly maintained control, oversight, and direction over the operation of its departments, divisions, agencies, including their employment, labor, and leave related practices.

32.     Upon information and belief, DOC controls and oversees the care and custody of individuals awaiting trial in New York City or who are convicted and sentenced to one year or less of jail time.

33.     Upon information and belief, DOC's headquarters is located at 75-20 Astoria Blvd., East Elmhurst, NY 11370.

34.     DOC's ID (the Investigation Division) is a special division within DOC responsible for, among other responsibilities, investigating allegations against DOC's staff and/or inmates involving use(s) of force ("UOF") or allegations of UOF, investigating allegations of sexual misconduct by staff on inmates or inmate on inmate, approving promotions for uniformed ranks where appropriate, approving the Good Guy Letter afforded to retirees (*i.e.*, a letter typically required to obtain future law enforcement positions requiring use of firearms), assessing administrative transfers, and drug testing employees or inmates.  ID is allowed to enforce any policies, directives, rules and regulations stipulated by DOC.

35.     The Deputy Commissioner of ID reports directly to the NYC DOC Commissioner and is appointed by the NYC DOC Commissioner.

36.     Upon information and belief, ID's headquarters is located at 75-20 Astoria Boulevard East, Room 350, Elmhurst, NY 11370.

37.     Upon information and belief, HMD is the health division within DOC responsible for evaluating, monitoring, and reviewing correction officers' sick leave and/or medically monitored restrictions.

38.     Upon information and belief, HMD's headquarters is located at 1 Lefrak City Plz. # 16, 15th Floor, Flushing, NY 11368.

39.     A reference to "Defendant City" or "City" in this Complaint encompasses DOC, ID, HMD, as departments, divisions, and/or agencies of Defendant City, and any reference to DOC, ID, HMD, and/or any other Defendant City agency, division and/or department is synonymous to referencing "Defendant City" or "City" in this Complaint because the Defendant City maintains control, oversight, and direction over the operation of its departments, agencies, and/or divisions.

40.     At all times relevant to the Complaint, Defendant City was Plaintiff's employer within the meaning of Title VII, the Rehabilitation Act, the FMLA, and the NYCHRL.

41.     At all times relevant to the Complaint, Defendant City employed more than 50 employees within seventy-five miles of Plaintiff's worksite(s).

42.     At all times relevant herein, Defendant City was an employer within the meaning of the Title VII, Rehabilitation Act, FMLA, and NYCHRL.

43.     At all times relevant to the Complaint, Defendant City is a public agency within the meaning of the FMLA.

44.     At all times relevant to the Complaint, Defendant City was a covered employer and/or joint employer within the meaning of the NYCHRL.

45.     At all times relevant herein, Defendant City was a person within the meaning of the NYCHRL.

46.     Defendant City's unlawful actions in violation of NYCHRL had an impact within New York City, including at the Eric M. Taylor Center ("EMTC"), the Otis Bantum Correctional Facility ("OBCC"), and ID headquarters.

7

**C.      Defendant Townsend**

47.      Upon information and belief, in or around 2016, Defendant Townsend began working as a Deputy General Counsel in the Trials Division for DOC.

48.      Defendant Townsend was the Deputy Commissioner of DOC's Intelligence, Investigation, and Trials Division from approximately April 2018 to February 2022.

49.      In this Deputy Commissioner role, Defendant Townsend oversaw all of ID's operations, including approval of all charges or disciplinary actions against staff.

50.      At all times relevant herein, Defendant Townsend was an employee and/or agent of Defendant City.

51.      At all times relevant herein, Defendant Townsend was a person and/or natural person within the meaning of the NYCHRL.

52.      Defendant Townsend's unlawful actions in violation of NYCHRL had an impact within New York City, including at EMTC, OBCC, and ID headquarters.

**D.      Defendant Ruben Benitez**

53.      Upon information and belief, Defendant Benitez is the Assistant Commissioner of the ID.

54.      In this role, Defendant Benitez was second in command in overseeing all of ID's operations.

55.       Defendant Benitez was the second in command of the ID when Defendant Townsend was the head of ID.

56.      Upon information and belief, Defendant Benitez was a key decisionmaker with regard to charges or disciplinary actions being taken and/or pursued against ID staff.

57.     At all times relevant herein, Defendant Benitez was an employee and/or agent of the Defendant City.

58.     At all times relevant herein, Defendant Benitez was a person and/or natural person within the meaning of the NYCHRL.

59.     Defendant Benitez's unlawful actions in violation of NYCHRL had an impact within New York City, including at the EMTC, OBCC, and ID.

## FACTUAL BACKGROUND

### Plaintiff Has Excellent Academic and Professional Credentials

60.     Plaintiff earned a Bachelor's of Science in Economics and Finance in 1991 from Manhattanville College.

61.     Plaintiff had a previous successful career on Wall Street as a bond analyst. Plaintiff closed high profile cases as a bond analyst and reached Assistant Vice President level at the firm he worked for.  When the firm downsized in or around 2006, Plaintiff was self-employed for several years and then embarked on a career with DOC as a Correction Officer in May 2011.

### Plaintiff Was a Dedicated and High-Performing Employee of Defendant City

62.     On or about May 26, 2011, Plaintiff joined DOC's Correction Academy and graduated in or around September 2011.

63.     Subsequent to graduating from the DOC's Correction Academy, DOC assigned Plaintiff to the EMTC, a jail facility on Rikers Island, where he worked as a Correction Officer until 2013.  Plaintiff had an exemplary record during his time at EMTC.  Plaintiff had no charges or write ups for lateness or absences.

9

64.     Plaintiff put in for a transfer to DOC's Manhattan Detention Complex ("MDC"), which DOC granted.  Plaintiff worked as a Correction Officer for MDC from 2013 (the year he was transferred) through 2015.  Plaintiff had an exemplary record at MDC.  Plaintiff was never written up or given a Memorandum of Complaint (MOC charge).

65.     Plaintiff put in for a transfer to DOC's ID (Investigation Division) -- a very selective division.  Plaintiff was part of the first line of Correction Officers reassigned to ID. The selection process of the ID was comprehensive.  At that time, Correction Officers applying to transfer to ID typically had to demonstrate excellent writing skills in addition to having a spotless disciplinary record.  Beyond submitting a resume and undergoing a formal interview, Plaintiff's disciplinary records (or lack thereof) and attendance (lateness and/or absences) were reviewed.  Excessive lateness and absences would typically disqualify candidates.  Given Plaintiff's credentials and exemplary record while at DOC, Plaintiff was selected and transferred to the ID in January 2015.   Plaintiff's assignment to ID within such a short timeframe is a testament to his work ethic and professionalism.

66.     From January 2015 through on or about August 20, 2021, when Plaintiff was unlawfully transferred out of ID in retaliation for his protected activity and/or because of his race and/or race plus gender, Plaintiff worked for the Defendant DOC's ID.

67.     In the ID, Plaintiff primarily investigated UOF (use of force) by DOC's staff cases or cases involving allegations of UOF by DOC's staff.  He also investigated sexual harassment cases, an inmate death case, and several Prison Rape Elimination Action cases.

***Plaintiff Was an Exemplary Employee in ID***

68.     Plaintiff passed his probationary period in ID in four months and was assigned to the ID Rikers Island trailer office where he reported to Supervisor Investigator Difo ("Supervisor

Difo") -- a Black male -- and Deputy Director Steve Peoples ("Deputy Director Peoples") -- a Black male.

69.     Plaintiff performed his duties so well that the Deputy Commissioner Michael Blake ("Deputy Commissioner Blake") -- a Black male -- who was the head of ID at the time, requested that Plaintiff be moved to headquarters to replace an investigator who was leaving ID. Plaintiff was told by Deputy Director Peoples that Deputy Commissioner Blake wanted Plaintiff to work in headquarters because of Plaintiff's work ethic.  Apparently, because of Plaintiff's exceptional work Deputy Director Peoples, did not want Plaintiff to leave his unit and offered Deputy Commissioner Blake other investigators, but Deputy Commissioner Blake insisted on Plaintiff working with him.

70.     Plaintiff transitioned to headquarters in or around the summer of 2015 where he reported to Supervisor Christina Falzon ("Supervisor Falzon") who was in charge of the George Motchan Detention Center ("GMDC") team.  GMDC is a jail facility in Rikers Island.

71.     Because of his work performance, Plaintiff (who was an investigator for less than one year) was assigned cases that were typically reserved for seasoned investigators with years of experience.  Plaintiff accepted these assignments and rose to the challenge.  Under Supervisor Falzon, Plaintiff closed at least three high profile cases, including: (1) the death of a young detainee in custody by suicide; (2) the sexual harassment of a female detainee by a civilian doctor, which Plaintiff was able to substantiate; and (3) the assault of an inmate by several correction officers via video surveillance.

72.     In the sexual harassment matter, the doctor was subsequently removed from the female jail based on Plaintiff's recommendations and newspaper articles supporting Plaintiff's findings.

11

73.     With regard to the assault of an inmate by several correction officers, Plaintiff reported the matter to upper management and was assigned the matter.  The case was eventually taken to the New York City Department of Investigation ("NYC DOI") after ID recommended criminal prosecution based on Plaintiff's investigative report.  NYC DOI took it over for prosecution, the correction officers were ultimately prosecuted, and Plaintiff testified in court. The correction officers were ultimately found guilty and NYC DOI acknowledged Plaintiff's work on the matter.

***Defendant City Pushes Deputy Commissioner Blake and Supervisor Difo -- Two Black Males -- Out of ID***

74.     Upon information and belief, in or around December 2015, Defendant City pushed Deputy Commissioner Blake -- a Black male -- out of the ID and replaced him with Deputy Commissioner Gregory Kuczinski ("Deputy Commissioner Kuczinski") -- a Caucasian male.  Initially, Deputy Commissioner Kuczinski served as the acting head of the division until April 2016 when he became the official head of the ID.

75.     Upon information and belief, in or around February 2016, Defendant pushed Supervisor Difo -- a Black male -- to resign from ID after he was passed over by Deputy Commissioner Kuczinski (a Caucasian male) for the Deputy Director of Investigation position for Michael Bardales -- a Caucasian male (upon information and belief, Italian ethnicity and/or ancestry).

76.     Supervisor Difo had a reputation for being a brilliant investigator.

77.     Upon information and belief, Supervisor Difo was more qualified than Michael Bardales and had impressive educational credentials.

***Plaintiff Is Transferred within ID to MDC & Continues to Excel***

78.      In or around 2016, Plaintiff was transferred to the newly opened MDC ID
(Manhattan Detention Complex – Investigation Division) office located in the MDC and reported
to Supervisor Alberto Rodriguez ("Supervisor Rodriguez").

79.      Supervisor Rodriguez stated to Plaintiff and Michael Bardales that Plaintiff was
one of his best investigators.

80.      On or around December 8, 2016, Deputy Commissioner Gregory Kuczinski (the
head of ID at the time) gave Plaintiff a Certificate of Recognition for closing the most cases
within 180 days on his team and for his "good example and professional demeanor representing
[his] Team and the Investigation Division."  Plaintiff was nominated for the certificate by
Supervisor Rodriguez and Deputy Director of Investigation Michael Bardales ("DDI Bardales").

81.      Plaintiff's work at the MDC ID was also stellar.  Because of his reputation for
being a thorough and hardworking investigator, Plaintiff was assigned the highest number of
cases and the most difficult complex cases.

82.      Plaintiff had several supervisors at the MDC ID and was well respected by all of
them because of his work and diligence.

83.      Plaintiff worked as an investigator for the MDC ID until he was unlawfully
transferred out of the ID in August 2021, as discussed below.

***Deputy Commissioner Kuczinski Is Terminated from ID***

84.      Deputy Commissioner Kuczinski was terminated and left the ID in or around
2017.  While a replacement was sought, Antonio Cruz became the Acting Deputy Commissioner
of ID ("Acting Deputy Commissioner Cruz").  Acting Deputy Commissioner Cruz is a
Caucasian, fair-colored, and/or non-Black Hispanic male.

***DOC Appoints Defendant Townsend (a Caucasian Woman) to Lead ID***

85.     Upon information and belief, in or around 2016, Defendant Townsend began working as a Deputy General Counsel in the Trials Division for DOC.

86.     In or around 2018, DOC replaced Acting Deputy Commissioner Cruz with Defendant Townsend as Deputy Commissioner of the Intelligence, Investigation & Trials Division of DOC.  As such, Defendant Townsend became the new head of ID.  She became the new head of the Trials Division as well because the ID and Trials divisions were newly combined divisions.  Defendant Townsend was also put in charge of the Correction Intelligence Bureau ("CIB") of DOC.

87.     Upon information and belief, prior to Defendant Townsend leading all three divisions (ID, Trials, and CIB), all three divisions were run separately.  Upon information and belief, the three divisions were previously run separately because of potential conflicts.

88.     Upon information and belief, soon after assuming her new role as head of ID, Defendant Townsend (a Caucasian female) immediately began aggressively investigating and processing personnel and charging and suspending officers, upon information and belief, especially Black male correction officers, though publicly she claimed to focus on UOF cases.

89.     Furthermore, under Defendant Townsend, ID continued to remain a primarily Caucasian and/or non-Black division within DOC, despite ID being charged with being the investigatory/disciplinary arm of DOC where the majority of DOC's Correction Officers are Black and/or Brown employees -- and the majority of individuals in DOC's custody are primarily Black and/or Brown.

90.     Upon information and belief, there has been a systematic pattern and practice in DOC of its investigatory arm (ID) being primarily constituted of non-Black and/or Caucasian employees, especially in its senior leadership.

91.     In addition, upon information and belief, under Defendant Townsend, Caucasian Correction Officers were more likely to be hired in the ID than Black Correction Officers and later more likely to be placed in a more prestigious unit over more qualified Black investigators. For example, Correction Officers Lupinacci and Cheeseman (both Caucasians with little to no experience) were hired to the ID and quickly provided preferred opportunities and/or posts by Defendant Townsend and/or Defendant Benitez.

92.     Moreover, under Defendant Townsend, civilian investigators, who were primarily Caucasian and/or non-Black, were preferentially selected over Correction Officers for the ID.  In addition, when Defendant Townsend hired Correction Officers for ID, from the pool of Correction Officers consisting primarily of Black Correction Officers, she disproportionately hired Caucasian Correction Officers.

93.     Upon information and belief, Defendant Townsend also hired some of her relatives into ID who were all (or primarily) Caucasian.

94.     For example, upon information and belief, Defendant Townsend hired and/or facilitated the hiring of her niece Gabrielle Radow ("Radow") (a Caucasian female) as a civilian investigator in ID, despite her, upon information and belief, having little relevant experience to be an investigator.  Similarly, upon information and belief, Defendant Townsend hired and/or facilitated the hiring of two Caucasian men who were related to her husband.

95.     Under Deputy Commissioner Townsend's tenure, new Caucasian investigators in ID were given promotions and placed in preferred units, like Investigator Cheeseman (a

Caucasian male) who was placed in Intel even though he had *no prior ID* experience.  In

contrast, senior non-Caucasian investigators requested the post and were denied.

96.     Investigator Cheeseman was similarly quickly moved up the ranks in ID despite

higher performing comparators, and eventually became a favorite of Defendant Townsend.

97.     As an additional example, in or around the first quarter of 2021, ID Civilian

Investigator Logan (Caucasian male) was promoted to the ID Intel Team with no peace officer or

correction officer experience over more qualified non-Caucasians and/or non-Caucasian males.

98.     An additional example is Tyler Stofer (a Caucasian civilian female), who began

employment with ID performing clerical work under Deputy Director of Investigation Wade

Carper ("DDI Carper") as an investigator trainee.  Tyler Stofer was quickly promoted to

Supervisor over more qualified non-Caucasian investigators.  She was then rapidly promoted

again to a Deputy Director of Investigation Division ("DDI") position, with Defendant City

passing over qualified and/or more qualified non-Caucasian supervisors who had been waiting

for such a promotion opportunity in ID.  Upon information and belief, the rapid professional

growth Tyler Stofer (a Caucasian female) experienced in ID would not have taken place had

Tyler Stofer been Black and/or a Black male.

99.     Similarly, Caucasian Correction Officers benefitted from a two-tiered set of

discipline standards, one favoring and applicable to Caucasians and/or Caucasian men, and the

other disfavoring non-Caucasians and/or non-Caucasian men.  For example, as discussed below,

upon information and belief, a Caucasian Hispanic Correction Officer left his loaded gun in a

public bathroom, which was recovered by someone else, and he remained in ID and kept his

preferred post with the Arrest Team. In contrast, Black and/or Black male Correction Officers --

like Plaintiff -- have been removed from ID for far less serious alleged and/or actual conduct.

100.    Additionally, upon information and belief, during Defendant Townsend's almost four-year tenure from April 2018 to February 2022 as head of ID, <u>no</u> Black males were elevated to the senior ranks of ID.

***ID (the Investigatory/Disciplinary Arm of DOC) Has Consistently Had a Lack of Diversity, Especially of Black Males, at Its Most Senior Levels***

101.    Generally, the head of DOC's ID holds the title "Deputy Commissioner of Investigation Division."  In ID, generally, the hierarchy of the most senior ranks after the Deputy Commissioner of Investigation Division title include: Assistant Deputy Commissioner of Investigation Division, Director, and Deputy Director of Investigation Division (DDI).

102.    When Plaintiff commenced his employment with ID in 2015, the head of ID was a Black male, Deputy Commissioner Blake.  Upon information and belief, as set forth above, Defendant City pushed Deputy Commissioner Blake out of his position in ID.

103.    Upon information and belief, for almost a <u>decade</u> since approximately December 2015, ID has had ***no*** Black males head the ID.

104.    From approximately December 2015 through 2022, only ***one*** Black male, Deputy Director Peoples, held a senior level title in ID out of approximately 18 employees in ID senior leadership.  In addition, there were no Black males in the most senior level executive positions in ID during this time.

105.    Upon information and belief, Deputy Director Peoples (the one Black male in a senior leadership role at the time) was involuntarily transferred out of the ID to the Transportation Unit in or about 2022, and subsequently forced to resign from DOC.

106.    Since approximately December 2015 through at least early 2022, primarily Caucasians and/or fair-colored (non-Black) individuals have held positions at senior levels in the ID.

107.    Moreover, since 2015, middle management (e.g., supervisors) in the ID had also consisted primarily of Caucasian, Hispanic, and/or fair-colored (non-Black) individuals.  There were also more Caucasian, Hispanic, and/or fair-colored (non-Black) captains in the ID than Black male captains despite the pool of Correction Officers being primarily Black.

108.    Furthermore, upon information and belief, there have been **no** Black males in middle management in the ID since approximately 2016-2017 when Supervisor Difo (a Black male) was forced to resign after being passed over for multiple promotions over his Caucasian and/or non-Black colleagues.

109.    Similarly, upon information and belief, under Sarena Townsend's tenure from April 2018 to February 2022, there were no Black males in upper management in the ID in the positions of Deputy Director, Director, and/or Assistant Commissioner.

### Plaintiff Is Subjected to Discriminatory Treatment Based on His Race (Black) or Haitian Ancestry (National Origin)

110.    During his employment in the ID, Defendant City subjected Plaintiff to discriminatory treatment and a race-based and/or Haitian-based hostile work environment by Defendant Benitez, Assistant Commissioner of the ID and second in command in ID.

111.    During approximately May 2018, while in the pantry at ID headquarters having coffee, a female investigator asked Plaintiff where he was from originally.  Defendant Benitez, who came into the pantry for coffee, overheard Plaintiff responding to the female investigator that he was half Puerto Rican.  Defendant Benitez interjected himself in the conversation cutting Plaintiff off and disparagingly yelled at Plaintiff, stating, in sum and substance, "You are not Puerto Rican."  Defendant Benitez continued his disparaging rant by stating, in sum and substance, that he was Puerto Rican and that he "knew who his people were and [Plaintiff] was not one of them."

18

112.   Plaintiff calmly explained that he was raised by his mother who is Haitian, but that his father is Puerto Rican.

113.   Defendant Benitez became *visibly* angry that Plaintiff continued to refer to himself as part Puerto Rican.

114.   Plaintiff changed the subject, as it was evident that Defendant Benitez had a racially discriminatory view that being a "real" or "legitimate" "Puerto Rican" constituted being a non-Black person.

115.   Upon information and belief, Defendant Benitez made this statement because Plaintiff is half of Haitian ancestry and/or Black, and this statement was an explicit reference to Plaintiff not being considered Puerto Rican by Assistant Commissioner Benitez because he is Black, of Haitian ethnicity, not fair colored, and/or not Caucasian.

116.   Upon information and belief, Defendant Benitez is a Caucasian and/or fair-colored (non-Black) Puerto Rican.

117.   Upon information and belief, Defendant Benitez carries animus against Black persons, and treats Black persons less well than non-Blacks (including non-Black Hispanics).

118.   Another ID employee, who is both Black and Puerto Rican, also told Plaintiff that they were given the cold shoulder by Defendant Benitez, because he does not acknowledge the person as being Puerto Rican because they are also Black.  The person has been denied multiple promotions in ID, including the DDI position.

119.   Upon information and belief, Defendant Benitez has a problem with the miscegenation of Puerto Ricans with those of other ancestries and/or national origins with darked complexions, and/or the existence of mixed ethnicity Puerto Ricans -- like Plaintiff.

***Plaintiff is Passed Over for a Promotion in Favor of a Caucasian and Hispanic with Less Correction Officer and Investigation Division Experience Than He***

19

120.    During approximately March 2018, Plaintiff -- with approximately three years of experience in ID and seven years of experience as a Correction Officer -- was denied a promotion to the NYC DOI (NYC Department of Investigation) in favor of less qualified non-Black applicants: (1) Investigator Lupinacci a Caucasian male with less ID and overall Correction Officer experience than Plaintiff; and (2) Crossman a Hispanic woman with only one year of experience in ID and three years as a Correction Officer.

121.    Upon information and belief, Defendant Benitez had influence regarding who NYC DOI hiring process because the ID had to recommend individuals to the NYC DOI.  Upon information and belief, Defendant Benitez made recommendations of individuals to the NYC DOI because of their race and/or race plus gender (or at least based in part on his race and/or race plus gender).

122.    Upon information and belief, Defendant Benitez did not recommend Plaintiff (a Black male) to be hired by NYC DOI because of his race and/or race plus gender (or at least based in part on his race and/or race plus gender).

***Plaintiff Is Selected to Be Part of a High-Profile Squad***

123.    In or around early 2019, Plaintiff was selected to be part of a newly created team, Use of Force Priority Squad ("UPS"), which was charged with high profile investigation reporting directly to upper management.

124.    Upon information and belief, Defendant Townsend was not involved in Plaintiff's selection and, as she would later admit, did not know that Plaintiff had been selected.

125.    Upon information and belief, every team supervisor recommended their best investigators.  Plaintiff was selected but declined because of the increased commute without a pay increase.

***Defendant City Suspends Plaintiff for Doing His Job Correctly***

126.    On or about August 16, 2019, Defendant City wrongfully suspended Plaintiff for

providing an *accurate* report regarding an inmate incident.

127.    Plaintiff was working alone at the MDC ID office when an inmate barricade

transpired on the roof.  The Genetec (DOC's security footage system) footage was "ghosted"

(meaning taken off the feed so that those with access could not watch the video of what was

transpiring).  As a result, Plaintiff did not have a way to provide updates to his supervisors who

were working out of headquarters as required.

128.    Plaintiff informed DOC-IT of the situation and that he needed access, but he

needed to send an update to senior management before IT could respond.  Therefore, being

proactive and a team player, Plaintiff reported to the area alone to conduct a cursory review of

the incident, gather information, and speak with members of service (MOS) about the event that

unfolded.

129.    Plaintiff then returned to the office and emailed his supervisors Supervisor Lesley

Bedeau ("Supervisor Bedeau"), DDI Carper, and Headquarters Supervisor Maritza Batista

("Supervisor Batista"), concerning his initial report on the investigation of the inmate barricade

incident.

130.    In fact, Supervisor Batista had requested information from Plaintiff on the status

of the inmate barricade incident and had insisted that Plaintiff send her some information on the

incident to put in her End of Tour Report.

131.    Supervisor Bedeau should have been working out of the MDC ID office,

however, Defendant Townsend and DDI Bardales allowed her to work out of the Queens

headquarters office to facilitate her commute to Long Island.  Had she been at the MDC ID office, she would have been the one briefing management.

132.    The content of Plaintiff's report was entirely accurate.

133.    DDI Carper even reviewed Plaintiff's email and thanked Plaintiff for his work and for taking initiative.

134.    Upon information and belief, DDI Carper forwarded Plaintiff's email to Defendant Townsend so she would have an account (details) of the incident.  Upon information and belief, Plaintiff's email was eventually forwarded to Board of Correction and then-DOC Commissioner Cynthia Brann ("Commissioner Brann") -- a Caucasian female.  During that time, Commissioner Brann was under a significant amount of scrutiny because of level of violence against both DOC's correction officers and those incarcerated at DOC's facilities, namely Rikers Island.

135.    Upon information and belief, Commissioner Brann called Defendant Townsend and expressed her displeasure with Plaintiff's report (irrespective of the accuracy of the report) because, upon information and belief, it was not in line with the narrative that Commissioner Brann, Defendant City, and/or DOC wanted to portray regarding DOC.  Upon information and belief, Commissioner Brann did not want the truth about the barricade incident to come out and was trying to diffuse the incident to the media and the Board of Correction when Defendant Townsend forwarded Plaintiff's report to her and the Board of Correction.

136.    Upon information and belief, Commissioner Brann yelled at Defendant Townsend and, in turn, Defendant Townsend improperly punished Plaintiff (a Black male), even though Plaintiff's email was: (a) accurate, (b) followed the chain of command, (c) was approved by DDI Carper, and (d) was forwarded by DDI Carper (not Plaintiff) to Defendant Townsend.

137.     Nonetheless, upon information and belief, Defendant Townsend would not have treated Plaintiff so harshly if he were a Caucasian, Caucasian male, non-Black, and/or non-Black male employee.

138.     Upon information and belief, instead of standing up for Plaintiff (a Black male) who was doing his job by accurately reporting an inmate barricade, Defendant Townsend (a Caucasian female) called Plaintiff (a Black male) and screamed at him for simply doing his job.

139.     Defendant Townsend even threatened to expel Plaintiff out of ID -- which she eventually did -- and falsely claimed that Plaintiff (a Black male with a stellar track record in ID) was making things up in his email.  Plaintiff's email summarized the statements made by several officers who knew of the incident.  In fact, newspaper articles[1] that followed the incident also supported the content of Plaintiff's email.

140.     In an attempt to protect its narrative, Defendant Townsend *wrongfully suspended* Plaintiff for seven working days *without pay* for allegedly providing inaccurate information in his incident report even though Plaintiff had done his job by reporting accurate information.

141.     As further evidence of the pretextual nature of this suspension, Plaintiff was never charged in connection with or for this suspension with a Memorandum of Complaint (MOC), pursuant to DOC policy and/or practice.

142.     Upon information and belief, prior to the suspension there was also no investigation concerning the stated basis for the suspension, a practice Defendant Townsend

---

[1]     Chelsia Marcius & Thomas Tracy, *Inmates clash with correction officers in standoff at Manhattan Detention Complex*, DAILY NEWS, Aug. 16, 2019, https://www.nydailynews.com/new-york/nyc-crime/ny-hostage-situation-at-manhattan-detention-complex-20190816-64bef733bzgqxetbq73ercovya-story.html.

would later characterize in statements to the media as something that should not generally be done: "You really need to do an investigation before suspending somebody":

> ***What are the hurdles that prevent there being an effective disciplinary process to deal with these absences and this culture of corruption that you're describing?***
>
> The fastest way to discipline somebody is to suspend them, but you have to wield that sword in a limited fashion. You can't just suspend everybody every time they do something. You really need to do an investigation before suspending somebody. Certain cases where it's brazen and obvious, I'm comfortable suspending somebody. But the typical disciplinary process is a lengty, lengthy process.[2]

143.    Upon information and belief, Defendant Townsend would not have treated and/or disciplined Plaintiff as harshly if he were a Caucasian, Caucasian male, non-Black, and/or non-Black male employee.

144.    Plaintiff's job in the ID had been to keep inmates and staff safe.  Yet when relaying observations, DOC's management acted as if this were not part of his job.  The involved staff wrote UOF reports and at least one staff member was injured and left the facility via EMS.

145.    Plaintiff's superior (DDI Carper) served Plaintiff with the suspension on or about August 16, 2019, though he was distraught and teary eyed when doing so.

146.    DDI Carper told Plaintiff that serving Plaintiff with the suspension -- the unwarranted suspension -- was the hardest thing he ever had to do.  Specifically, he stated that the discipline was not coming from him, that his words did not mean much, and that Defendant

---

[2]     JB Nicholas*, Former Rikers Watchdog: 'This Whole Fucking Thing Is a Racket'*, HELLS GATE, May 3, 2022, https://hellgatenyc.com/nycs-former-jails-investigator-identifies-top-problem-on-rikers-corruption.

Townsend told DDI Carper to suspend Plaintiff due to an ongoing investigation into the inmate barricade matter.

147.    The suspension was for 7 business/working days covering a 10-day period during which time his insurance and benefits were also suspended.  Plaintiff also lost ten days from his pension funding (NYCERS) that he needed to make up, pushing his retirement date back by 10 days.

148.    Plaintiff contacted the union lawyers.  Upon information and belief, the union lawyer, Steven Isaacs of Kholer and Isaacs LLP was so shocked that he contacted Defendant Townsend, who apparently tried to discredit Plaintiff's character and falsely claimed that Plaintiff (a Black male) was not a good employee even though she could not reference any disciplinary action taken against Plaintiff.  Upon information and belief, attorney Issacs told Defendant Townsend that Plaintiff had received a certificate for his work in ID and was also selected to be part of the elite Use of Force Priority Squad (UPS).  Upon information and belief, Defendant Townsend dismissed the union lawyer saying that it was not her call to select Plaintiff to the Use of Force Priority Squad (UPS).

149.    Upon information and belief, Defendant Townsend, Commissioner Brann, and/or Defendant City would not have treated Plaintiff and/or disciplined him as harshly if he were a Caucasian, Caucasian male, non-Black, and/or non-Black male employee.

150.    Upon information and belief, Caucasian or non-Black employees (or Caucasian male and/or non-Black male employees) were allowed to accurately report incidents at DOC's jails and/or comment on the conditions at DOC's jails, including Defendant Townsend herself. However, unlike Plaintiff's Caucasian and/or non-Black colleagues, Plaintiff (a Black male) was disfavored by being subjected to a two-tiered set of performance and conduct standards -- one

favoring Caucasian and/or Caucasian males and the other disfavoring Black and/or Black male employees.  As a result, Plaintiff was not allowed to accurately report on an inmate barricade incident without retribution.

151.    Plaintiff sent a letter to the Summary Suspension Review Committee challenging the suspension as soon as he got home but never received a reply to his letter.

152.    Tellingly, following an investigation, Defendant City and/or Defendant Townsend *never* brought administrative charges against Plaintiff for having done anything wrong.  Yet, Defendant City and/or Defendant Townsend never gave Plaintiff back the seven business days time for which Defendant City and/or Defendant Townsend wrongfully suspended him.

153.    Had Plaintiff been non-Black or Caucasian, Plaintiff would not have been disciplined, or as severely disciplined, for simply doing his job.

154.    Upon information and belief, Plaintiff would not have been suspended for filing this accurate report if he were Caucasian.

155.    Because of his wrongful suspension in August 2019, to the extent it was possible, Plaintiff tried to stay clear of Defendant Townsend, given that Plaintiff had not done anything wrong (which she knew) when he reported on the inmate barricade incident.

156.    However, during the COVID-19 pandemic, Plaintiff worked with Defendant Townsend's Caucasian niece Radow, a civilian investigator assigned to Intake whom Defendant Townsend had hired (or facilitated hiring) into ID, despite her, upon information and belief, lack of experience.

157.    During this time, Defendant Townsend's Caucasian niece Radow worked from home and Plaintiff (a uniformed employee) worked in person.  Defendant Townsend's Caucasian niece Radow (who had far less experience that Plaintiff in ID) expected Plaintiff (a Black man)

to carry out her workload.  She often failed to provide Plaintiff with a complete package to begin investigations, such as inmate interviews and photos of the incidents, failed to request videos of incidents, which Plaintiff then had to go back and complete.

158.    Irrespective of Plaintiff's years of dedicated service to DOC and ID, Defendant Townsend's niece (a Caucasian woman) was given preferential treatment by DOC and Defendant Townsend because of her race and/or gender (Caucasian female) and familial relationship with Defendant Townsend.

**_Plaintiff Is Temporarily Assigned to Rikers & Warns a Few Fellow Corrections Officers in a Private Audio Chat Message of the Horrible Conditions_**

159.    On or about July 17-18, 2021, Plaintiff was temporarily assigned for two days to assist at the Anna M. Kross Center ("AMKC"), a Rikers Island jail facility, in a Correction Officer role (non-ID role).  This temporary assignment was due to shortage of staff at Rikers Island.  DOC began to pull uniformed staff from special units to work in a correction officer capacity to alleviate the triple tours in jails.  However, in the first waves of redeployment, many Caucasian and/or Caucasian males assigned to ID were _not_ redeployed to Rikers Island, such as Jeffrey Leibrock, Picard, and John Zadwydas.

160.    As Plaintiff had not worked a corrections role at Rikers Island for six and a half years, Plaintiff was astounded by the reality of the horrible working conditions at Rikers Island during his temporary assignment.

161.    Subsequently, on or about July 18, 2021, after returning from his shift, Plaintiff had a WhatsApp non-public audio message recoding communication with a small group of seven Correction Officer colleagues who were familiar to Plaintiff and assigned to MDC, where Plaintiff was assigned prior to ID, stating, in sum and substance:

You know, fellows, B, porters, Paul, listen, and the rest of you guys, uh, this is Roland. I worked, uh, at AMKC yesterday, I was deployed, redeployed. I worked the intake from 7:00 AM to 1:30 AM, almost uh, what is it? 16 hours in total. Um, what I saw was never seen. The DOC jails, uh, run that way. *Guys were pretty much smoking in their pens, right in front of COs, you can't even tell them to, uh, uh, put it out.* Um, the COs told me that this is, this is normal. Um, as long as they're not setting their pen on fire, this is the only time they respond. Uh, guys are, you know, in their pens for over 12 hours, no one gets rehoused. Um, this is crazy, man. I couldn't do anything, because then I'll be disrupting the program, because, um, the officers told me they gotta get, uh . . . OSIU has to rehouse these guys and they can't do anything.

Facility cannot rehouse inmates. Everything has to come from OSIU, and, and OSIU will take a whole day before responding. And when they do respond, inmates refuse to go to the house or the house doesn't want the inmate, they have to take the inmate back to the, uh, intake and have the inmate stay for another 12 hours to, to wait for OSI. This shit is crazy, alright? Um, I'm ID and they're treating me like, you know, like, yeah, that's the way it is, you know? It's just that shit is crazy. Uh, I don't know what the solution is, brothers, but be safe. Um, I prevented a couple of, uh, officers yesterday from getting into fights with inmates, because I didn't wanna do the paperwork, I didn't wanna have to write. I walked these guys away from the inmates, I tried to defuse the situation.

Uh, the inmates are walking in the, in the intake. Um, they refuse to be secured in the pens. They're walking, no shirt on. *Uh, some of them are even outside the pen, smoking, and uh, there's no control. Um, don't expect a probe team. You're not gonna get one. Okay?* There's no probe team, uh, there's no captain touring. Um, the place is just . . . . Once you go there, bro, you are stuck. You are stuck. Um, you know, you know, you are stuck for at least, uh, you know, uh, a triple, you know. Guys were bragging about, 'Oh, I did, I did 24 hours straight so I'm going to go home.'

Like, like a triple is acceptable. This shit is crazy, you know? Um, I don't know, bro. I don't know, man. Just be safe out there, fellows. Like I say, I, um, you know, more importantly, try not to get into a use of force with any inmates because *the department does not have your back.* Um, I just . . . You know, like I said, I was . . . I defused like at least four or five fights between inmates and staff. Um, you know, uh, 'cause *there would be no probe team, and oh, by the way, no doctors in the clinic.* There was one doctor who was actually working both C-71, uh, clinic as well as the AMKC main clinic. So,

which means that guys who had to be detoxed, um, um, I don't know, guys who had to go to the clinic for whatever reason were sitting in the pens all day long, waiting. This shit is . . . I can't even make this shit up, bro.

*This is the worst I've ever seen it.* Uh, like I say, I don't know if you saw the *Titanic, the boat hit the iceberg, the boat sunk, now we are at the point where, you know, dead bodies are floating in the ocean. That's, that's where DOC is right now.* Okay? Shit is . . . I don't know. All right, anyway, be safe, and uh, you know, watch your back and um, just make sure that you document everything, because at the end of the day, when the shit hits the fan, they're gonna always come back to you as the person who, who didn't do something right, you know? But you can't do anything, you know? Give you an example. I couldn't get the guy in the pen. How am I gonna get him in the pen? Staff don't have my back. And second of all, I'm looking for a use of force if I do that. And then who's gonna back me up*? The probe team ain't coming, the intake captain is not around.* And so, I'm just basically . . . It's a useless battle, you know? Alright, fellows, stay safe.

(emphasis added).

162.    One of these colleagues, without Plaintiff's knowledge or authorization, forwarded Plaintiff's private group WhatsApp recording to other persons (*i.e.*, correction officers) outside of the private group, which was then, upon information and belief, further circulated amongst correction officers without Plaintiff's knowledge or authorization.

163.    Upon information and belief, Defendant City never investigated and/or disciplined the Correction Officer who circulated Plaintiff's private message to other correction officers.

164.    Plaintiff's WhatsApp recording was a monologue narrating the uniquely bad working conditions for Correction Officers at Rikers -- where Plaintiff had recently been temporarily assigned for two days to assist -- all of which was a completely accurate description of the horrible working conditions for Correction Officers at Rikers.

165.     Plaintiff directly observed these conditions during his temporary assignment to Rikers Island for two days while still permanently assigned to the ID.

166.     Furthermore, the conditions at Rikers Island were publicly known and well documented for years by this time, as DOC was under the purview of a federal monitor based on a consent decree that it entered into in *Nunez v. City of New York et. al*., 11-cv-5845 (LTS) (SDNY), in or around October 2015.  While the *Nunez* lawsuit primarily alleged that DOC had engaged in a pattern and practice of unnecessary and excessive force, the Consent Decree took on a broad range of reforms to create an environment that protects those incarcerated by DOC, as well as to protect DOC's staff and Corrections Officers.

167.     By this point, in 2021, Rikers Island and the conditions at Rikers Island were well publicized in myriad ways.

168.     Upon information and belief, violence at Rikers Island -- impacting those incarcerated at Rikers Island and those working there -- became *worse* during Defendant Townsend's tenure and around the time that Plaintiff made his private comment on WhatsApp. For example, in 2019, Politico reported:  "Despite millions of dollars invested in efforts to stem persistent violence, statistics released Tuesday in the Mayor's Management Report show *that inmate attacks on other inmates, assaults on staff and use of force by guards against inmates have <u>risen significantly</u> at all city jails* — though most of the roughly 8,000 inmates are housed at Rikers" (emphasis added).[3]  In fact, in 2021, the federal monitor admitted that "'Data on uses of force, fights, stabbings, and slashings among people in custody and assaults on staff reveal

---

[3]     Erin Durkin, *New stats show surge in violence at Rikers Island*, Politico, Sept. 17, 2019, https://www.politico.com/states/new-york/albany/story/2019/09/17/new-stats-show-surge-in-violence-at-rikers-island-1193798.

*that 2021 has been the most dangerous year*' since the monitor began overseeing local lockups in 2015, the scathing 152-page report found."[4]  "While mostly focused on the first half of the year, the monitor's report also noted that there were 2,113 detainee assaults on staff between January and September 2021. 'This translates to nearly eight assaults on staff per day during the 273-day period,' the report said, adding the risk of attack 'is both frightening and stressful for staff.'"[5]

### *Plaintiff Is Unfairly Suspended and Punitively Permanently Transferred out of ID Because He Is a Black and/or Black Male Correction Officer Voicing Concerns about Working Conditions at Rikers Island*

169.    On or about July 20, 2021, DOC (ID) unfairly suspended Plaintiff *without pay* for 30 days for "conduct unbecoming," based on having sent this recording expressing concerns to Plaintiff's small group of Correction Officer colleagues about their working conditions.

170.    Plaintiff contested the suspension at the time because he had done nothing wrong.

171.    Following his refusal to accept that he deserved the suspension, Defendant City and/or Defendant Townsend offered Plaintiff a 10-day suspension with a Negotiated Plea Agreement and a retaliatory and/or discriminatory transfer to OBCC, which Plaintiff declined because he had not done anything wrong.

172.    Upon information and belief, had Plaintiff been non-Black and/or Caucasian, DOC (ID) would not have suspended him and/or disciplined him as harshly.

173.    Instead, Plaintiff was subjected to a two-tiered set of performance and conduct standards, one applicable to and disfavoring Black and/or Black male Correction Officers, like

---

[4]      Reuven Blau, *Rikers Report Calls 2021 'Most Dangerous Year' Amid Escalating Jailhouse Violence*, THE CITY, Dec. 6, 2021, https://www.thecity.nyc/2021/12/6/22821629/rikers-report-calls-2021-most-dangerous-year-amid-escalating-jailhouse-violence.

[5]      *Id.*

him, and one favoring Caucasian and/or Caucasian male Correction Officers who would not have been disciplined at all, or as harshly, for the same conduct and/or alleged conduct.

174.    Notably, Plaintiff was suspended for "conduct unbecoming," for *privately* stating the basic objective reality, that commentators, and *even later Defendant Townsend herself would repeatedly publicly say*, about the *horrible* and deteriorating conditions for both inmates and Correction Officers occurring at Rikers.

175.    In other words, instead of improving the actual conditions at Rikers, DOC punished Plaintiff (a Black male Correction Officer) for -- privately -- stating the reality of the conditions at Rikers in an effort to support his fellow Correction Officers working under the same conditions.

176.    In addition, upon information and belief, Defendant City was waiting for any opportunity to try and remove Plaintiff (a Black male) from ID for any non-meritorious reason, in order to open up a vacancy that could eventually be filled by the preferred demographic of a Caucasian and/or Caucasian male in ID.

177.    Following the termination of Plaintiff's 30-day suspension without pay, on or about August 20, 2021, DOC further discriminated and/or retaliated against Plaintiff by punitively and permanently transferring him out of the ID to *the <u>most violent</u> jail within Rikers Island* – the OBCC.[6]

---

[6]    Apparently, during approximately June 2022, DOC's internal records indicated that DOC was planning to shut down OBCC, "amid an agency-wide staffing crisis that's created deplorable and unsafe conditions at the jail's admissions building."  Gabrielle Fonrouge, *NYC shutting down Rikers facility over staffing crisis, conditions*, N.Y. POST, Jun. 17, 2022, https://nypost.com/2022/06/17/nyc-closing-rikers-island-facility-over-staffing-crisis/.

178.    Subsequently, the President of the New York City Correction Officers' Benevolent Association ("COBA") and a COBA attorney informed Plaintiff that Defendant Townsend and Defendant Benitez wanted Plaintiff out of ID.

179.    Upon information and belief, Defendant Townsend and Defendant Benitez (who demonstrated with his previous direct comments to Plaintiff that he holds racial animus towards Black and/or Haitian persons) decided and/or were involved in the decision to suspend Plaintiff for thirty days and/or punitively permanently reassign Plaintiff.

180.    When Plaintiff returned from his suspension, on or about August 20, 2021, he went to pick up his shield from ID at headquarters, other investigators told him that he did nothing wrong to be suspended but that Defendant Townsend and Defendant Benitez wanted him out of ID.  Specifically, Correction Officer Investigators Brown (Intel Team) and Claxton (ID delegate and part of the Intel Team) stated to Plaintiff that he had done nothing wrong and that Defendant Townsend and Defendant Benitez simply wanted Plaintiff out of ID.

181.    Correction Officer Investigator Brown admitted to Plaintiff that DOC had nothing to charge him with but that Defendant Townsend had simply ordered him to find a charge to charge Plaintiff with.

182.    Prior to working in the ID, Plaintiff had been assigned to the MDC/Manhattan Court, which would have been the standard place to reassign Plaintiff -- although any reassignment by ID (Defendant City) would have been *highly punitive for a member of ID like Plaintiff*.

183.    Indeed, given Plaintiff's investigative role at ID, which involved investigating and ultimately charging staff and inmates with violations, DOC's, Defendant Townsend's, and/or Defendant Benitez's punitive reassignment of Plaintiff to the Rikers Island jail facility (OBCC)

33

put Plaintiff in real and immediate danger (beyond the already dangerous conditions there) because Plaintiff *had investigated and/or charged inmates and staff at this and/or other jail facilities*.

184.    Given Plaintiff's position in ID for over 6 years at that time, DOC, Defendant Townsend and/or Defendant Benitez's punitive permanent reassignment of Plaintiff to Rikers Island (OBCC) necessarily, and knowingly, put him in *grave physical danger* from both other Correction Officers and inmates because he had investigated hundreds of Correction Officers and inmates.

185.    Upon information and belief, DOC, Defendant Townsend and/or Defendant Benitez permanently transferred Plaintiff (a Black man) to Rikers Island without any regard for his safety or well-being given his investigatory role in ID.

186.    Upon information and belief, DOC, Defendant Townsend and/or Defendant Benitez would not have assigned Plaintiff and put his life at risk had he been a member of the favored group of Caucasians and/or Caucasian men -- whose lives and well-being they valued more highly than a Black male's life and well-being.

187.    Because Plaintiff feared for his safety given his investigative role in ID, Plaintiff requested to return to MDC.  DOC and Defendant Townsend refused his request.

188.    In contrast, DOC and Defendant Townsend had accommodated Caucasian ID investigators whom had been transferred by placing them in non-inmate contact divisions, including but not limited to Captain Davila (upon information and belief, a Caucasian of Spanish ancestry), Captain Noon (a Caucasian female transferred to Special Operations Division), and Correction Officer Picard (Caucasian male transferred to CIB, then brought back to ID), though few Caucasian officers were ever even transferred out of ID.

189.    It was clear that DOC, Defendant Townsend, and/or Defendant Benitez's goal was to cause Plaintiff harm by exposing him to the same Correction Officers and inmates he had investigated when working on their investigatory cases.

190.    ID even left Plaintiff holding his investigator shield, *clearing identifying him as a member of ID* that had investigated Correction Officer and inmates at the facility, for over seven months, leaving an enormous target on Plaintiff' back that put his safety at risk while working at the facility.

191.    Indeed, during his assignment it was well known that Plaintiff had worked as an investigator in the ID, and Plaintiff was ridiculed and threatened by staff and inmates alike for his previous work on his investigations while assigned to the ID.

192.    For example, subsequent to the unauthorized leak of Plaintiff's private WhatsApp audio message about working conditions, Plaintiff received severe hostility from both staff and, upon information and belief, correction officers, including derogatory posts that were forwarded to him.

193.    DOC, Defendant Townsend, and/or Defendant Benitez did nothing to protect Plaintiff from this hostility, even though Plaintiff might have been working alongside someone (a correction officer) who would likely not have had an issue with Plaintiff being physically harmed.  Instead, they, discriminatorily permanently transferred Plaintiff into an inmate-facing jail position as -- *potentially deadly* -- "punishment" given his years of work in ID as evidenced by the disdain and outrage expressed in this post for Plaintiff's work in ID.

194.    DOC, Defendant Townsend, and/or Defendant Benitez also failed to investigate who actually leaked and circulated Plaintiff's private message.

195.    Plaintiff worked at OBCC at Riker's knowing staff had animosity towards him and still wearing an investigation shield, which caused Plaintiff significant emotional distress.

196.    Upon information and belief, ID has *only* permanently *transferred Black and/or non-Caucasian* Correction Officer investigators out of ID to inmate-facing jail positions *and has never* permanently transferred Caucasians to such jail positions.

197.    Upon information and belief, because of their discriminatory bias against Black male and/or Black Correction Officers and in favor of Caucasian and/or Caucasian male Correction Officers in ID, Defendant Townsend and/or Defendant Benitez valued the health and well-being of Caucasian and/or Caucasian male Correction Officers and were unwilling to punitively transfer them to inmate-facing jail positions (but were willing to do so for less valued Black and/or Black male Correction Officers like Plaintiff).

198.    In contrast to the treatment of Plaintiff, and consistent with the racial disparity in discipline that permeates DOC, Correction Officer Pennachio (a Caucasian male) was critical of the conditions Corrections Officers were being forced to work in and, during approximately August 2021 stated so explicitly on *his public-facing podcast*, upon information and belief, without repercussions.

199.    Indeed, upon information and belief, DOC and DOC ID were well aware of Correction Officer Pennachio podcast's content, however, Correction Officer Pennachio received *no discipline* for the following public podcast episode criticizing the working conditions at Rikers Island, in sum and substance with:

> What's going on all you crazy ghost enthusiasts out there? It's your boy, Ghost Show, of the Work Reality Podcast. Listen, new Work Reality Podcast episodes are coming very, very soon, so please stay tuned for that, but this is gonna be a little different. Uh, I'm sorry, it's not gonna be paranormal, uh, related, but, umm, that I promise you from here on out, it will be, but this is something that is very,

uh, near and dear to my heart because I am going through, uh, something, umm, not as bad as some of my coworkers, but, umm, you know, it's a joint thing going on here, and I'd like to let you guys know, uh, what's been happening. So, uh, I'm a New York City correctional officer. Okay, I've worked Rikers Island, umm, and some courts' buildings and whatnot. Now, a lot of people have preconceived notions about what we do. You know, a lot of people don't really know because we're behind a wall, we're kind of out of sight, out of mind.

Nobody really knows. Umm, listen, we're not the heroes that go around saving people from jumping off of bridges, or we're not running into burning buildings saving, uh, your grandmother's cat, right, umm, but most people don't realize that we're down in the trenches working directly with incarcerated individuals.

Uh, we don't ask for recognition when we break up inmate gang assaults or run into a cell, uh, set on fire to save the very individual that started it, or when we have to perform CPR or cut down a suicidal inmate, uh, that's hanging himself in the cell. And before you turn this off, 'cause it doesn't directly affect you, uh, maybe you know someone who is incarcerated that may be affected. Due to the policies that have been changed throughout the last few years, the New York City jail system is suffering greatly. *Correctional officers are being mandated to perform 24 to 36 hour shifts without meals, without bathroom breaks, and most of the time, we're not even getting paid for it.* Due to these hard conditions, officers are falling asleep at the wheel, uh, due to exhaustion. *Uh, they're quitting in droves, umm, they're getting hurt left and right, umm, or some of them are seeking mental health resources.* You're probably still saying, 'That doesn't affect me. I don't care.' Uh, but think about approximately *4000 people driving around in your neighborhood sleep-deprived for at least 30 hours.* Sleep deprivation could include brain fog, impaired decision-making, increased errors, extreme fatigue and delusions.

*So let me ask you, is this someone that you would like to be in charge of watching 30 to 100 individuals to make sure that they're safe and getting all the services that they're supposed to get? It's so dangerous for all staff in the New York City jails. Officers are being threatened with weapons, umm, being physically assaulted in order for these individuals to do whatever they want. When the alarm is pushed, no one is showing up to help you.* Many supervisors are also overworked and discouraged with the current conditions, and therefore, either just comply with the detainees' demands, as

unlawful as they may be, or they're just not showing up to your post to help you.

*Detainees are running through jail hallways stealing whatever they can, blatantly selling and using drugs in front of staff and even sexually assaulting female staff.* Correction officers are constantly being put down by everyone in the public, to the mayor and even our own commissioner. *The jail culture has changed over the years, and the repercussions that were once in place for inmates who break the rules are no longer being adhered to. Basically, an inmate can permanently scar an officer's face with, umm, a homemade shank and they'll only get a slap on the wrist, if that.*

Before you say it, this is not what we signed up for. Did we know the potential risks of injury when applying for this job? Yeah, of course we did, but we were all under the impression that if we were in trouble, we would have reinforcements coming to assist us, or at least the Department would indemnify our actions if they were within Department standards. *The Department and the City constantly put us down and they're coming up with ridiculous policies in order for us to either hang ourselves and get ourselves in trouble or quit.* Listen, I'm not saying that all COs are innocent, uh, in everything, we have flaws too. Uh, there's bad people everywhere, but we end up paying for those people, as well as minor, uh, things that we do, uh, with suspensions, terminations and writeups. *These New York City practices are atrocious and many are downright illegal.* Okay, to all my brothers and sisters in blue, and even some in white shirts, if I've missed anything, please comment below. Everyone, please be safe and take care of each other. My rant is over now. Back to your regularly scheduled paranormal programming. Good night, everybody. Don't forget to change your shorts.

(emphasis added).

200.    Upon information and belief, Correction Officer Pennachio (a Caucasian male) received no discipline for these *public-facing* severe criticisms of the conditions for Correction Officers working at Rikers Island.

201.    Upon information and belief, DOC was aware of this podcast because it has an Intel team that monitors social media posts of Correction Officers.

202.    Plaintiff raised this discrepancy with COBA after he was suspended.

203.     When Plaintiff later spoke directly with Correction Officer Pennachio about the podcast episode, Pennachio told him COBA had merely told him to "tone it down," and that he had not received any disciplinary charges from ID in connection with *the public-facing* podcast.

204.     In marked contrast, Plaintiff was suspended without pay for thirty days, and then punitively transferred out of the ID into the dangerous Rikers Island facility, for his statement that was *privately* (non-publicly) shared with a handful of Correction Officer peers.

205.     The only meaningful difference between the actual content of Plaintiff's (private statement to a small group of other Correction Officers) criticizing the working conditions for Correction Officers and Pennachio's (intentionally public-facing statements) was that he is Caucasian and Plaintiff is Black.

206.     Indeed, if anything, Pennachio's *intentionally public statement* was *more explicitly critical of Defendant City (DOC) and/or the working conditions for Correction Officers* than Plaintiff's own (private) statement.

207.     In summary, incredibly: (1) Plaintiff (a Black male) was disciplined with a thirty day suspension and a life-threatening reassignment to Rikers for making a private non-public statement about Correction Officer working conditions at Rikers Island to other Correction Officers that was not intended to be circulated; (2) Correction Officer Pennachio (a Caucasian male) was *not disciplined* for intentionally making: (i) public statements criticizing working conditions at Rikers; (ii) that were *intentionally* broadcast; (iii) to *a large audience* through a published podcast; and (iv) *intended* to be broadcast to the general population.

208.     The treatment of these two Correction Officers is indicative of the two-tiered conduct standards -- including speech standards -- applied to the disfavored group of Black male

and/or Black male Correction Officers and the favored groups of Caucasian and/or Caucasian male Correction Officers.

209.    Upon information and belief, Plaintiff would not have been permanently assigned to Rikers Island if Plaintiff were a Caucasian male Correction Officer.

210.    More recently, on or about March 10, 2023, another Caucasian male Correction Officer who works on Rikers Island, Bob Walters, spoke publicly on a Learning with Lowell podcast about his role as a correction officer at Rikers. His statements included commentary asserting the poor, dangerous, hectic, chaotic, and rough conditions at Rikers Island, as well as illegal activities he alleged occurred there.

211.    In contrast to Plaintiff who made private comments and was disciplined, upon information and belief, Correction Officer Bob Walters (a Caucasian male) has not been disciplined for any of his negative public comments on the dangerous conditions at Rikers Island posted to YouTube on or about March 10, 2023, on Learning With Lowell, Inside Rikers Island with Corrections Officer Bob Walters, Episode #166.

***ID's Discipline Policies Practices Disadvantage Black Male Correction Officers***

212.    In the ID, examples of the discriminatory policies, practices, and/or standard operating procedures, disadvantaging Black male Correction Officers and/or Black Correction Officers as compared to Caucasian and fair-skinned Hispanic men and women, include:

> (1)    Deputy Director Alexandria Maldonado ("Maldonado") (Caucasian female Hispanic ancestry), according to media reports, allegedly *assaulted a police officer* while being arrested for driving under the influence in or around September 2020.  Upon information and belief, high level ID personnel, including Defendant Townsend and Defendant Benitez, assisted Maldonado with her criminal charges. Instead of being terminated, *she was placed in the DOC training academy* and remained under the ID umbrella.  In

other words, she has been placed in a *better position* and retained her salary and title despite allegedly assaulting a police officer -- which would not have happened to her if she were a Black male and/or Black.[7]

(4)     Upon information and belief, a Caucasian Hispanic Correction Officer working in ID, during 2021, *forgot his loaded firearm in a public bathroom*, which was *later recovered by a civilian* and returned to the ID.  Upon further information and belief, this, however, only resulted in him being *suspended for five days* and *not* being transferred out of the ID after completing his suspension.  In contrast, Plaintiff was: (1) suspended for approximately ten days for filing an *accurate* incident report; and (2) Plaintiff was suspended for 30 days for *a private conversation about the actual work conditions at Rikers* and then punitively transferred out of the ID to a dangerous facility at Rikers Island;

(5)     Upon information and belief, a Caucasian male Correction Officer had several instances of blatant insubordination towards multiple supervisors including, but not limited to: (1) swearing at a supervisor including using the word "fuck"; (2) screaming at additional supervisors; and (3) hurling an ethnic slur at a Hispanic male supervisor -- that he was a "Mexican wetback" because of his Mexican background, which was heard by the entire team.  Upon information and belief, this Caucasian male Correction Officer was never meaningfully disciplined for this discriminatory slur against a Hispanic male supervisor, despite the filing of an EEO complaint against him by a person who witnessed the racial harassment.  ID management (including specifically Defendant Benitez) was also aware that this Caucasian male Correction Officer made several racially discriminatory comments to the team referring to Black investigators as, "You People," and claiming Black employees always complained about discrimination and that they should, "GET OVER IT," but did nothing.  In addition, unlike Plaintiff, this Caucasian male Correction Officer was not sent for permanent reassignments to work directly in the jails;

(6)     While a Caucasian male Correction Officer Investigator was a *temporarily* assigned with Plaintiff (when Plaintiff was temporarily reassigned) to the dangerous AMKC facility on

---

[7]     Craig McCarthy, *Dept. of Corrections investigator allegedly attacked cop during drunk driving arrest*, N.Y. POST, Sept. 8, 2020, https://nypost.com/2020/09/08/dept-of-corrections-investigator-busted-for-drunk-driving-slugging-cop/.

Rikers Island in or around July 2021, the Caucasian male Correction Officer Investigator was allowed to end his tour early and return to ID on account of heat exhaustion. In contrast, a Black female Correction Officer Investigator was permanently transferred back to the jail from ID because she had a medical emergency while redeployed and later resigned from DOC after being permanently transferred to the jail in 2022. In contrast to the typical treatment of Caucasian male Correction officers, Black Correction Officers are typically threatened with punitive transfers out of the ID to inmate jail assignments if they call out sick;

(7) A dark-skinned Black male of Haitian ancestry, who was a Captain, was punitively transferred out of the ID in or around 2018 for allegedly lying about whether an inmate had thrown water at him.[8] In marked comparison, a Caucasian male Correction Officer Investigator was not transferred out of the ID after *being caught -- on camera --* lying about an inmate stealing his watch while he was on redeployment to a jail;

(8) A dark-skinned Black male Correction Officer was punitively transferred out of the ID during approximately 2018, but his Caucasian male Correction Officer partner was allowed to remain in the ID, following their involvement in the same use of force incident. Defendant Townsend favored the Caucasian male and, upon information and belief, protected him and his position in ID; and

(9) A light-skinned Hispanic male ID K-9 CO Investigator and a Caucasian male ID K-9 CO Investigator were caught watching movies on their phones while assigned to perform K-9 duties in the jails. These ID Correction Officers were merely transferred out of ID, not to inmate-facing jail assignments, but to the Special Operation Division K-9 to perform same duties.

***DOC's Is More Lenient on a Caucasian Male Correction Officer for Publicly Posting Flagrantly Racist Post on Facebook***

213. On or about June 4, 2020 (a Thursday), a Caucasian Correction Officer Derrick Lascko ("Correction Officer Lascko") posted on DOC's Facebook page "a sickening online

---

[8] He later resigned after inmates through fecal material at him.

parody of the George Floyd death photo – with the white worker shown kneeling on the neck of his union's black president."[9]  Correction Officer Lascko's neck was superimposed over Derek Chauvin (the former Minneapolis cop) and the face of Elias Husamudeen, who is Black and was the President of COBA at the time, was superimposed in the place of George Floyd's face.

214.    Apparently, Correction Officer Lascko claimed that he never posted the image to his page and tried to blame it on Elias Husamudeen's camp because of an upcoming COBA election even though Correction Officer Lasko actually defended his meme calling it "satire" a day earlier.

215.    Upon information and belief, DOC only imposed a short suspension (less than 30 days) on Correction Officer Lascko.

216.    Plaintiff (a Black male Correction Officer) -- whose *private* WhatsApp message (a true account about the conditions on Rikers Island) pales in comparison to Correction Officer Lascko's racially hostile, violent, and threatening Facebook post -- was disciplined far more harshly than Correction Officer Lascko (a Caucasian male Correction Officer).

217.    Upon information and belief, Correction Officer Lascko returned to work after less than a 30-day suspension <u>and</u> received his days back -- rendering DOC's suspension of him virtually meaningless.  Furthermore, upon information and belief, DOC actually *dismissed* Correction Officer Lascko's charges and his case was resolved by DOC very quickly.

218.    Furthermore, upon information and belief, unlike Plaintiff who was permanently transferred out of ID to Rikers Island, Correction Officer Lascko *did not* lose his position in

---

[9]     Craig McCarthy & Laura Italiano, *NYC corrections officer suspended over sick George Floyd parody photo*, N.Y. POST, Jun. 5, 2020, https://nypost.com/2020/06/05/nyc-corrections-officer-suspended-over-george-floyd-parody-photo/..

Transportation and/or was not transferred out of his position for his racially hostile and threatening Facebook post.

219.    DOC engages in a pattern and practice of subjecting Black male and/or Black Correction Officers to harsher and/or more severe punishment than Caucasian and/or non-Black male correction officers for actions that are either comparable and/or even less severe than those alleged against and/or actually engaged in by Caucasian male and/or Caucasian Correction Officers.

***Plaintiff Reports Discrimination and Retaliation***

220.    On or about September 7, 2021, Plaintiff made a protected email complaint of: (1) ongoing race discrimination; (2) prior disability discrimination; (3) prior failure to accommodate disability discrimination; (4) prior retaliation for requesting a disability accommodation; (5) and ongoing whistleblower retaliation, *directly to* then DOC Commissioner Schiraldi:

> Dear Commissioner Schiraldi,
>
> I write this email with all intentions of having a positive resolution to this matter. I am a tenured officer with 10 years completed without receiving a CI, CD, or MOC, and no uses of force or allegations. I have an excellent record working for the Department with a good attendance record. I earned my Bachelors of Science in economics/finance and worked at a prestigious Wall Street firm as a bond analyst prior to its downsizing.  I embarked on a second career with the Department of Correction in 2011. I worked my way from EMTC to MDC and then to the Investigation Division (ID) in 2015. It was one of my proudest accomplishments with the Department.
>
> However, most recently, when an unknown colleague violated my privacy and shared a private conversation, the DOC is *retaliating* against me for observations made during a private conversation on my past day that was shared publicly.  I am **being *reassigned in retaliation***, for what I don't know. The Doc's actions to re-assign me make this retaliation for a whistleblower case. It was never my intent for a private conversation to be shared publicly. Furthermore, conditions in the jail are part of what any ID

investigator does regularly. So, retaliation is giving merit to the fact that the department deems me as some sort of whistleblower, whom they must take action against. I am requesting that the DOC not retaliate. If they wish to move me out of ID--a position where I have been successful in closing cases throughout my tenure, fine. However, I ask that I go back to my prior command at Manhattan court or someplace, where I would not be in direct conflict with the former task of investigations. The rest of this letter details my career success.

I delivered excellent work in the ID and received a certificate under former Deputy Commissioner Kuczinski for closing the most cases in my unit, and I was also selected to be part of the UPS team, under Deputy Commissioner Townsend, assigned to the high-profile cases in the ID, which I eventually turned down due to my commute. I developed a reputation for being a thorough investigator, and I was also a team player. In 2017, after suffering a debilitating sciatic back injury. In order to walk again, I received two epidural shots in my spine. Upon my return to work, I was told to participate in physically demanding mandated "BLOCK" training, which my medical doctor did not approve of and provided the medical paperwork. I reported to work *but requested that I be allowed to participate in the later session of the 'BLOCK' training to allow my back to heal. The department reprimanded me by giving me a CD stating that I was fit for duty even though I was still limping--in direct violation of federal ADA laws. I had legitimate medical reasons and paperwork for missing the first session. When people are debilitated and show proof, employers can not retaliate against them*.

In August 2019, I was working alone at the MDC-ID office when an inmate barricade transpired on the roof. The Genetec footage was 'ghosted' and I had no way to provide updates to my supervisors, who were working out of HQ. Being a team player, I reported to the area alone to conduct a cursory review of the incident talking with MOS about the event that unfolded. I then sent an email to my supervisors relating the information, which was then forwarded to Deputy Commissioner Townsend and eventually to Commissioner Brann. I was suspended for 7 days for allegedly providing inaccurate information. My job in ID has been to keep inmates and staff safe, yet when relaying observations management has acted as if this isn't part of my job. The involved staff wrote UOF reports and at least one staff member was injured and left the facility via EMS. *After a complete review, no charges were brought against me; however, I was never given back the 7 days time for which I was wrongfully suspended.*

45

On July 17, 2021, I was scheduled for redeployment. I was assigned to the AMKC intake and worked approximately 18 hours going into my past day. I did not complain or try to get out of it. The next day, I participated in a private Whatsapp chat with 7 colleagues. We bounced issues off each other for moral support, and this chat has been in existence since 2017. I warned my colleagues not to engage in UOF and the various deficiencies that I noted as an officer deployed in the jail. This was a private conversation that was made public without my knowledge or consent by a coworker -- a direct invasion of my privacy.  I did not disclose any confidential information, I did not speak publicly, I did not slander anyone, I did not represent myself as the agency spokesperson, and I did not post anything on social media. On July 19th, my second past day, I received a text from Director Michael Bardales to report to HQ on my first. I was then told I was being suspended for 30 days for social media violation. This was a travesty of justice. My work in ID is an obligation to identify and correct deficiencies--that's my job description. My observations should have led to further investigations to rectify the problems. Instead, I was punished and retaliated against for exercising my freedom of speech, especially in private conversation.  What was said in the conversation, has constantly been mentioned by the press, the union, *and by MOS of all ranks*. I was offered 10-days with a negotiated plea.  I declined it because I did nothing wrong. *I am not going to plead guilty--for neither doing what my job requires nor for having a personal discussion*.

**Furthermore, I contend that I am being treated differently and harassed because I am an officer of color.  A caucasian officer was seen on a Facebook podcast criticizing the Department and of course, no disciplinary actions were taken by the Department.**

**After serving my 30 days without pay, I was administratively transferred back to Rikers Island in retaliation for what it seems the DOC has deemed whistleblower conduct.  The punishment does not fit the crime. These retaliatory actions would expose me to the same officers I have had to investigate in the past and the inmates I have had to interview. The DOC is clearly trying to create a harassing environment and placing me in harm's way. I expected to be transferred back to my prior command at Manhattan court and resumed work or be placed in SOD**.

The actions of DOC are *targeting me as a whistleblower*--in a situation that was not my intent and in which my personal right to privacy and freedom of speech have both been violated. The last I

knew, we live and work in America--not in an oppressive dictatorial regime. I'm not sure why the management is acting like the Gestapo. Again, I can only think that the Department is *retaliating* against what they perceive as *whistleblowing*.

I am respectfully appealing to you to send me back to my prior command at Manhattan court or SOD so that this matter can end.

Respectfully submitted,

Leo Roland

(emphasis added).

221.    Plaintiff's email was a protected complaint of race discrimination, disability discrimination, and retaliation.

222.    Within less than thirty days of this protected complaint of race discrimination, disability discrimination, accommodation request retaliation, and whistleblower retaliation Defendant City, instead of addressing these concerns or reasonably transferring Plaintiff back to the ID so he could resume his work at the ID at which he excelled, NYC responded to this protected complaint by *escalating its retaliation and/or discrimination against Plaintiff*.

223.    Specifically, on or about October 5, 2021, in furtherance of their discrimination and/or retaliation, upon information and belief, without Defendants conducting a full investigation as required, Defendants hastily (and without evidence) internally charged Plaintiff with Violations of Rules and Regulations ("conduct unbecoming a member of service") based primarily on his non-public *truthful* communication about the conditions on Rikers Island:

1.    Said officer, on or about July 18, 2021, engaged in conduct unbecoming a member of service and of a nature to bring discredit upon the Department in that he made and disseminated an audio recording in which he disclosed confidential information describing the working conditions of the Intake area. Said recording contained defamatory information regarding the Department.

***

47

2.   Said officer, on or about July 17, 2021, at approximately 0700 hours in the Intake area of AMKC, engaged in conduct unbecoming a member of service and failed to efficiently perform his duties in that he failed to take action to secure inmates inside the holding pens. Said officer failed to take action to prevent inmates from smoking in the Intake area. Said officer failed to report the discovery of contraband in the Intake area.

224.   The Charges and Specifications document was electronically signed on behalf of Defendant Townsend by attorney and the Director of Intelligence, Investigation & Trials Division of DOC Joshua Pal ("Director Pal").

225.   Upon information and belief, Director Pal drafted the Charges and Specifications.

226.   Upon information and belief, Plaintiff was charged *because of* Plaintiff's September 7, 2021 protected complaints of race discrimination, disability discrimination, and/or because of his prior protected activity, and/or based on further race discrimination based on NYC's standard operating procedure of a discriminatory two-tiered set of performance and conduct (including speech) standards disfavoring Black male and/or Black Correction Officers.

227.   In addition, upon information and belief, Defendants continued to punitively hold open the investigation of Plaintiff regarding his private criticism of the Rikers Island conditions -- without bringing charges to OATH -- *because of* his above-protected complaints and/or because of his Black race and/or Black race and male gender.

228.   In retaliation for Plaintiff's protected activity and/or because of his race and/or race plus gender, DOC held the investigation into Plaintiff open *for more than one* year without charges being brought against Plaintiff.  Doing so negatively impacted Plaintiff's employment record, eligibility for promotion, and ability to pursue employment opportunities in comparable roles at DOC or other law enforcement positions outside of DOC in law enforcement.

229.    During a more than one-year delay DOC refused to conclude the investigation or actually bring charges holding Plaintiff in limbo, during which period, with formal charges pending, he could not: (1) be considered for a promotion; (2) transfer to a new department; (3) get a "Good Guy" letter from DOC (*i.e.*, a letter typically required to obtain future law enforcement positions requiring use of firearms); and (4) was ineligible to apply for a law enforcement position outside of DOC.

230.    Upon information and belief, DOC would have kept Plaintiff in investigative and legal purgatory for even *longer* but for him, after a year, *taking the extraordinary step of bringing a state court lawsuit forcing DOC to actually prosecute him on his pending administrative disciplinary charges* before OATH.  Specifically, Plaintiff was forced to file an Article 78 proceeding on September 8, 2022 to force the City to bring its disciplinary charges to OATH or close the investigation.

231.    It is highly unusual for a Correction Officer under investigation to be forced to bring an Article 78 proceeding asking the City to *actually prosecute* against him/her at OATH on administrative disciplinary charges.

232.    Upon information and belief, the knowing pretextual nature, as well as significant doubt about the validity of and/or the ability to prove the disciplinary charges, were the reasons Defendant City delayed the prosecution of the charges against Plaintiff at OATH.

233.    Although Defendants allegedly investigated and disciplined Plaintiff regarding Plaintiff's private statement about the conditions at Rikers Island, it declined to either administratively charge Plaintiff by scheduling the matter at OATH, or close the investigation for over one year -- which in limbo status prevented (and/or created significant barriers for) any

transfer or promotion, or any successful law enforcement job application for positions outside of DOC.

234.    The failure to actually prosecute Plaintiff for disciplinary charges supports the pretextual nature of the charges.

235.    Essentially, DOC voluntarily brought disciplinary charges to harm Plaintiff, but only *involuntarily* pursued those charges, as indicative of their pretextual nature.

236.    Upon information and belief, DOC wielded its power to freeze Plaintiff's DOC career with pretextual, discriminatory, and retaliatory disciplinary charges as an enforcement mechanism to control Plaintiff and other Black Correction Officers and/or Black male Correction Officers, particularly those who complained about discrimination or retaliation.

237.    In summary, Plaintiff could not prove the falsity and/or insufficiency of the disciplinary charges until the charges could be adjudicated before OATH, but the City could freeze his career simply by charging him (but again not actually prosecuting him) with alleged misconduct.

238.    The use of this discriminatory and retaliatory tactic of alleging but refusing to formally prosecute disciplinary charges before OATH substantially harmed Plaintiff.

239.    Upon information and belief, the Charges and Specifications the charges were based entirely on Plaintiff's privately shared audio statement in which he: (1) accurately described the publicly well-known conditions at Rikers with current and/or former Corrections Officers; and (2) stated that he did not stop inmates from smoking because the Correction Officers at that location had indicated that permitting smoking was part of "the program," at that location and that it would have been unsafe to stop the smoking without support or backup.

240.     On or about February 22, 2022, Plaintiff was turned down for a position with ICE because of the pending investigation that Defendants refused to either bring as charges at OATH or close without bringing charges.  Specifically, the denial, citing the ongoing open investigation, for which no charges had been brought, stated:

> Based upon the investigative results, you have been found unfit for the following reason(s): Misconduct in Employment as evidenced by an *ongoing internal investigation* that you engaged in 'Conduct Unbecoming' while working for the New York City Department of Corrections in or around July 2021. The fact that the allegations of possible misconduct are still in process and the investigation is ongoing, creates an undue risk to our agency.  It has been determined your support on this contract would not promote the integrity or efficiency of ICE. This is a final decision.

(emphasis added).

241.     Upon information and belief, had Plaintiff not been denied this position because of Defendants' ongoing discrimination and/or retaliation, Plaintiff would have significantly increased his total compensation and benefits beyond what Plaintiff made as a DOC's Correction Officer.

242.     Upon information and belief, the charges would not have been brought, would have been dropped against Plaintiff, and/or the investigation closed without prosecution of charges if Plaintiff were Caucasian and/or had not engaged in protected activity.

***Defendant Townsend Is Terminated and/or Forced to Resign***

243.     Upon information and belief, during approximately the first week of January 2022, soon after Mayor Eric Adams appointed Commissioner Louis A. Molina ("Commissioner Molina") to head up DOC, Defendant Townsend was terminated and/or forced to resign

244.     Upon information and belief, COBA had asserted to Commissioner Molina that Defendant Townsend abused her authority by charging staff on frivolous cases and created an

atmosphere of intimidation, which caused low morale in DOC, where staff refused to come to work in fear of being wrongfully charged.

***Plaintiff Undergoes MEO-16 Interview about His Pending Case***

245.    On or about February 3, 2022, Plaintiff was summoned to the ID to be questioned and/or interviewed -- a Mayoral Executive Order #16 ("MEO-16") interview required by the consent decree in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (SDNY) -- about his pending case relating to the WhatsApp chat.

246.    Captain Simone Fuller, the lead investigator, and Supervisor Nia Pinchback interviewed Plaintiff.

247.    Plaintiff was represented by a COBA (union) attorney, though Plaintiff's attorney was not allowed to ask questions.

248.    Plaintiff identified all eight members on the group chat during the MEO-16 interview.

249.    Upon information and belief, *none* of the other members on the group chat was brought in for an MEO-16 interview.

250.    Upon information and belief, the Correction Officer *who actually circulated* the WhatsApp message, was not disciplined for doing so.

251.    The ID never asked Plaintiff to download the chat in its entirety to further investigate who may have leaked it.

252.    The ID never asked Plaintiff who disclosed or circulated the WhatsApp message outside of the private WhatsApp group.

253.    During the interview, Plaintiff stated that Caucasian male CO Investigator Zadwydas had lied about him under oath by claiming that Plaintiff was disseminating ID

information to officers with pending charges against them -- which was untrue -- in an effort by the City to discredit Plaintiff.  Upon information and belief, CO Investigator Zadwydas was instructed to lie by DDI Bardales who sought to discredit Plaintiff's testimony at an OATH hearing where Plaintiff did not testify for ID, but for the union, because there was a chain of custody issue.  However, upon information and belief, Caucasian male Zadwydas was never investigated in response to this disclosure by Plaintiff.

254.    Plaintiff was told by an ID investigator who happened to be in the Trials and Litigation office that the ID investigator overheard Captain Simone Fuller discussing Plaintiff's case with the attorneys at Trials.  Plaintiff was told that Captain Simone Fuller was overheard admitting that she had ***nothing*** she could actually formally charge Plaintiff with.

255.    Upon information and belief, attorney and the Director of Intelligence, Investigation & Trials Division of DOC Joshua Pal, was aware of the lack merit relating to the October 5, 2021 charges against Plaintiff, as it was common knowledge in ID and in the Trials and Litigation office.  Nonetheless, Director Pal, brought and continued to pursue, formal charges against Plaintiff, in retaliation for his protected activity and/or because of his Black race and/or Black race plus male gender.

***Plaintiff Reaches Out to Commissioner Molina about His Pending Case***

256.    Soon after Mayor Adams appointed Commissioner Molina, Plaintiff reached out directly to him regarding a request for the withdrawal of the discriminatory, retaliatory, and pretextual case against him.

257.    On or about March 2, 2022, Plaintiff met with Captain Davelle Williams who met with him on behalf of the Commissioner.

53

258.    Plaintiff presented his case to her with evidence including that he had been targeted by Defendant Townsend, whom Commissioner Molina had just fired based on the very allegation that she had abused her authority by charging staff on frivolous cases.  While Captain Williams stated that she was impressed with Plaintiff's presentation and told him that she would discuss his concerns with Commissioner Molina, Captain Williams never followed up with Plaintiff.

***Plaintiff Takes Intermittent Leave Protected by Disability Laws and/or the FMLA***

259.    Plaintiff suffers from debilitating sciatica, osteoporosis in his knees, and high blood pressure.

260.    At least in part due to Defendants' discriminatory and/or retaliatory actions against Plaintiff by transferring him out of ID to Rikers Island, where he was required to work sixteen-hour-plus days on assignment (often with no meal breaks) with inmates, the above-referenced conditions were aggravated.

261.    As a result, Plaintiff took leave from work on the following days for the following reasons, based on a stated medical condition, including the aforementioned conditions:

(a)    From approximately January 4, 2022 to January 22, 2022, Plaintiff was out on sick leave because of COVID-19 that made Plaintiff unable to work which, upon information and belief, was severe enough that it was covered by FMLA protection and/or disability-protected leave;

(b)    From approximately January 27, 2022, to February 9, 2022, Plaintiff was out because of debilitating sciatica disability back pain that made Plaintiff unable to work which, upon information and belief, was covered by FMLA protection and/or disability-protected leave;

(c)    On or about May 13-14, 2022, Plaintiff was out on leave for severe knee swelling associated with his osteoporosis and/or loss of cartilage that made Plaintiff unable to work which, upon information and belief, was FMLA-protected and/or disability-protected leave;

(d)     On or about June 3-4, 2022, Plaintiff was out on leave for severe knee swelling associated with Plaintiff's osteoporosis and/or cartilage loss that made Plaintiff unable to work which, upon information and belief, was FMLA-protected and/or disability-protected leave;

(e)     On or about June 16-17, 2022, Plaintiff was out on leave because of severe symptoms associated with high blood pressure that made Plaintiff nauseous and dizzy and unable to work which, upon information and belief, was FMLA-protected and/or disability-protected leave;

(f)     On or about July 16-18, 2022, Plaintiff was out on leave for severe knee swelling associated with his osteoporosis and/or cartilage loss that made Plaintiff unable to work which, upon information and belief, was FMLA-protected and/or disability-protected leave; and

(g)     On or about August 6-7, 2022, Plaintiff was out on leave because of severe symptoms associated with high blood pressure that made Plaintiff nauseous and dizzy and unable to work, which, upon information and belief, was FMLA-protected and/or disability-protected leave.

262.    Upon information and belief, as explained further below, DOC would later unlawfully rely on some of the aforementioned leave to place Plaintiff on a punitive "Chronic Absence" status. DOC did so subsequent to Plaintiff filing an administrative charge against Defendant City with the EEOC, even though some (if not all) of the leave was protected under disability laws, and/or the FMLA, based on Plaintiff's disabilities and/or serious health conditions of severe sciatica back pain, severe chronic knee pain, high blood pressure, and/or COVID-19 infection.

263.    Not only did doing so violate the FMLA and disability accommodation laws, it was upon information and belief, also done in retaliation for Plaintiff's protected complaints.

***Dr. Kay Illegally Returns Plaintiff to Full Duty without Reviewing Plaintiff's MRI Results***

264.    In or around May 2022, Dr. Henry Strulovici, a plastic surgeon, was employed by the DOC's Health Management Division ("HMD") and assigned to visit the Rikers Island jails. Upon information and belief, he was employed by DOC to meet with officers who were in

medical monitoring restriction status, in order to attempt to remove them from medical monitoring restricted ("MMR") status and return them to full duty status.

265.    While assigned to OBCC, Plaintiff was summoned to meet with plastic surgeon Dr. Strulovici concerning Plaintiff's medical status.  Dr. Strulovici spoke with Plaintiff about why he was MMR3 status (*i.e.*, limited to eight hours without overtime with inmate contact).

266.    After Plaintiff told him that he was waiting for the MRI results of his knees, Dr. Strulovici extended his restriction.

267.    Dr. Strulovici decided to keep Plaintiff on MMR3 status until he could review the MRI results from Plaintiff's orthopedist.

268.    Plaintiff was scheduled for HMD to see Dr. Kay that week but was told he had already had his HMD visit.

269.    HMD, however, called the jail and threatened Plaintiff by telling him that Dr. Kay needed to see Plaintiff or charges would be imposed for missing Plaintiff's HMD appointment.

270.    When Plaintiff reported to HMD that same week, Dr. Kay inexplicably reversed course by removing Plaintiff from MMR status and placing him on full duty claiming that Plaintiff's sciatica was improving.

271.    When Plaintiff told Dr. Kay that he had already met with Dr. Strulovici at the jail two days prior, and that he had extended Plaintiff's restriction until HMD received the MRI results on Plaintiff's knees, Dr. Kay stated that Dr. Strulovici is "not a Real Doctor" who did not know anything about Plaintiff's knees.  She also conveyed that Dr. Strulovici had told the head doctor at HMD that he would get staff back to work faster by going to the jails to assess them.

272.    She then told Plaintiff, in sum and substance, that DOC "wants staff back at work."

273.    Dr. Kay conveyed to Plaintiff that HMD was under a lot of pressure to send sick staff back to work because there was a shortage of staff in the jails -- essentially an admission that Plaintiff was being returned to work because that was what DOC wanted, not because his actual health condition supported being returned.

274.    Irrespective of Plaintiff's health, and in contradiction to Dr. Strulvici's decision, Dr. Kay forced Plaintiff back to full duty -- without having received the MRI results on Plaintiff's knees.  Dr. Kay then told Plaintiff that she is a licensed doctor, that she "doesn't take orders" from Dr. Strulovici, and that she was Plaintiff's doctor.  Plaintiff questioned her decision to return him to full duty, especially given it contradicted Dr. Strulovici's decision.  However, Dr. Kay returned Plaintiff to full duty status without reviewing his pending MRI results.

275.    When the MRI results came back, Dr. Kay minimized the condition of his knees by only noting that Plaintiff had a ligament tear -- which Plaintiff already knew from meeting with his orthopedist.  Dr. Kay kept Plaintiff on full duty status and only offered to return him to MMR3 status if he wanted to have surgery.

276.    Upon information and belief, Defendant City was utilizing HMD (*i.e.*, Dr. Kay) to force correction officers on MMR status back to full duty irrespective of their health because there was a staffing shortage in the jails.

277.    This policy, pattern practice, and/or standard operating procedure constituted: (1) retaliation for taking, utilizing, and/or requiring accommodation based leave; (2) retaliation for taking, utilizing, and/or requiring FMLA leave; (3) failure to accommodate disabilities; (4) FMLA leave denial; (5) ADA and FMLA interference with rights; (6) FMLA leave denial; and (7) failure to engage in the cooperative dialogue required by the NYCHRL.

***Plaintiff Is Told That ID Intel Saw Nothing Wrong with Plaintiff's Statement on WhatsApp***

278.    ID should have requested the shield room to change Plaintiff's shield when he was permanently transferred to Rikers, but ID and Defendant Townsend did not do.  Upon information and belief, they did not do so because they wanted Plaintiff to be harassed and violently threatened by staff and inmates who disliked the ID on Rikers.

279.    The investigator shield caused Plaintiff to stand out and be ridiculed by other staff members at Rikers Island.

280.    On or around June 6, 2022, Plaintiff was finally permitted to report to ID Headquarters to exchange his investigation shield.

281.    On that day, Plaintiff ran into Investigator Patrick Brown ("Investigator Brown") in the corridor.  Investigator Brown was assigned to ID Intel.  In short, ID Intel is a special unit in the ID that gathers intelligence on staff malfeasance and wrongdoings.  The unit was created for the ID to be in the forefront of criminal arrests instead of DOI.  Investigator Brown approached Plaintiff and told him that he felt bad about what had happened to Plaintiff.

282.    Investigator Brown further stated that the Intel group saw nothing wrong with what Plaintiff said (meaning Plaintiff's WhatsApp message) but that Defendant Townsend wanted them (*i.e.*, forced them) to suspend Plaintiff and generate charges.

283.    Upon information and belief, the information conveyed by Investigator Brown was common knowledge within ID and DOC's Intelligence, Investigation & Trials Division, including to Director Pal.  Nonetheless, Defendants continued to engage in the ongoing discrimination, harassment, and/or retaliation against Plaintiff and took no action to stop the discriminatory and retaliatory treatment of Plaintiff.

284.    In addition, upon information and belief, Defendants were methodically getting rid of Black males in ID irrespective of their work performance or absence of a history of misconduct.

285.    Upon information and belief, as the result of a two-tiered set of conduct (including speech) standard favoring Caucasians and/or Caucasian males and disfavoring Black and/or Black males, Defendant Townsend, Defendant Benitez, Correction Officer Pennachio, and/or other Caucasian and/or non-Black employees could speak about the horrible conditions on Rikers Island – while Black and/or Black male employees could not.

286.    Upon information and belief, Caucasian and/or non-Black employees were permitted to work in ID with more serious disciplinary records than Plaintiff (a Black male).

287.    Plaintiff was being discriminated and/or retaliated against for vocalizing privately what was already public knowledge -- that the conditions at Rikers Island were (and are) horrible.

288.    Upon information and belief, Black and/or Black male Correction Officers were subjected to a two-tiered set of performance and/or conduct standards, in which Black and/or Black male Correction Officers were disproportionately penalized and/or disciplined as compared to their non-Black, non-Black male, Caucasian, and/or Caucasian male counterparts.

289.    Upon information and belief, DOC applied a two-tiered set of speech standards in which Black and/or Black male Correction Officers were disproportionately penalized and/or disciplined as compared to their non-Black, non-Black male, Caucasian, and/or Caucasian male counterparts.

***Plaintiff Files a Class EEOC Charge Against Defendant***

290.    On or about August 15, 2022, Plaintiff filed a class EEOC charge against Defendant City (DOC) for race, national origin, sex, race plus sex (Black male), Haitian ancestry discrimination, and retaliation.

291.    The Charge was filed on a class action basis.

***Defendant Retaliates and Discriminates Against Plaintiff by Placing Him on Chronic Absence Status***

292.    On or about August 31, 2022, approximately two weeks after Plaintiff filed his first EEOC Class Charge against Defendant, Defendant City, upon information and belief, retaliated and/or discriminated against Plaintiff by placing him on "chronic absent" status *through March 23, 2023*, because of his aforementioned protected "disability-protected medical callouts," and/or his protected complaint of discrimination, retaliation, and/or whistleblowing.

293.    Upon information and belief, all, or at least several, of the aforementioned 2022 absences that resulted in Plaintiff being unlawfully placed on "chronic absent" status were protected leave under the FMLA, Rehabilitation Act, and/or NYCHRL.

294.    In addition, as a result of "chronic absent" status, Plaintiff was forced to report in-person to HMD, even when Plaintiff was in *severe pain* because of his sciatica disability and could *hardly* walk.

295.    The reason provided for requiring Plaintiff to report in-person was ostensibly to assess when Plaintiff was going to be sent back to full-duty status.

296.    The effect of being on this "chronic absent" status until March 1, 2023, was that Plaintiff: (1) lost entitlement to several discretionary benefits and/or privileges; and (2) was unnecessarily required to report to work in-person, even when sick and/or suffering from a disability, under most circumstances.

297.    This in-person reporting requirement, in turn, typically resulted in the exacerbation of the disability Plaintiff requested and/or utilized protected leave (disability-based leave) to address.

298.    Discretionary benefits and/or privileges that may be removed, under the chronic absent Directive, include: (1) assignment to a steady tour; (2) assignment to a specified post or duties; (3) access to voluntary overtime; (4) promotions; (5) secondary employment; (6) assignment to preferential/special units or commands; and (7) transfers.

299.    For example, in Plaintiff's case, being placed on chronic absent status meant that Plaintiff was denied the ability to: (1) transfer to other divisions; (2) obtain preferred posts; and/or (3) be promoted to the rank of Captain if he passed the promotional exam (this is in addition to otherwise being prevented from being promoted because of Plaintiff's retaliatory pending OATH charge(s)).

300.    Until Plaintiff's "chronic absent" status was removed by DOC, if Plaintiff called out sick for any reason -- including based on: (1) requiring disability-based leave as a reasonable accommodation of a disability; or (2) FMLA-protected absences -- his "chronic absent" status would be *automatically extended* by an additional six months irrespective of the basis for such leave.

301.    As noted above, the status could be renewed, potentially indefinitely, if the Correction Officer continued to call out sick: "A chronic absent classification shall remain in effect for six (6) months from the date the member returns to duty after being absent twelve (12) or more work days. . . . If the member is absent during the six (6) month period, the chronic absent classification shall be extended for six (6) months following the date the member returns to duty following the last absence."

302.    Upon information and belief, these restrictions were in addition to the same limitations and/or practical impacts that prohibited Plaintiff from obtaining a reassignment and/or promotion (or alternative employment) because of Plaintiff's pending, false, pretextual, and/or retaliatory OATH charges (one of which had been pending for more than a year without any effort by Defendants at adjudication as described above).

***DOC Continues to Retaliate Against Plaintiff Following the Filing of Plaintiff's Initial EEOC Charge***

303.    Following Plaintiff's filing of his first class charge with the EEOC on August 15, 2022, DOC subjected Plaintiff to additional retaliation because of: (1) Plaintiff's pre-August 15, 2022 protected activity; and/or (2) Plaintiff's August 15, 2022 EEOC charge filing.

304.    Following Plaintiff's return from vacation on or about September 2, 2022, approximately two weeks after Plaintiff filed his first EEOC charge, DOC served Plaintiff with two retaliatory command disciplines and notified Plaintiff of a retaliatory tour change from the morning to the overnight tour.

305.    Upon information and belief, these two command disciplines and tour change were further retaliation for Plaintiff's pre-August 15, 2022 protected activity and/or the filing of his EEOC charge on August 15, 2022.

306.    As to the first retaliatory command discipline, on or about September 2, 2022, approximately *two weeks* after Plaintiff filed his first EEOC charge, Plaintiff received a retaliatory disciplinary charge concerning an incident that had occurred a month and a half prior on or about July 18, 2022.

307.    The charge pretextually, misleadingly, and falsely alleges that Plaintiff did the following:

> On Monday July 18, 2022, at approximately 1410 hours in housing area 12 Upper Correction Officer Leo Roland# 7384 assigned to the 'A' station post allowed inmate ... B/C # . . . / NYSID # . . . to exit the housing area (Reference Genetic Camera Angle 26.145). The inmate then entered the Main Corridor and refused staff orders to return to his assigned housing area resulting in UOF # . . . . During the Rapid Review of the incident, it was deemed avoidable. The Officer's actions compromised the security of the facility to allow the inmate into the corridor without supervision or an escort.

308.    This charge/write-up was factually inaccurate, pretextual, and retaliatory.

309.    Specifically, as contrasted with the characterization of DOC, Plaintiff had properly activated a medical emergency due to an inmate complaining of chest pain and difficulty breathing.  The *clinic*, however, *did not respond* to the housing area for medical attention as it should have.  Instead of correctly responding, the clinic staff instructed Plaintiff to let the inmate out of the housing unit to meet the clinic escort officer due to a shortage of clinic staff who were unable to report to the housing unit.

310.    Typically, DOC has up to 30 days to generate a command discipline, but this was generated after 30 days had already passed.

311.    Plaintiff subsequently had his hearing with Acting Warden Harvey about DOC's sham disciplinary charge and was given a retaliatory verbal reprimand for letting the inmate out.

312.    The only other option besides taking the action Plaintiff took would have been to keep inmate in the housing area -- which could have been *fatal* to the inmate.

313.    Plaintiff was unwilling to put the inmate's life at risk and took the appropriate actions under the circumstances.

314.    The second retaliatory command discipline charged Plaintiff with being absent without Official Leave ("AWOL") when Plaintiff had in fact properly called out sick pursuant to the required procedures.

315.    That Plaintiff had called out sick using the correct procedures was clearly reflected by Plaintiff having received a sick assignment number from DOC's HMD.  The assigned sick number was 6190221.

316.    This retaliatory, false, and/or pretextual command discipline was signed by Acting Warden Harvey.

317.    That Plaintiff had properly called out sick using the required procedures could have been easily verified by Acting Warden Harvey contacting the HMD before incorrectly giving Plaintiff a command discipline.

318.    This retaliatory command discipline was subsequently dismissed after Plaintiff challenged it.

319.    As background to Plaintiff's retaliatory shift reassignment, being "medically monitored" at DOC is a term meaning that a Correction Officer has medical limitations that prevents the Correction Officer from being on full duty. The Correction Officer's level of medical monitoring is determined by the HMD doctor based on medical paperwork provided by the Correction Officer's doctor and their medical assessments.

320.    During September 2022, Plaintiff was MM3- Medically Monitored 3.

321.    With respect to Plaintiff's retaliatory shift reassignment, on or about September 2, 2022, Plaintiff received a call from Personnel Captain Pamela Desousa ("Captain Desousa") to report to the personnel department.

322.    Upon reporting to the personnel department, Captain Desousa informed Plaintiff that his tour was being switched to midnight due to his medical restriction status (MM3- Medically Monitored 3).

323.    When Plaintiff informed her of his medical condition of sleep apnea, documented in Plaintiff's DOC medical record, she stated that there was nothing she could do because she had to spread the medical restricted staff around to different tours.   Plaintiff asked if it was being done by seniority, and her response was to apply for a transfer to another facility if the midnight shift was not feasible.  She did not answer Plaintiff's question regarding seniority.

324.    Having been a Correction Officer for approximately 11 years, Plaintiff was senior to many Correction Officers who were also being medically monitored.  Nonetheless, these less senior Correction Officers did not have their shifts changed.

325.    Upon information and belief, Plaintiff was selected for this shift change over less senior Correction Officers who were also being medically monitored, in further retaliation for his protected complaints and/or based on further race discrimination (and/or race plus male gender discrimination (Black male)).

326.    Upon information and belief, Plaintiff would not have been reassigned to the late shift if he had not previously engaged in protected activity and/or if he had been Caucasian and/or non- Black.

327.    Upon information and belief, the number of medically monitored Correction Officers who were reassigned to the night shift were disproportionately Black and/or non-Caucasian and/or had disproportionately engaged in the protected activity of complaining about race discrimination and/or related retaliation.

65

328.     No reasonable justification for Plaintiff's reassignment to a night shift over more junior Correction Officers was ever provided to Plaintiff.

***DOC Continued to Retaliate Against Plaintiff by Punitively Holding Its "Investigation" Into Him Open and then Retaliated Against Him for Filing an Article 78***

329.     DOC continued to punitively hold open the investigation of Plaintiff regarding Plaintiff's private criticism of the Rikers Island conditions without bringing charges to OATH, upon information and belief, because of Plaintiff's protected complaints and/or opposition to discrimination and/or retaliation.

330.     Despite charging Plaintiff with disciplinary charges on or about October 5, 2021, DOC failed to schedule an OATH trial to adjudicate its charges until being forced into action by Plaintiff's September 8, 2022 filing of an Article 78 seeking to require the scheduling of his OATH trial on his almost year-long charge.

331.     Indeed, instead of scheduling the OATH trial, DOC repeatedly attempted to pressure Plaintiff into accepting a false "plea" admitting to the alleged misconduct that Plaintiff did not in fact engage in.

332.     DOC repeatedly offered to resolve these false, misleading, retaliatory, and/or pretextual charge(s) with the time served from Plaintiff's original suspension during July 2021.

333.     As a result, Plaintiff was subjected to suspension without DOC having provided Plaintiff with support for its disciplinary action(s) against Plaintiff regarding Plaintiff's OATH charges.

334.     Additionally, both before and after Plaintiff declined DOC's plea offer (which plea would have been false), DOC failed to provide Plaintiff's attorney with the customary -- or indeed any -- discovery for the OATH trial.

335.    In fact, Plaintiff's attorney for the disciplinary charges asked for the discovery related to the OATH charge against Plaintiff from Director Pal beginning in at least November 2021, but never received any documents, up to and including November 11, 2022.

336.    On or about August 27, 2022, Plaintiff's attorney for the disciplinary charges directly wrote Commissioner Molina requesting that DOC schedule the OATH trial on the (retaliatory and/or discriminatory) charges:

> My office represents Correction Officer Leo Roland, who currently is facing Charges and Specifications dated October 05, 2021 (Case# B1363/2021). C.O. Roland has chosen to proceed to administrative trial at OATH, but DOC has not scheduled the case for trial. The Trials Division has informed my office that it is waiting to receive various reports which will constitute the discovery package in this case, but why there is continued delay is not understood. Certainly, if there was a sufficient documented basis for filing charges against C.O. Roland, then any necessary reports must have been completed already.
>
> C.O. Roland has asked that my office do all that is possible to expedite the trial in
> this case. With charges pending, C.O. Roland is foreclosed from possibilities of promotion and advancement, and even if he chose to retire, doing so with charges pending would leave a negative cloud hanging over him.
> With these concerns in mind, as well as others, on behalf of C.O. Roland I now request that DOC contact OATH within ten days, and schedule this case for trial.
>
> I regret that this matter has reached this state of affairs, and it is my hope that we can avoid unnecessary legal proceedings to compel agency action.

337.    This letter was protected opposition to the discriminatory and/or retaliatory delay of the scheduling of the OATH trial.

338.    If DOC had sufficient (or potentially any) support for the original OATH charge it brought against Plaintiff when it suspended Plaintiff in July 2021, it should have had no difficulty quickly providing this discovery -- without the need for further investigation to support the charge *ex post facto*.

339.    This practice is part of a retaliatory pattern and/or practice of holding Correction Officers in limbo, with never-ending pending false charges that prevent them from transferring and/or obtaining alternative employment, without DOC ever being forced to actually adjudicate and prove the basis for its charges during an OATH administrative trial.

340.    Upon information and belief, DOC has subjected Plaintiff to this pattern and/or practice of retaliation because of Plaintiff's protected activity of complaining about and/or opposing discrimination and/or retaliation.

341.    Having been held in limbo for almost a year with pending charges, on the morning of September 8, 2022, Plaintiff's OATH attorney filed an Article 78 petition to force DOC to proceed with his OATH proceeding.

342.    Despite being suspended for the charge pending before OATH in July 2021, DOC declined to proceed to adjudicate Plaintiff's challenge to this charge for more than *fourteen* months after his suspension.  Indeed, DOC would have continued to hold Plaintiff in limbo except for the fact that it was pressured to act when Plaintiff's OATH attorney filed a September 8, 2022 Article 78 petition seeking to require DOC to schedule Plaintiff's OATH proceeding.

343.    Upon information and belief, DOC would have held Plaintiff in limbo *even longer, if not indefinitely,* had his OATH attorney not filed an Article 78 lawsuit demanding a trial.

344.    Plaintiff's September 8, 2022 Article 78 lawsuit, was, in part, filed in opposition to and/or to address DOC's retaliation against Plaintiff by way of holding false charges against Plaintiff open and/or open indefinitely without scheduling an OATH hearing (in Plaintiff's case for approximately fourteen months on his original charge).

345.     Plaintiff's September 8, 2022 Article 78 was protected opposition to DOC's retaliation and/or pattern and/or practice of retaliation against Plaintiff by way of holding false charges against Plaintiff open and/or open indefinitely without scheduling an OATH hearing.

346.     Upon information and belief, on September 9, 2022, the day after Plaintiff's oppositional Article 78 proceeding that complained about DOC's failure to schedule an OATH hearing, and approximately *three weeks* after filing his first EEOC Charge on August 15, 2022, Plaintiff received *a second retaliatory* OATH disciplinary charge that was added to the pending OATH proceeding against Plaintiff.

347.     Specifically, upon information and belief on or about September 9, 2022, two and a half months after the alleged incident, Plaintiff was given written notice of the retaliatory ID charges.

348.     The retaliatory Charge alleged that Plaintiff did the following:

> On or about June 25, 2022, while assigned the I 500x23 l5 hour tour, in EMTC Main Intake, inefficiently performed his duties engaged in conduct unbecoming an officer, and of a nature to bring discredit upon the Department in that said Officer failed to conduct tours to ensure the care, custody, and control of the individuals secured in the Intake area.

349.     This charge/write-up was factually inaccurate, pretextual, and retaliatory.

350.     Upon information and belief this retaliatory charge was made because of: (1) the filing of the oppositional Article 78 proceeding the day before; (2) Plaintiff's attorney's oppositional August 27, 2022 letter indicating an intention to file the Article 78 proceeding; and/or (3) Plaintiff's previous protected activity.

351.     As background, on or about June 25, 2022, Plaintiff had been assigned to search the new admission inmates in the intake on the 7x3 tour and the 3x11 tour overtime shift.

352.     Plaintiff's job, however, did <u>not</u> entail conducting tours of the intake. Plaintiff's job, however, did <u>not</u> entail conducting tours of the intake.  Instead, frequent and interval tours are conducted by the "A" or "B" post officer and the intake Captain to keep track of and report the inmate count accurately  Simply put, this was not Plaintiff's job.

353.     This incorrect charge stemmed from an incident on the overnight tour (11x7) with intake staff that was *completely unrelated* to Plaintiff.

354.     On or about September 12, 2022, at 10:51 a.m., Plaintiff directly emailed a copy of Plaintiff's initial EEOC charge to DOC's EEO Officer Deputy Director Florina Getman ("Deputy Director Getman"):

>     Good Afternoon Deputy Director Getman,
>
>     I would like to make you aware, if you are not already, that I filed the attached EEOC complaint against the Department of Correction.
>
>     Please confirm receipt. Best,
>
>     Leo Roland

355.     Less than one hour later Deputy Director Getman confirmed receipt at 11:36 AM.

356.     Approximately 2.5 *hours* after Plaintiff had forwarded a copy of his EEOC charge to Deputy Director Getman, the attorney representing Plaintiff in Plaintiff's OATH disciplinary adjudication was contacted via email by Director Pal (*i.e.*, DOC's attorney in Plaintiff's intentionally stalled OATH proceeding).

357.     Director Pal's email notified Plaintiff's attorney of DOC's pursuit of the second charge against Plaintiff via OATH (albeit a false, retaliatory, and pretextual charge), and, in an additional effort to intimidate Plaintiff with the "second" retaliatory and/or discriminatory

charge, again urged Plaintiff (via his attorney) to take an administrative "plea" admitting to the charged misconduct that Plaintiff had <u>not</u> engaged in:

> You should also be aware that CO Roland recently picked up a second case. I do not know if he has retained you on both matters. The Department's practice is to bring all matters to OATH when a Respondent has multiple open cases, as opposed to handling them piecemeal.
>
> That being said, the Department is willing to resolve both matters with time served on the 30 day suspension that CO Roland has already served with no additional penalty.

358.   Upon information and belief, this communication was further retaliation against Plaintiff for having filed an EEOC charge on August 15, 2022 and/or for forwarding it directly to Deputy Director Getman earlier that day in further opposition to the discrimination and/or retaliation against Plaintiff.

359.   Upon information and belief, DOC and Director Pal offered a time-served suspension because DOC (as investigators had openly albeit privately admitted) *did not have actual evidence* to support its claims against Plaintiff in the OATH proceeding.

360.   When Plaintiff's attorney indicated that Plaintiff would not be pleading to the charges (*i.e.*, accepting responsibility for misconduct that Plaintiff had <u>not</u> actually engaged in), Pal responded the same day that ***DOC would be seeking Plaintiff's termination at the OATH proceeding***.

361.   Although the charges against Plaintiff were false and pretextual, even if they *had* been accurate (which they were not) they would not warrant DOC seeking (or be sufficient to support) Plaintiff's termination.

362.   Upon information and belief, Director Pal informed Plaintiff's OATH attorney that he and/or DOC would seek termination through the OATH proceeding -- an entirely

disproportionate remedy for the relatively minor charges against Plaintiff: (1) because Plaintiff had filed an EEOC charge; (2) because of his protected activity of directly forwarding Plaintiff's initial EEOC charge to Deputy Director Getman the day before; (3) because Plaintiff had engaged in the protected activity of opposing the retaliation against him (the City's indefinite delay of bringing his disciplinary charges to OATH) by challenging it in an Article 78 proceeding and seeking to require the City to schedule his OATH hearing; and/or (4) because of any or all of Plaintiff's previous protected complaints and/or opposition.

363.    The above-described retaliatory conduct could well have dissuaded a reasonable worker from engaging in protected activity.

364.    Upon information and belief, DOC did not pursue termination as a remedy for the alleged offenses of these Caucasian male Correction Officers because they had not engaged in protected activity and/or because they were Caucasian and/or Caucasian males.

365.    Upon information and belief, for the charges it originally brought on October 05, 2021, DOC *never* scheduled an OATH trial prior to adjudicate the charges against Plaintiff prior to, or after, Plaintiff's eventual November 11, 2022 constructive discharge over *a year* later.

***Plaintiff's Health Deteriorates and He Requests FMLA Leave but DOC Unlawfully Prevents Him from Taking FMLA & Fails to Comply with FMLA Requirements***

366.    On September 12, 2022, Plaintiff emailed Deputy Director Getman of DOC's Office of Equal Employment Opportunity indicating that he was requesting FMLA leave for a serious health condition and requesting the appropriate paperwork:

> Good morning Deputy Director Getman,
>
> I am requesting the use of protected FMLA leave because of a serious health condition.

Please provide me with the appropriate FMLA paperwork regarding this request for leave.

Please confirm receipt.

Best,
Leo Roland

367.    On September 12, 2022, Deputy Director Getman claimed her office did not handle FMLA matters and told Plaintiff to contact the HR Division, Cozetta Profitt of DOC ("HR Profitt"), who Deputy Director Getman copied on her email.

368.    Plaintiff contacted HR Profitt the same day with the same request he had made to Deputy Director Getman.

369.    As of on or about September 12, 2022, Defendant City was  on notice of Plaintiff's need for and/or request for FMLA.

370.    Plaintiff's notice of his need for FMLA because of a serious health condition triggered DOC's obligation to provide Plaintiff with an FMLA eligibility notice within five business days, pursuant to 29 C.F.R. § 825.300(b).

371.    On or about September 13, 2022, HR Profitt emailed Plaintiff an FMLA application package (copying HR Leave Request and Monique Franklin) but did not provide Plaintiff with an actual FMLA eligibility notice.

372.    By September 19, 2022, DOC should have provided Plaintiff with an eligibility notice under the FMLA, 29 C.F.R. § 825.300(b), which states in part: "[w]hen an employee requests FMLA leave . . . the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances."

373.    DOC failed to provide Plaintiff with FMLA eligibility notice by September 19, 2022.

374.     On or around September 20, 2022, Plaintiff submitted his FMLA paperwork supporting his request for FMLA leave for a serious health condition, including a Treating Physician's Summary Report and Certification of Physician or Other Health Care Provider Form from his orthopedist surgeon, to Warden Sonya Harden. This FMLA paperwork stated that Plaintiff had a diagnosis of "bilateral severe osteoarthritis" in both knees and "xrays conclude severe bilateral knee tri-compartmental osteoarthritis" with a prescribed treatment of "[p]lanning total knee replacement surgery – [t]reatment plan includes recommendation of rest until surgery date clearance & booking."

375.     Plaintiff's FMLA leave was requested to be from October 1, 2022 to December 19, 2022.

376.     Plaintiff gave notice to DOC of his need for FMLA leave as soon as practicable, subsequent to learning that his chronic condition had deteriorated to the point that it was significantly impacting his ability to fully bear weight on his knees or stand/sit for long periods of time.

377.     Especially as a result of his retaliatory and discriminatory reassigned position at Rikers, Plaintiff was required to be on his feet for hours at a time.

378.     Plaintiff's need for FMLA was not foreseeable.

379.     Plaintiff had received a shot to subside the knee pain and to provide him with reprieve.  However, his condition deteriorated quickly after returning to the jails.

380.     On September 22, 2022, Plaintiff also submitted his FMLA paperwork to HR Profitt of DOC's HR Division and inquired as to next steps.

381.     On September 23, 2022, as directed, Plaintiff also submitted his FMLA paperwork to:  HRLeaveRequest@doc.nyc.gov.

382.    Plaintiff's FMLA paperwork included, without limitation, The Treating Physician's Summary Report ("the Treating Physician's Report") completed by his orthopedist surgeon, which stated under diagnosis: "M17.0 – Bilateral severe osteoarthritis. xrays conclude severe bilateral knee tri-compartmental osteoarthritis."  On this same form, the prescribed treatment stated: "Planning total knee replacement surgery - Treatment plan includes recommendation of rest until surgery date clearance & booking."

383.    Plaintiff's FMLA paperwork also included The Certification of Physician or Other Health Care Provider form (the "Certification Form"), which was also completed by Plaintiff's orthopedist surgeon, and provided medical information on Plaintiff's need for FMLA, including a description of medical facts supporting the certification.  The certification stated: Patient has permanent, chronic severe osteoarthritis of bilateral knees. Xray results show severe tri-compartmental arthritis."  In response to a question 5(c) of the Certification Form, [i]f the condition is a **chronic condition** (condition #4) . . . state whether the patient is presently incapacitated and the likely duration and frequency of **episodes of incapacity**," Plaintiff's provider responded: "Patient is unable to fully bear weight in both knees, as well as unable to stand/sit extended periods of time."  (footnote omitted).

384.    In response to question 7(a) of the Certification Form, "[i]f medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?", Plaintiff's provider responded:  "Yes  Specifically due to the profession, *he is currently unable to <u>safely provide service within his line of duty</u>*."  (emphasis added).

385.    By, at least, September 23, 2022, DOC had sufficient information to make a determination on Plaintiff's FMLA paperwork within 5 business days (*i.e.*, by September 30, 2022) about whether to designate the leave as FMLA-qualifying, as required by 29 C.F.R. § 825.300(d).

386.    A few days later, on or about September 27, 2022, Plaintiff realized that he needed to complete the top portion of Form 15B of the FMLA paperwork (a ministerial component of the paperwork, not a medical certification).  He immediately completed it and submitted the form to HR Leave Request, HRLeaveRequest@doc.nyc.gov: "This form was not initially filled out. Attached is the form. Name Leo Roland Employee ID . . . Shield:.  . . .Assignment EMTC Straight leave 10/1-12/19/22 Thank you."

387.    On or about September 29, 2022, DOC addressed an email to "Dear Command Warden and Member of Service" – an email addressed to the attention of both Plaintiff and Acting Warden Harvey.

388.    Other than Plaintiff, the email included numerous individuals involved in personnel decisions at DOC, including: Acting Warden Harvey, Eric Boyd, George Boyd, Captain Desousa, Virginia Vazquez.  The email was also sent to HRLeaveRequest@doc.nyc.gov.

389.    The email informed Plaintiff and the Command Warden (Acting Warden Harvey) that Plaintiff was "eligible for FMLA."

390.    As a result, in contravention of the FMLA, DOC belatedly sent Plaintiff this FMLA eligibility notice, which it should have provided to Plaintiff approximately 10 days prior on or about September 19, 2022 – *i.e.*, five business days after Plaintiff's initial request for FMLA on September 12, 2022.

391.    Upon information and belief, DOC has a systemic pattern and/or practice of unlawfully delaying its provision of eligibility notice beyond the requisite time period required by 29 C.F.R. 825.300(b)(1), by *only* providing FMLA eligibility notice to employees who submit FMLA paperwork (including certification documentation) to DOC.

392.    Upon information and belief this was the case even if employees (like Plaintiff) had requested FMLA leave prior to submitting their FMLA paperwork (including certification documentation).

393.    Moreover, DOC's September 29, 2022 email also instructed Plaintiff that he could not commence FMLA until he received written approval from HR.

394.    The email stated, in part: "HR will review the leave of absence request by determining FMLA/Medical eligibility, audit leave balances *and then prepare the appropriate determination letter to the employee with a cc to the command. The requestor should not begin the leave until written approval is given by HR*."  (emphasis added).

395.    DOC's email clearly notified Plaintiff that a determination on his FMLA request had not yet been made.

396.    DOC's email clearly notified Plaintiff that he could not stop working and take leave *until* approved to do so in writing without facing discipline.

397.    DOC's ,form of 15B was "missing" when Plaintiff had already submitted it on September 27, 2022.

398.    Days later, on October 4, 2022, DOC acknowledged it had received the top form of 15B on September 27, 2022, by responding to Plaintiff's September 27, 2022 email by stating, "Received".

399.    The other documentation (a signature of the Warden or designee) DOC claimed was required (missing) in its September 29, 2022 email, was to be provided by the Warden whom DOC also addressed in the email.

400.    Pursuant to FMLA regulations, an employer must provide "designation notice" as follows:

> The employer is responsible in all circumstances for designating leave as FMLA-qualifying, and for giving notice of the designation to the employee as provided in this section. When the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason (e.g., after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave **within five business days** absent extenuating circumstances. Only one notice of designation is required for each FMLA-qualifying reason per applicable 12-month period, regardless of whether the leave taken due to the qualifying reason will be a continuous block of leave or intermittent or reduced schedule leave. If the employer determines that the leave will not be designated as FMLA-qualifying (e.g., if the leave is not for a reason covered by FMLA or the FMLA leave entitlement has been exhausted), the employer must notify the employee of that determination. If the employer requires paid leave to be substituted for unpaid FMLA leave, or that paid leave taken under an existing leave plan be counted as FMLA leave, the employer must inform the employee of this designation at the time of designating the FMLA leave.

29 C.F.R. § 825.300(d)(1) (emphasis added).

401.    Based on the FMLA paperwork and medical certification documentation (*i.e.*, Certification Form and Treating Physician's Report) that Plaintiff submitted to DOC on September 20, 2022, September 22, 2022, and September 23, 2022, by at least September 30, 2022 -- five business days subsequent to September 23, 2022 when Plaintiff submitted his FMLA paperwork (including medical certification documentation) to HRLeaveRequest@doc.nyc.gov -- DOC was required to provide Plaintiff with the required FMLA designation notice.

402.     DOC failed to provide Plaintiff with the required FMLA designation notice within the requisite time period, in violation of 29 C.F.R. § 300(d)(1) (emphasis added). f

403.     Although Plaintiff's requested FMLA leave start date was October 1, 2022, Plaintiff did not receive a FMLA designation notice and/or determination from DOC by October 1, 2022.

404.     As instructed by DOC, Plaintiff continued to work, in spite of his health being severely and dangerously impacted by DOC's failure to provide him with an FMLA designation notice and/or failure to make a determination on his FMLA request.

405.     DOC forced Plaintiff to continue to report to work even though Plaintiff's physician's certification had clearly stated that he was "currently unable to safely provide service within his line of duty," (emphasis added) placing Plaintiff, and potentially other correction officers and inmates, in real danger.

406.     Upon information and belief, DOC was so committed to denying Plaintiff, and upon information and belief other correction officers FMLA leave, that they placed Plaintiff, their staff, and inmates in danger to accomplish that goal.

407.     Upon information and belief, after "DOC ha[d] enough information to determine whether the leave [would be] taken for a FMLA-qualifying reason" from employees -- such as "after receiving a certification" -- DOC had (and has) a systemic pattern and/or practice of failing to provide employees, like Plaintiff, with FMLA designation notice within 5 business days, as required by 29 C.F.R. § 300(d)(1).

408.     This systemic pattern and/or practice, resulted in leave denials, leave delays, non-responses to FMLA leave requests, and otherwise prevented correction officers from effectively asserting, scheduling, and/or protecting their FMLA rights.

***Plaintiff Files a Second EEOC Charge***

409.    On or about October 3, 2022, Plaintiff filed a Second EEOC Class Charge with the EEOC.

410.    On or about October 3, 2022, Plaintiff emailed Deputy Director Getman the Second EEOC Class Charge.

411.    On or about October 4, 2022, Deputy Director Getman responded to Plaintiff and stated, in part: "I am in receipt of your external complaint. Please be advised, the Department's Internal EEO Office does not handle external EEO complaints filed with the US EEOC.  I will be referring this to the Department's General Counsel's Office."

***DOC Fails to Provide FMLA Designation Notice and/or Approve Plaintiff's FMLA Leave***

412.    DOC continued to fail to provide Plaintiff with an FMLA designation notice.

413.    DOC never confirmed Plaintiff's FMLA leave despite numerous emails Plaintiff sent and/or communications requesting the status.

414.    For example, on October 7, 2022, Plaintiff sent an email with the Subject, "Status of approval for FMLA," to HRLeaveRequest@doc.nyc.gov (the designated contact for FMLA), which stated:

> Although your office has emailed me confirmation of my eligibility, please note that I have yet to receive a response to my FMLA request from EMTC Personel [sic] Office. I am behind on my days needed to begin medical treatment, which was to begin October 1, 2022. *Please let me know if it is approved or denied, and if it is denied, why it is denied. Thank you.*
>
> Leo Roland

(emphasis added).

415.    On October 11, 2022, Plaintiff asked Captain Desousa (who worked in personnel) about the status of his FMLA request. She claimed, in sum and substance, that she "knew nothing about it."

416.    She claimed ignorance even though she was copied on the September 29, 2022 communication from HRLeaveRequest@doc.nyc.gov referenced above.

417.    As a result, that same day, October 11, 2022, Plaintiff forwarded the September 29, 2022 email, on which she was already copied, to Captain Pamela Desousa for review.

418.    On October 11, 2022, Plaintiff emailed HR Leave Request and HR Profitt informing them of Captain Desousa's claimed ignorance of his pending FMLA application.  In addition, Plaintiff explained that his "medical treatment was unforeseen" and asked them to advise him on a definite time by which he would receive a response, as he had originally requested to begin FMLA leave on October 1, 2022 -- ten days earlier:

> Good afternoon,
>
> Today, I reported to EMTC Personnel to get a status on my FMLA, and Captain Desousa, the Personnel Captain at EMTC, informed me that she is not aware of my FMLA application even though she and other Personnel staff at EMTC were CC'ed on the email. My medical treatment was unforeseen and I was supposed to begin on October 1, 2022. Please advise of a definite time so I can plan accordingly.
>
> Best,
> Leo Roland

419.    Not hearing any response on his multiple inquiries, on October 12, 2022, Plaintiff emailed HR Leave Request again:

> Good afternoon,
>
> I am eligible and entitled to FMLA. Please notify EMTC of the timeline. The Personnel office at EMTC doesn't seem to understand

the urgency and significance of processing my FMLA paperwork timely in order to begin medical treatment..Thank you.

Leo Roland

420.    On October 13, 2022, at 10:42 a.m., Plaintiff emailed HR Profitt and HR Leave Request as follows:

Good morning Mrs. Cozetta,

*I am very troubled by the fact that the EMTC Personnel office stated that they know nothing about my FMLA request*. On 9/20/22, they received the physical copy, which I also emailed to HRLeave. *As a result of the aforementioned, my medical treatment has been delayed and I am forced to report to work against the medical advice of my doctor*. On 9/22/22, I forwarded a copy to your email address and HRLeave, which on 9/29/22, replied 'Eligible' and CC'd the EMTC Personnel staff and Warden Harvey. I would appreciate your attention to this matter and thank you in advance for your assistance.

Best,

Leo Roland

(emphasis added).

421.    From October 1, 2022, Plaintiff was forced to continue to report to work against his physician's advice, putting his health and safety, and that of other correction officers, as well as inmates, in jeopardy, because DOC failed to comply with his FMLA leave rights.

422.    In spite of the urgency, Plaintiff did not hear back from DOC.

423.    Plaintiff informed DOC that he would be forced to resign if his FMLA was not approved.  Specifically, on October 13, 2022, at approximately 9:00 p.m., Plaintiff emailed HR Profitt and HR Leave Request again, with the Email Subject, "FMLA leave request approval," and stated:

*I may be forced to resign if am not promptly notified of the approval for my pending FMLA leave request*.

> I ask again that you please approve me for my submitted FMLA
> leave request submitted on September 20th and resubmitted on
> September 22nd.
>
> Thank you
>
> Leo Roland

(emphasis added).

424. In an effort to further delay, retaliate, and/or interfere with Plaintiff's FMLA rights, on or about October 14, 2022, HR Profitt responded to Plaintiff making false claims about his FMLA application, including, that: (1) "[Plaintiff] must give HR 30 days before [his] expected leave start date to process [his] leave"; and (2) that "FMLA leave [was] foreseeable in [his] case."

425. HR Profitt also falsely claimed that Plaintiff had submitted an "incomplete package for a [FMLA] leave" on September 22, 2022, that HR Leave team informed him of on September 29, 2022, even though DOC knew that Plaintiff *had* submitted the asserted "missing information" (ministerial in nature).

426. DOC knew that Plaintiff had done so on September 27, 2022, prior to DOC's September 29, 2022 email, which DOC acknowledged on October 4, 2022.

427. He received no subsequent email of "missing information" from DOC.

428. More importantly, Plaintiff had submitted, "enough information [for DOC] to determine whether the leave [was] being taken for a FMLA-qualifying reason," 29 C.F.R. § 300(d), because he had submitted medical certification forms on September 20, 2022, September 22, 2022, and September 23, 2022.

429. That same day, Plaintiff immediately responded to HR Profitt and asked for clarification on "what information [she] contended [was] missing", and when and how they

requested the missing information from [him]."  He explained that he had submitted the "missing" information DOC had flagged on September 29, 2022 (top portion of form 15B – a ministerial component of the his paperwork) on or about September 27, 2022 before he was even asked for it, which DOC confirmed it had received on or about October 4, 2022.

430.    Upon information and belief, HR Profitt had known that DOC had complete paperwork and was simply attempting to violate, avoid, and manipulate the FMLA by claiming otherwise.

431.    On or about October 18, 2022, Plaintiff emailed HR Leave Request and indicated the DOC should have already responded to Plaintiff's FMLA leave request "designating [his] requested leave as FMLA-qualifying, [which] was required within five business days of [his] October 4th paperwork resubmission, if not [his] September 27 submission."

432.    Therefore, in light DOC's failure to designate Plaintiff's leave as qualifying or not, Plaintiff asked that DOC immediately approve his FMLA leave request and immediately send him "a written designation notice designating [his] requested leave as FMLA- qualifying."

433.    Plaintiff also made it clear to DOC that his "FMLA leave was not foreseeable and [ ] was requested as soon as possible under the circumstances."  He explained: "Lastly, even if my leave request was deemed foreseeable (which it was not), my leave should still be immediately approved to begin thirty days after my initial September 27 request for FMLA leave – which in that case should begin October 27."

434.    Upon information and belief, in violation of the FMLA, 29 C.F.R. § 300(d), DOC engages is a systemic practice of failing to provide an FMLA written designation notice to Plaintiff and other correction officers within the statutory mandated time period of five business

days of having "enough information to determine whether the leave is being taken for a FMLA-qualifying reason" (e.g., after receiving a certification).

435.   DOC did not immediately respond to Plaintiff's October 18, 2022 email.

436.   On October 19, 2022, Plaintiff followed up on his FMLA request again by email to HR Leave Request.

437.   On or about October 20, 2022, ignoring that DOC was already in violation of the FMLA designation requirement, DOC (via HR Leave Request) continued to engage in unlawful conduct by responding to Plaintiff and informing him, in-part: "In the 5 to 7 days you are to receive notice if you are eligible or not for the requested leave. Each case varies processing time. Therefore HR cannot immediately approve any case without proper review. . . ."

438.   Against the advice of his medical doctor because of the severity of his osteoarthritis, and as instructed to do by DOC until DOC had made a determination about his FMLA request in writing, Plaintiff continued to report to work while awaiting approval of his FMLA leave request.

439.   In furtherance of DOC's ongoing unlawful conduct, DOC did not respond to Plaintiff within the "5 to 7 days" it had indicated in its October 20, 2022 email.

440.   On October 28, 2022, after the five to seven-day window had passed, Plaintiff again followed up with DOC (HR Leave Request) asking for an update on his FMLA request.

441.   Instead of providing Plaintiff with the required FMLA designation notice, and in furtherance DOC's unlawful conduct, on October 31, 2022, DOC (HR Leave Request) emailed Plaintiff: "According to Citytime you are currently working?  Please provide the requested dates to complete this audit."

85

442.    That same day, October 31, 2022, Plaintiff immediately responded to DOC (HR Leave Request): "You already have my request for leave from October 1 to December 19, please advise whether approved or denied."

443.    DOC continued to fail to provide Plaintiff with the required FMLA designation notice or to otherwise approve or deny his FMLA leave request for some or all of his requested leave period of October 1 to December 19, 2022 (more than six weeks of which still remained to be taken as leave despite DOC's delays).

444.    On November 1 and 2, 2022, Plaintiff again emailed DOC (HR Leave Request) and asked for an update on his FMLA request that was submitted for the period October 1, 2022 to December 19, 2022.

445.    Without providing Plaintiff with the required FMLA designation notice, and in furtherance of DOC's unlawful conduct, on November 2, 2022, DOC (HR Leave Request) emailed Plaintiff: "According to city time this MOS is currently working.  Kindly advise when then the leave shall start, thank you."

446.    Plaintiff had already provided DOC with leave information (including the timeframe of the leave requested) since September 20, 2022, and countless times subsequent to that date.

447.    Moreover, DOC had instructed Plaintiff to continue working until a determination was made on his FMLA.

448.    On November 4, 2022, Plaintiff responded to DOC (HR Leave Request) forwarding his original FMLA paperwork that he submitted to HR Leave Request on September 23, 2023, and stated:

> Attached is the original email which was submitted to Personnel at
> my command (EMTC) for FMLA leave and the paperwork was

subsequently emailed to HRLeaverequest@doc.nyc.gov and to Mrs. Loretta Proffitt at HQ Personnel. My leave was to start from October 1 through December 19th (the allotted 12 weeks of FMLA leave). I am still working while I await the approval of my FMLA *to avoid being considered AWOL being out of work without an approved leave* and not worsening my chronic sick status. Please provide the status of my FMLA request.

Best,

Leo Roland

(emphasis added).

449.    On November 4, 2022, instead of providing Plaintiff with the required FMLA designation notice, or otherwise approving his leave, DOC (HR Leave Request) emailed Plaintiff: "I cannot process your audit it shows you are working.  Once again provide a start date for this request."

***Plaintiff Is Forced to Resign***

450.    On or about November 11, 2022, Defendant City constructively discharged Plaintiff by forcing his resignation by failing to approve the FMLA he needed because of his serious health condition and in order to receive the treatment that would have allowed him to safely (with respect to his own health as well as with respect to the safety of his co-workers and assigned inmates) as a Correction Officer.

451.    Upon information and belief, DOC engaged in an intentional effort to push Plaintiff (a Black male in ID) out of DOC because of his FMLA leave requests, disabilities, protected discrimination complaints, and/or opposition, and/or his race (and/or race plus gender).

***DOC Denies Plaintiff FMLA***

452.    On November 14, 2022, after Plaintiff had already been constructively

discharged, DOC (HR Leave Request) emailed Plaintiff to his personal email account: "This case

cannot be completed without the required information.  Last request for a start date."

453.    On November 29, 2022, after Plaintiff had already been constructively discharged

on November 11, 2022, DOC employee Monique Franklin emailed Plaintiff an FMLA denial

letter signed by Kory Brown, Leave Supervisor, Employee Services, dated November 16, 2022,

to his personal email account denying Plaintiff FMLA leave.  Numerous DOC employees were

included on the email.  The letter stated:

> Dear Leo Roland:
>
> The Human Resources Employee Services (HRES) is in receipt of
> your request for an **FMLA- Self** leave of absence for effective
> October 1, 2022.
>
> ***We regret to inform you that your request is denied.***
>
> On November 4, 2022 HR emailed the above mentioned requesting
> the following.. [sic]
>
> - ***Start date requested*** for this submission.
> - An audit was conducted and it shows ***you are still working***. We
>   cannot process the request without a start date.
>
> To date, I have *not received the requested documentation*.
>
> Please be advised HR is no longer able to process this request. If
> the employee is still interested in requesting an FMLA leave,
> please have them submit an updated and completed FMLA
> package.
>
> If you have any questions regarding this letter, please contact
> Hrleaverequest@doc.nyc.gov , or call 718-546-3190.
>
> . . . .

(emphasis added).

454.    DOC's FMLA denial letter falsely states that Plaintiff did not respond to the November 4, 2022 communication when Plaintiff did respond to the email, and had previously provided his start date for leave numerous times.

455.    Plaintiff had also previously provided his initial FMLA paperwork, clearly articulating that this leave was to start from October 1 through December 19, and explained why he was still working.

456.    Plaintiff was working on November 4, 2022, because (1) on September 29, 2022, DOC instructed him to work until an FMLA determination was made; and (2) DOC's failure to comply with the requisite FMLA designation notice approving his leave request.

457.    Upon information and belief, DOC engages in a policy and/or practice of unlawfully denying FMLA to employees otherwise entitled to FMLA, and systematically violates the FMLA by denying employees, like Plaintiff, FMLA based on: (a) their currently working status *even though DOC instructs employees to continue* working while an FMLA determination is being made; and/or (b) their alleged failure to provide a start date for leave when a start date was already provided to DOC and at least a portion of the original requested leave period requested at least partially remained.

458.    In addition, upon information and belief, DOC engages in a policy and/or practice of unlawfully denying or not granting FMLA, as opposed to merely delaying the start date of FMLA, for FMLA leave request for which insufficient notice of the requested leave was provided.

***Defendant Townsend (a Caucasian Female) Publicly Speaks about the Conditions at Rikers Island but Plaintiff (a Black Male) Is Penalized for Voicing His Private Comments***

459.    Following her termination and/or forced resignation, Defendant Townsend has been publicly critical about DOC, DOC staff, and the horrible conditions at Rikers Island.

460.    Defendant Townsend's public criticisms of the horrible conditions at Rikers Island undercut the notion that that she believed Plaintiff's comparable criticisms of the horrible conditions at Rikers Island were false.

461.    For example, on or about February 1, 2023, Defendant Townsend (former Deputy Commissioner Townsend) admitted on public social media that being housed on Rikers Island is "akin to torture," and that someone awaiting trial "should not be subjected to deadly conditions."[10]

462.    At a symposium held at the University of Texas at Austin on February 3-4, 2023, Defendant Townsend readily admitted that Rikers Island is facing many dangerous conditions, and that there have been issues for decades, and even notes how discipline can be unfairly administered.

463.    Even more shocking, according to Local Today, Defendant Townsend (former Deputy Commissioner Townsend) is now seemingly representing a doctor (upon information and belief, a Caucasian man) who was banned from Rikers Island for publicly criticizing management and the conditions at Rikers Island via social medial posts that he made between June and November 2022.[11]

464.    In complete contravention to her position while at DOC with regard to Plaintiff (a Black man) – whom Defendant Townsend and/or DOC disciplined for *privately* commenting about these same conditions at Rikers Island in 2021, which ultimately resulted in Plaintiff being

---

[10]     https://www.instagram.com/reel/CoIXzNGD_mc/?igshid=NjcyZGVjMzk%3D.

[11]     Graham Rayman, *Doctor banned from Rikers for slamming Correction Department chiefs to sue NYC on free speech, retaliation grounds*, Daily News, Mar. 20, 2023, https://www.nydailynews.com/2023/03/20/doctor-banned-from-rikers-for-slamming-correction-department-chiefs-to-sue-nyc-on-free-speech-retaliation-grounds/.

transferred to (very unsafe) Rikers Islands and constructively discharged -- Defendant Townsend essentially states that the doctor's public statements about the conditions at Rikers Island were "legitimate," and that moreover, DOC is acting unlawfully.

465.    Defendant Townsend, who is representing the doctor along with attorney David Erlich, is quoted as follows:

> Our client, Dr. James Uhrig, a revered physician, devoted to healing people languishing behind bars in our city's decrepit jails, was *constructively discharged* from his position for daring to voice his *legitimate concerns about the deadly conditions on Rikers Island* and the failures of its commissioner, Louis Molina," said lawyer Sarena Townsend, who is representing Uhrig with attorney David Erlich [12]

(emphasis added).

466.    In fact, Defendant Townsend and another lawyer publicly stated that DOC is wrong for shaming the doctor and firing him for his public posts: "'Rather than keep a respected, dedicated physician on his team at a time when [the Correction Department] is unable to provide timely medical care to its detainees, Molina preferred instead to shame and dismiss him,' the lawyers said."[13]

467.    According to her own her public statements, Defendant Townsend is admitting that it was similarly unlawful for DOC and her to actively pursue discipline against Plaintiff for voicing concerns in a private chat about the conditions on Rikers Island.

468.    During approximately, December 2023 or before, it became public that Defendant Townsend is also representing Defendant Benitez against Defendant City (DOC) when Defendant Benitez recently claimed that Commissioner Molina demoted him after he reported

---

[12]    *Id.* (emphasis added).

[13]    *Id.*

department misconduct.  Specifically, Defendant Townsend is defending Defendant Benitez for supposedly telling the truth about internal conditions within DOC and reporting them.[14]

469.    In addition, as noted above, upon information and belief, despite suspending Plaintiff with no investigation, Defendant Townsend later stated to the media that such a practice was something that should not generally be done: "You really need to do an investigation before suspending somebody":

> **What are the hurdles that prevent there being an effective disciplinary process to deal with these absences and this culture of corruption that you're describing?** The fastest way to discipline somebody is to suspend them, but you have to wield that sword in a limited fashion. You can't just suspend everybody every time they do something. You really need to do an investigation before suspending somebody. Certain cases where it's brazen and obvious, I'm comfortable suspending somebody. But the typical disciplinary process is a lengthy, lengthy process.[15]

470.    Defendant Townsend's *very public* criticisms of DOC are almost indistinguishable from Plaintiff's *private* criticisms of the appalling conditions at Rikers Island.

471.    Again, through her recent actions, Defendant Townsend has essentially admitted that the actions taken against Plaintiff by DOC, Defendant Townsend, and/or Defendant Benitez, were wrong, given that Plaintiff merely privately communicated *truthful* statements about the conditions at Rikers Island.

---

[14]    *See* Graham Rayman , *NYC jails commissioner Molina ran campaign to undermine outside oversight: court papers,* NY Daily News, Dec. 5, 2023, https://www.nydailynews.com/2023/12/05/nyc-jails-commissioner-molina-ran-accused-undermining-outside-oversight-court-filing/.

[15]    JB Nicholas, *Former Rikers Watchdog: 'This Whole Fucking Thing Is a Racket'*, HELLS GATE, May 3, 2022, https://hellgatenyc.com/nycs-former-jails-investigator-identifies-top-problem-on-rikers-corruption.

472.    Upon information and belief, Defendant Townsend knew that it was not warranted to pursue discipline against Plaintiff (a Black man who worked in ID), but she did so anyway because (or in part because) of Plaintiff's race (Black) and/or race plus gender (Black male) and/or protected activity.

473.    The reality is that the discipline pursued and implemented against Plaintiff was emblematic of the pattern and practice of discriminatory racially motivated conduct Black males face in ID (and/or retaliatory animus), especially when ID was under Defendant Townsend and Defendant Benitez's control.

## CLASS ACTION ALLEGATIONS

474.    Plaintiff brings this action, as a class action, on behalf of all similarly situated correction officers employed by the City, at any time within two years of the filing of the Complaint, through the resolution of this litigation, who were an FMLA-eligible employee pursuant to 29 U.S.C. § 2611(2), with FMLA leave remaining pursuant to 29 C.F.R. § 825.200, who made a request for FMLA self-care leave, and submitted a medical certification in support of such request, whose request was: (1) denied and/or not approved on the stated ground that they were reporting to work at the time the request was made and/or evaluated (the "Continued Reporting FMLA Class"); (2) denied and/or not approved on the stated ground that that they did not provide new requested leave dates, after an initial denial or failure to approve their leave, when some or all of their requested leave time-period had not already occurred (the "New Leave Dates FMLA Class"); and/or (3) denied and/or not granted based on the stated ground of insufficient notice, instead of having the start date of leave merely delayed pursuant to 29 C.F.R. § 825.304(b)-(d) (the "Delay Start Date  FMLA Class").

475.    The Continued Reporting FMLA Class, New Leave Dates FMLA Class, and the Delayed Start Date Class are collectively referred to as the "FMLA Denial Classes."

476.    Accordingly, Plaintiff brings the First and Second Causes of Action on behalf of the FMLA Denial Classes for violations of the FMLA, as a class action, pursuant to Rule 23(b)(2), (b)(3), (c)(4), against the City.

477.    Plaintiff additionally brings this action, as a class action, on behalf of the members of the FMLA Denial Classes, whom were not provided a designation notice required by 29 C.F.R. § 825.300(d) indicating whether their requested leave will be designated and counted as FMLA leave, within five business days of the City's receipt of their complete and sufficient medical certification within the meaning of 29 C.F.R. § 825.305(c) and/or 29 C.F.R. § 825.306(a)(1)-(4) (the "FMLA Designation Notice Class").

478.    Plaintiff additionally brings this action, as a class action, on behalf of the members of the FMLA Denial Classes, whom were not provided an eligibility notice within five business days of their request for FMLA as required by 29 C.F.R. § 825.300(b) indicating: (1) whether the employee was eligible for FMLA within the meaning of 29 C.F.R. § 825.110; or (2) stating at least one reason the employee was not eligible within the meaning of 29 C.F.R. § 825.110 (the "FMLA Eligibility Notice Class").

479.    The FMLA Designation Notice Class and the FMLA Eligibility Notice Class are collectively referred to as the "FMLA Notice Classes".

480.    Accordingly, Plaintiff brings the First Cause of Action on behalf of the FMLA Notice Classes for interference violations of the FMLA, as a class action, pursuant to Rule 23(b)(2), (c)(4), against the City for injunctive relief.

481.     Plaintiff additionally brings this action, as a class action, on behalf of the members of the FMLA Denial Classes who were not offered and/or provided unpaid leave as a reasonable accommodation of their disability, simultaneous with, in addition to, and/or as an alternative to FMLA leave (the "Failure to Accommodate Class").

482.     Accordingly, Plaintiff brings the Third, Fourth, Eighth, Ninth Causes of Action on behalf of the Failure to Accommodate Class for failure to accommodate, interference, and/or obligation to engage in a cooperative dialogue violations of the Rehabilitation Act and the NYCHRL, pursuant to Rule 23(b)(2), (b)(3), (c)(4), against the City.

483.     Plaintiff is a member of the Classes she seeks to represent.

484.     The members of the Class(es) identified herein are so numerous that joinder of all members is impracticable.

485.     Although Plaintiff does not know the precise number of the members of the Class(es) their number is greater than can be feasibly addressed through joinder.

486.     The members of the Classes are ascertainable

487.     A class action is superior to other available means for the fair and efficient adjudication of the Classes' claims.

488.     Plaintiff has retained counsel competent and experienced in employment class actions.

489.     Plaintiff's claims are typical of the claims of the Classes.

490.     Excluded from the Classes are: (1) Defendants; (2) current or former managerial employees of the City; (3) Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or at any time during the class period has had, a controlling interest in Defendants; (4) the Judge(s) to whom this case is assigned and any

member of the Judge's immediate family; (5) all persons who submit timely and otherwise proper requests for exclusion from the Classes; and (6) persons who are named plaintiffs in filed actions in state or federal court asserting FMLA, Rehabilitation Act, and/or NYCHRL claims against any of the Defendants.

491.    There are questions of law and fact common to some or all of the Classes, including, but not limited to, whether:

a.    the City had a policy, practice, custom, procedure, and/or standard operating procedure of illegally denying, or failing to respond to FMLA requests on the stated ground that the employee was reporting to work at the time the request was made and/or evaluated;

b.    the City had a policy, practice, custom, procedure, and/or standard operating procedure of illegally denying, or failing to respond to FMLA requests on the stated ground that the employee did not provide new requested leave dates, after an initial denial or failure to approve their leave, when some or all of their requested leave time-period had not already occurred

c.    the City had a policy, practice, custom, procedure, and/or standard operating procedure of illegally denying, or failing to respond to FMLA requests on the stated ground that the employee had given insufficient notice, instead of having the start date of leave merely delayed pursuant to 29 C.F.R. §§ 825.304(b)-(d);

d.    the City had a policy, practice, custom, procedure, and/or standard operating procedure of illegally failing to comply with 29 §§

825.300(b),  825.300(d)(2)

e.  the City had a policy, practice, custom, procedure, and/or standard operating procedure of illegally failing to comply with 29 C.F.R. § 825.300(b);

f.  the City had a policy, practice, custom, procedure, and/or standard operating procedure of illegally failing to comply with 29 C.F.R. § 825.300(d);

g.  the City is an employer within the meaning of the FMLA;

h.  the City is an employer within the meaning of the Rehabilitation Act;

i.  the City is an employer within the meaning of the NYCHRL;

j.  whether the FMLA Classes are employees within the meaning of the FMLA;

k.  whether the Failure to Accommodate Class are employees within the meaning of the Rehabilitation Act;

l.  whether the Failure to Accommodate Class are employees within the meaning of the NYCHRL;

m.  whether an award of liquidated damages is appropriate for failure of the City to establish its affirmative defense of good faith compliance with the FMLA;

n.  whether a request for FMLA leave was required to be simultaneously evaluated as a request for disability-based accommodation leave under

97

the Rehabilitation Act and/or NYCHRL;

o.      whether the failure to offer or provide the Failure to Accommodate Class unpaid leave as a reasonable accommodation of their disability, in addition to and/or as an alternative to denied FMLA leave, was a violation of the Rehabilitation Act;

p.      whether the failure to offer or provide the Failure to Accommodate Class unpaid leave as a reasonable accommodation of their disability, in addition to and/or as an alternative to denied and/or delayed FMLA leave, was a violation of the NYCHRL's accommodation obligation;

q.      whether the failure to offer, notify, disclose, and/or discuss the possibility of unpaid leave the Failure to Accommodate Class, as a potential reasonable accommodation of their disability, in addition to and/or as an alternative to, denied and/or delayed FMLA leave, was a violation of the NYCHRL's cooperative dialogue obligation;

492.    Class certification of the Class(es) is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because the City has acted and/or refused to act on grounds generally applicable to the Classes, making declaratory and injunctive relief appropriate with respect to Plaintiff and the Class(es) as a whole.  The Class members are entitled to declaratory and injunctive relief concerning the City's discriminatory and/or retaliatory policies, practices, customs, and/or procedures.

493.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because the above-described common questions also predominate over questions affecting only individual

members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The members of the Classes have been injured and are entitled to recovery as a result of common illegal practices.

494.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(c)(4)  because the resolution of additional common issues, would reduce the range of issues in dispute and promote judicial economy.

495.    Similarly, resolution of any one of the above-described common questions, even where such issue(s) are not appropriate for resolution pursuant to Fed. R. Civ. P. 23(b)(3), would nonetheless reduce the range of issues in dispute and promote judicial economy if resolved as an issues class pursuant to Fed. R. Civ. P. 23(c)(4).

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Interference, Restraint, and Denial in Violation of the FMLA

### (Brought on Behalf of Plaintiff and the FMLA Denial Classes and FMLA Notice Classes Against Defendant City)

496.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

497.    At all times relevant to the Complaint, the City was an enterprise engaged in commerce and/or in the production of goods for commerce within the meaning of the FMLA.

498.    At all times relevant to the Complaint, Defendant City was a public agency within the meaning of the FMLA.

499.    At all times during his employment Plaintiff was qualified for his position.

500.    At all times relevant to the Complaint, Plaintiff and upon information and belief, the FMLA Denial Classes and FMLA Notice Classes were correction officers qualified for their positions

501.    The City denied, interfered with, and/or restrained Plaintiff's exercise of and/or attempt to exercise his FMLA rights.

502.    The City denied, interfered with, and/or restrained the FMLA Denial Classes' and the FMLA Notice Classes' exercise of and/or attempt to exercise their FMLA rights.

503.    At all times during Plaintiff's employment with the City, the City was an employer within the meaning of the FMLA.

504.    The City had the power to hire and fire Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes.

505.    The City had the power to hire and fire Plaintiff and effectively fired and/or constructively discharged Plaintiff by denying him necessary FMLA leave.

506.    The City had the power to fire, and upon information and belief fired and/or constructively discharged members of, the FMLA Denial Classes, including by terminating them and/or denying them necessary FMLA leave.

507.    The City controlled Plaintiff's, the FMLA Denial Classes', and the FMLA Notice Classes' work schedules and conditions of employment, including by determining their location and shift assignments and additional terms and conditions of those assignments.

508.    The City set the method and frequency of payment for Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes, including by controlling payroll payments and application of suspensions without pay.

509.     The City maintained employment records for Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes, including their personnel, disciplinary file, and medical records and certifications submitted in support of FMLA leave requests and/or disability-based accommodation requests.

510.     The City possessed the power to control Plaintiff, the FMLA Denial Classes, and FMLA Notice Classes, and controlled them, including but not limited to, through control over work location and shift assignments reassignments, initiation of disciplinary proceedings, initiations of investigations, classification of absences as unauthorized and related docking of pay, and terminations.

511.     At all times during Plaintiff's employment with the City he depended on the City for the opportunity to render Correction Officer services.

512.     At all times relevant to the Complaint, Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes were employees within the meaning of the FMLA and employed by NYC within the meaning of the FMLA.

513.     At all times relevant to the Complaint, Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes were eligible employees pursuant to 29 U.S.C. § 2611(2).

514.     At all times relevant to the Complaint, Plaintiff was receiving continuing treatment for a serious health condition within the meaning of 29 C.F.R. § 825.115.

515.     At all times relevant to the Complaint, Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, and the total number of employees of the City was fifty or more employees within seventy-five miles of the location to which they reported, and/or the location from which their assignments were made.

101

516.     At the time of their requests for leave, Plaintiff, and upon information and belief the FMLA Denial Classes, were entitled to FMLA self-care leave pursuant to 29 C.F.R. § 825.112(a)(4) because of their serious health condition(s).

517.     At all times relevant to the Complaint, Plaintiff had twelve weeks of available FMLA leave remaining, under any calculation of FMLA leave entitlement permitted by 29 C.F.R. § 825.200.

518.     At all times relevant to the Complaint, the FMLA Denial Classes had FMLA leave remaining, pursuant to 29 C.F.R. § 825.200.

519.     The City interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Denial Classes', exercise and/or attempt to exercise their FMLA rights, including, but not limited to, by, illegally denying and/or delaying the approval of their FMLA leave by illegally denying their FMLA leave requests based on their FMLA self-care leave requests being: (1) denied and/or not granted to on the stated ground that they were reporting to work at the time the request was made and/or evaluated; (2) denied and/or not granted responded to on the stated ground that that they did not provide new requested leave dates, after an initial denial or failure to approve their leave, when some or all of their requested leave time-period had not already occurred; and/or (3) denied and/or not granted be based on the stated ground of insufficient notice, instead of having the start date of leave merely delayed pursuant to 29 C.F.R. § 825.304(b)-(d).

520.     Upon information and belief, The City had an illegal policy, pattern, practice, custom, and/or standard operating procedure of illegally denying Plaintiff and the FMLA Denial Classes leave as a reasonable accommodation of their disability, based on and/or in retaliation for their request for FMLA leave -- a facial violation of the FMLA.

102

521.    The City took these actions despite having acquired knowledge that Plaintiff's, and upon information and belief, the FMLA Denial Classes' requested leave was for an FMLA-qualifying reason.

522.    Upon information and belief, the City, interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Denial Classes' exercise and/or attempt to exercise their FMLA rights, including through a policy, pattern, practice, custom, and/or standard operating procedure of interference, restraint and/or denial of the FMLA rights, including but not limited to, by: (1) denying and/or not approving FMLA leave on the stated ground that they were reporting to work at the time the request was made and/or evaluated; (2) denying and/or not approving FMLA leave on the stated ground that that the employee did not provide new requested leave dates, after an initial denial or failure to approve their leave, when some or all of their requested leave time-period had not already occurred; and/or (3) denying and/or not approving FMLA leave based on the stated ground of insufficient notice, instead of having the start date of leave merely delayed pursuant to 29 C.F.R. § 825.304(b)-(d).

523.    Upon information and belief, the City had a pattern, practice, policy, and/or standard operating procedure of failing to provide Plaintiff and the FMLA Denial Classes, and the FMLA Designation Notice Class with the designation notice required by 29 C.F.R. § 825.300(d), within five business days of receipt of requiring rejection or approval of the FMLA leave request within five business days of receipt of a medical certification.

524.    Upon information and belief, the City had a policy, practice, custom, procedure, and/or standard operating procedure of failing to comply with the five-business day designation notice requirement of 29 C.F.R. § 825.300(d), with respect to the FMLA Denial Classes.

525.    Upon information and belief, the City had a pattern, practice, policy, and/or

103

standard operating procedure of failing to provide, within the requisite time period, Plaintiff, the FMLA Denial Classes, and the FMLA Eligibility Notice Class with the eligibility notice required by 29 C.F.R. § 825.300(b) indicating: (1) whether the employee was eligible for FMLA within the meaning of C.F.R. § 825.110; or (2) stating at least one reason the employee was not eligible within the meaning of C.F.R. § 825.110.

526.    At all times during Plaintiff's employment with the City, the City was an employer within the meaning of the FMLA.

527.    The City, interfered with, restrained, and/or denied Plaintiff's exercise and/or attempt to exercise his FMLA rights, by failing to comply with and/or fully comply with the requirements of 29 C.F.R. § 825.300(b) and 29 C.F.R. § 825.300(d), which prohibited Plaintiff from most effectively utilizing and/or utilizing his FMLA leave.

528.    The City, interfered with, restrained, and/or denied Plaintiff, the FMLA Denial Classes', and the FMLA Designation Class's exercise of their FMLA rights and/or attempt to exercise their FMLA rights, by failing to provide them with the FMLA designation notice required by 29 C.F.R. § 825.300(d), within the five business day timeframe required by 29 C.F.R. § 825.300(d).

529.    The City, interfered with, restrained, and/or denied Plaintiff, the FMLA Denial Classes', and the FMLA Eligibility Classes' exercise of their FMLA rights and/or attempt to exercise their FMLA rights, by failing to provide them with the FMLA eligibility notice required by 29 C.F.R. § 825.300(b), within the five business day timeframe required by 29 C.F.R. § 825.300(b).

530.    Upon information and belief, the City, had a policy, practice, custom, procedure, and/or standard operating procedure of interfering with, restraining, and/or denying the FMLA

Denial Classes' and FMLA Notice Classes' exercise of their FMLA rights and/or attempts to exercise their FMLA rights, by failing to provide the FMLA Eligibility Class with the individual FMLA eligibility notices required  by 29 C.F.R. § 825.300(b), and the FMLA Designation Class with the individual designation notice required by 29 C.F.R. § 825.300(d), within the timeframe required by 29 C.F.R. § 825.300(b), (d).

531.    The City interfered with, restrained, and/or denied Plaintiff's, and upon information and belief, the FMLA Denial Classes and FMLA Notice Classes, from fully exercising, utilizing, protecting, and/or most effectively structuring their FMLA leave, including but not limited to, by failing to give them timely eligibility notices as required by 29 C.F.R. § 825.300(b) designation notices as required by 29 C.F.R. § 825.300(d).

532.    Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes have relied on NYC for the opportunity to render correction officer services.

533.    Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes have had no opportunity for profit or loss and have made no investment in the business while working for the City.

534.    Plaintiff, and upon information and belief, the FMLA Denial Classes and FMLA Notice Classes, have suffered damages as a result of the City's FMLA violations.

535.    Upon information and belief, the City did not have good faith or reasonable grounds for believing that its acts or omissions concerning Plaintiff, the FMLA Denial Classes, or the FMLA Notice Classes complied with the FMLA.

536.    The City's denial and delay of Plaintiff's FMLA leave, despite notice of its FMLA violations and/or non-compliance with FMLA regulations was intentional and willful.

537.    Upon information and belief, the City's violations of the FMLA were carried out,

as part of a knowing and intentional policy, pattern, practice, custom, and/or standard operating procedure of intentional non-compliance with the FMLA and/or manipulation to evade FMLA compliance.

538.    Upon information and belief, the City's non-compliance with the FMLA concerning Plaintiff, the FMLA Denial Classes, and the FMLA Notice Classes was systematic and chronic, to such a significant degree, despite knowledge of the obligations under the statute, that these violations were therefore willful, intentional, and/or in bad faith.

539.    Upon information and belief, the City's actions and inactions regarding proper FMLA administration, and failure to remedy or address the knowing continued ongoing widespread failure to comply fully with the FMLA concerning Plaintiff, the FMLA Denial Classes, or the FMLA Notice Classes rose to the level of intentional non-compliance with the FMLA.

540.    Upon information and belief, the City did not have reasonable grounds for believing that its acts or omissions concerning Plaintiff, the FMLA Denial Classes, or the FMLA Notice Classes complied with the FMLA.

541.     As a result of the City's FMLA violations, Plaintiff, and upon information and belief the FMLA Denial Classes, are entitled to recover back pay, front pay and/or reinstatement, liquidated damages, declaratory relief, injunctive relief, attorney's fees, and costs.

542.     As a result of the City's FMLA violations, Plaintiff and, upon information and belief, the FMLA Notice Classes are entitled to injunctive relief, attorney's fees, and costs

## SECOND CAUSE OF ACTION

### Retaliation in Violation of the FMLA

### (Brought on Behalf of Plaintiff and the FMLA Denial Classes Against Defendant City)

543.     Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

544.     At all times during his employment Plaintiff was qualified for his position.

545.     At all times relevant to the Complaint, Plaintiff, and upon information and belief the FMLA Denial Classes, were qualified for their Correction Officer positions.

546.     At all times relevant to the Complaint, the City was an enterprise engaged in commerce and/or in the production of goods for commerce within the meaning of the FMLA.

547.     At the time of their requests for leave, Plaintiff, and upon information and belief the FMLA Denial Classes, were entitled to FMLA self-care leave pursuant to 29 C.F.R. § 825.112(a)(4) because of their serious health condition.

548.     At all times relevant to the Complaint, the City was a public agency.

549.     At all times during his employment, Plaintiff was qualified for his position.

550.     The City retaliated against Plaintiff, and upon information and belief the FMLA Denial Classes, because of, or in part because of, their requests for FMLA leave, by failing to simultaneously evaluate them for, offer, and/or propose the possibility of unpaid leave as a reasonable accommodation of their disability.

551.     At all times during Plaintiff's employment with the City, the City was an employer within the meaning of the FMLA.

552.     The City had the power to hire and fire Plaintiff and the FMLA Denial Classes, including by termination and by constructively discharging them by illegally denying them necessary FMLA leave.

553.     The City had the power to fire Plaintiff and fired and/or constructively discharged Plaintiff by denying him necessary FMLA leave.

554.    The City had the power to fire, and upon information and belief fired and/or constructively discharged members of, the FMLA Denial Classes by denying them necessary FMLA leave.

555.    The City controlled Plaintiff's and the FMLA Denial Classes' work schedules and conditions of employment, including by determining their work location and shift assignments and their additional terms and conditions of employment.

556.    The City set the method and frequency of payment for Plaintiff and the FMLA Denial Classes, including by controlling payroll and payroll deductions, including control over deductions of pay for absences deemed to be unauthorized absences.

557.    The City maintained employment records for Plaintiff and the FMLA Denial Class including their personnel, disciplinary file, and medical records and certifications submitted in support of FMLA leave requests and/or disability-based accommodation requests.

558.    The City possessed the power to control Plaintiff and the FMLA Denial Classes, and controlled them, including but not limited to, through control over assignment locations and shift scheduling, reassignments, suspension, initiation of disciplinary proceedings, initiations of investigations, classification of absences as unauthorized and related docking of pay, constructive discharges, and terminations.

559.    At all times during Plaintiff's employment with the City, he depended on the City for the opportunity to render correction officer services.

560.    Upon information and belief, at all times relevant to the Complaint, Plaintiff and the FMLA Denial Classes were employees within the meaning of the FMLA and employed by

the City within the meaning of the FMLA.

561.    At all times during Plaintiff and the FMLA Denial Classes' employment with the City they depended on the City for the opportunity to render correction officer services.

562.    At all times relevant to the Complaint, Plaintiff and the FMLA Denial Classes were each an FMLA eligible employee pursuant to 29 U.S.C. § 2611(2).

563.    At all times relevant to the Complaint, Plaintiff and the FMLA Denial Classes, had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve- month period, and the total number of employees of the City was fifty or more employees within seventy-five miles of the location to which they reported, and/or the location from which their assignments were made.

564.    At all times relevant to the Complaint, Plaintiff was receiving continuing treatment for a serious health condition within the meaning of 29 C.F.R. § 825.115.

565.    The City had a policy, pattern, practice, custom, and/or standard operating procedure of retaliating against Plaintiff and the FMLA Denial Classes because of, or in part because of, their requests for FMLA leave by declining to provide, offer, or suggest unpaid leave as a reasonable accommodation, in addition to, or as an alternative to, FMLA leave.

566.    Plaintiff and the FMLA Denial Classes have relied on the FMLA Denial Classes for the opportunity to render correction officer services.

567.    Plaintiff and the FMLA Denial Classes have had no opportunity for profit or loss and have made no investment in the business while working for the City.

568.    Plaintiff, and upon information and belief the FMLA Denial Classes, have suffered damages as a result of the City's FMLA violations.

569.     Upon information and belief, the City did not have reasonable grounds for believing that its acts or omissions concerning Plaintiff or the FMLA Denial Classes, complied with the FMLA, or were in good faith, including because the acts were knowing and intentional violations of the FMLA.

570.     The City's denial and delay of Plaintiff's FMLA leave, despite notice of its FMLA violations and/or non-compliance with FMLA regulations was intentional and willful.

571.     Upon information and belief, the City's violations of the FMLA were carried out, as part of a knowing and intentional policy, pattern, practice, custom, and/or standard operating procedure of intentional non-compliance with the FMLA and/or manipulation to evade FMLA compliance.

572.     Upon information and belief, the City's non-compliance with the FMLA was systematic and chronic, to such a significant degree, despite their knowledge of their obligations under the statute, that these violations were therefore willful, intentional, and/or in bad faith.

573.     In addition, or in the alternative, the City's knowing inaction and failure to remedy or address the standard operating procedure of FMLA retaliation rose to the level of intentional retaliation.

574.     Upon information and belief, the City did not have reasonable grounds for believing that their acts or omissions concerning Plaintiff or the FMLA Denial Classes complied with the FMLA.

575.     As a result of the City's FMLA violations, Plaintiff, and upon information and belief the FMLA Denial Classes, are entitled to recover back pay, front pay and/or

reinstatement, liquidated damages, declaratory relief, injunctive relief, attorney's fees, and

costs.

## THIRD CAUSE OF ACTION

**Failure to Accommodate in Violation of the Rehabilitation Act**

**(Brought on Behalf of Plaintiff and the Failure to Accommodate Class Against Defendant City)**

576.     Plaintiff realleges and incorporates by reference all allegations in the preceding

paragraphs.

577.     The City has received, and currently receives, federal financial assistance.

578.     Plaintiff had, and continues to have, disabilities within the meaning of the

Rehabilitation Act.

579.     Plaintiff had, and continues to have, disabilities that substantially limited one or

more of his major life activities.

580.     At all times during his employment, Plaintiff was a qualified individual with a

disability, and was able to carry out the essential functions of his positions, with or without a

reasonable accommodation of her disabilities.

581.     Upon information and belief, at all times relevant to the Complaint, the Failure to

Accommodate Class had one or more disabilities within the meaning of the Rehabilitation Act,

were qualified individuals with disabilities, and were able to carry out the essential functions of

their positions, with or without a reasonable accommodation of their disabilities.

582.     Plaintiff and the Failure to Accommodate Class requested an accommodation of

unpaid leave simultaneously when they requested FMLA leave, which disability-based

reasonable accommodation was not granted.

583.    Plaintiff and the Failure to Accommodate Class made disability-based accommodation requests for unpaid leave.

584.    Plaintiff and the Failure to Accommodate Class disclosed that they had disabilities when requesting FMLA leave and/or their disability-based accommodation of unpaid leave.

585.    The City knew or should have known that Plaintiff and the Failure to Accommodate Class had covered disabilities based on their submission of information in support of their requests for FMLA leave and/or unpaid disability-based leave.

586.    The City failed to engage, or fully engage, in the required interactive process with Plaintiff, and upon information and belief the Failure to Accommodate Class, regarding disability-based leave as a reasonable accommodation in addition to, in conjunction with, FMLA leave, in response to a request for FMLA leave.

587.    The City failed to accommodate Plaintiff's, and upon information and belief the Failure to Accommodate Class's, disabilities with disability-based leave as a reasonable accommodation.

588.    The City never engaged fully in an interactive process regarding a potential reasonable accommodation of unpaid leave by failing to provide or offer the possibility of unpaid leave as a reasonable accommodation.

589.    The City violated the Rehabilitation Act by failing to simultaneously evaluate Plaintiff and the Failure to Accommodate Class's requests for FMLA leave as a request for leave as an accommodation under the Rehabilitation Act.

590.    The City discriminated against Plaintiff, and upon information and belief the Failure to Accommodate Class, by failing to reasonably accommodate their disabilities with unpaid leave.

112

591.    Upon information and belief, the City had a policy, practice, custom, procedure, and/or standard operating procedure of failing to provide reasonable disability-based accommodations of unpaid leave in addition to, or in conjunction with, FMLA leave, in response to a request for FMLA leave.

592.    Upon information and belief, the City had a policy, practice, custom, procedure, and/or standard operating procedure of failing to provide reasonable accommodations of unpaid leave in addition to, or in conjunction with, FMLA leave, in response to a request for FMLA leave.

593.    This policy, practice, custom, procedure, and/or standard operating procedure was a facial violation of the Rehabilitation Act, which requires simultaneous review and consideration of requests for disability accommodation based-leave at the same time as requests for FMLA leave.

594.    Upon information and belief, the City engaged in a policy, pattern, practice, custom, and/or standard operating procedure of denial of disability-based requests for leave.

595.    Upon information and belief, the City engaged in a pattern, practice, custom, and/or standard operating procedure of failure to accommodate disability discrimination, by imposing a blanket denial of provision of unpaid leave for as a reasonable accommodation for Correction Officers who requested self-care FMLA leave.

596.    At all times during his employment with the City, Plaintiff was qualified for his position.

597.    At all times during his employment with the City, Plaintiff, and upon information and belief the Failure to Accommodate Class, were qualified to perform, and could perform, the essential functions of their correction officer positions with and/or without a reasonable

113

accommodation.

598.    Providing the Failure to Accommodate Class with unpaid leave would not have created an undue hardship on the City.

599.    Upon information and belief, the City engaged in a pattern, practice, custom, and/or standard operating procedure of non-accommodation of Correction Officers with leave as a reasonable accommodation, who made a request for FMLA self-care leave.

600.    Upon information and belief, the City had a policy, pattern, practice, custom, and/or standard operating procedure of non-accommodation with unpaid leave of correction officer who requested FMLA self-care leave.

601.    At all times during Plaintiff's employment and/or joint employment with the City, the City was a covered employer under the Rehabilitation Act.

602.    At all times during Plaintiff's and the Failure to Accommodate Class's employment with the City, Plaintiff and the Failure to Accommodate Class were employees within the meaning of the Rehabilitation Act.

603.    At all times during Plaintiff and the Failure to Accommodate Class's employment with the City, the City had more than fifteen employees.

604.    Plaintiff, and upon information and belief, the Failure to Accommodate Class suffered damages as a result of the City' failure to accommodate their disabilities with unpaid leave, including but not limited to suspensions without pay, forced resignations, constructive discharges, and terminations.

605.    As a result of the City's failure to accommodate, Plaintiff, and upon information and belief the Accommodation Denial Class, are entitled to back pay, front pay and/or reinstatement, nominal damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## FOURTH CAUSE OF ACTION

### Rehabilitation Act – Interference, Coercion, and Intimidation

### (Brought on Behalf of Plaintiff and the Failure to Accommodate Class Against Defendant City)

606.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

607.    The City has received, and currently receives federal financial assistance.

608.    Plaintiff, and upon information and belief the Failure to Accommodate Class, had disabilities, were regarded as having disabilities, and/or had a record of disabilities within the meaning of the Rehabilitation Act.

609.    Plaintiff and the Failure to Accommodate Class made disability-based requests for leave as a reasonable accommodation when they requested FMLA self-care leave.

610.    The City intimidated, threatened, and/or interfered with Plaintiff, and upon information and belief  the Failure to Accommodate Class's exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their Rehabilitation Act rights, including by failing to simultaneously engage in the required interactive process and/or failing to provide, propose, or disclose the possibility of unpaid leave as a reasonable accommodation in response to their request for FMLA leave.

611.     Upon information and belief, the City had a policy, practice, custom, procedure, and/or standard operating procedure of coercing, intimidating, threatening, and/or interfering with the Failure to Accommodate Class's exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their disability rights by: (1) denying requests for disability-based unpaid leave  made as a request for self-care FMLA leave; and/or (2) declining to consider unpaid

115

leave as an alternative disability accommodation.

612.   The City intimidated, threatened, and/or interfered with Plaintiff's exercise or
enjoyment of his disability rights, by retaliating him for his protected complaints of disability
discrimination and protected requests for and/or use of leave including, but not limited to,
because of Plaintiff's September 7, 2021 protected retaliation and discrimination complaint sent
directly to then DOC Commissioner Schiraldi.

613.   The City's above-described conduct had a reasonable tendency to intimidate,
threaten, interfere with, and/or coerce an employee.

614.   The City's above-described conduct was reasonably likely to interfere with the
exercise or enjoyment of disability rights.

615.   At all times during Plaintiff's employment with the City, Plaintiff and the Failure
to Accommodate Class were employees within the meaning of the Rehabilitation Act.

616.   At all times during Plaintiff's and the Failure to Accommodate Class's
employment with the City, it had more than fifteen employees.

617.   At all times during Plaintiff and the Failure to Accommodate Class's employment
with the City, the City was an employer within the meaning of the Rehabilitation Act.

618.   Plaintiff, and upon information and belief the Failure to Accommodate Class,
suffered damages as a result of the City's coercion, intimidation, threats, and interference.

619.   As a result of the City's coercion, threats, and/or interference Plaintiff, and upon
information and belief the Failure to Accommodate Class, are entitled to back pay, front pay
and/or reinstatement, nominal damages, declaratory relief, injunctive relief, attorney's fees, and
costs.

**FIFTH CAUSE OF ACTION**

**Disparate Treatment Race and/or Ancestry Discrimination in Violation of Title VII**

**(Brought on Behalf of Plaintiff Against Defendant City)**

620.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

621.     This claim is brought by Plaintiff on behalf of himself.

622.     Plaintiff is Black and he is of Haitian ethnicity and/or national origin.

623.     Plaintiff was qualified for the positions he held at Defendant City.

624.     Defendant City subjected Plaintiff to a race-based, ancestry-based, national-origin-based, and/or ethnicity-based disparate treatment because of, or in part because of, his Black race, Haitian ethnicity, national origin, and/or ancestry.

625.     Defendant City treated Plaintiff disparately than other employees because of, or in part because of, his Black race, Haitian ethnicity, national origin, and/or ancestry, and/or because he was not Caucasian and/or non-Black.

626.     Because of, or in part because of, Plaintiff's Black race, Haitian ethnicity, national origin, and/or ancestry, Defendant City applied and held Plaintiff to less permissive (*i.e.*, more stringent and/or harsher) employment, conduct, discipline, speech standards, etc. than Caucasian and/or non-Black correction officers and/or employees of DOC.

627.     Defendant City applied a two-tiered system of conduct, discipline, and speech standards -- one less permissive standard for Black correction officers, like Plaintiff, and the other permissive standard for Caucasian and/or non-Black correction officers.

628.     Defendant City treated Caucasian and/or non-Black correction officers and/or employees of DOC preferentially to Plaintiff because of, or in part because of, his Black race,

Haitian ethnicity, national origin and/or ancestry, including, without limitation, in Defendant City's application and/or implementation of employment, conduct, discipline, or speech standards.

629.    As a result of Defendant City's discriminatory treatment, Plaintiff suffered numerous materially adverse actions as alleged in the Complaint, including, without limitation: (1) being suspended; (2) being transferred out of ID to an undesirable unsafe assignment on Rikers Island in which we was subjected to potentially life-threatening harassment; (3) being disciplined without the filing and prosecution of formal charges before OATH for more than a year resulting in his being denied employment opportunities or the possibility of promotion or transfer, all following his *non-public* and *truthful* communication about the conditions on Rikers Island; (4) bringing meritless internal DOC charges against Plaintiff for "conduct unbecoming" on or about October 5, 2021; (5) punitively holding open the investigation of Plaintiff regarding his private criticism of the Rikers Island conditions without bringing charges to OATH; (6) placing Plaintiff on "chronic absent" status; (7) serving Plaintiff with two meritless retaliatory command disciplines; (8) reassigning Plaintiff to a midnight tour; (9) bringing a second meritless retaliatory OATH disciplinary charge that was added to the pending OATH proceeding against Plaintiff; (10) pressuring Plaintiff to accept a false plea to unsupported charges -- which Plaintiff did not do -- on more than one occasion; (11) informing Plaintiff that DOC would be seeking Plaintiff's termination (an unreasonable punishment in light of the charges at issue) at the OATH proceeding; and (12) constructively discharging him.

630.    Plaintiff was subjected to disparate treatment because, or at least in part because, of a combination of his Black race, Haitian ethnicity, national origin and/or ancestry.

631.   A motivating factor in Plaintiff being subjected to a disparate treatment by Defendant City is because of his Black race, Haitian ethnicity, national origin and/or ancestry.

632.   Defendant City's conduct violated Title VII.

633.   Defendant City's illegal conduct proximately caused Plaintiff's injuries.

634.   As a direct result of Defendant City's unlawful and discriminatory conduct, Plaintiff has suffered and is entitled to damages and/or any other relief that may be warranted, including,  back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, and costs.

### SIXTH CAUSE OF ACTION

**Disparate Treatment Race and/or Ancestry Plus Gender (Black Male) Discrimination in Violation of Title VII**

**(Brought on Behalf of Plaintiff Against Defendant City)**

635.   Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

636.   This claim is brought by Plaintiff on behalf of himself.

637.   Plaintiff is a Black male and a male of Haitian ethnicity and/or national origin.

638.   Plaintiff was qualified for the position he held at Defendant City.

639.   Defendant City subjected Plaintiff to a combination of gender and race-based, ancestry-based, national-origin-based, and/or ethnicity-based disparate treatment because of, or in part because of, a combination of his male gender and Black race, Haitian ethnicity, national origin, and/or ancestry.

640.   Defendant City treated Plaintiff disparately, because of, or in part because, a combination of his male gender and Black race, Haitian ethnicity, national origin, and/or ancestry, and/or because he was not a Caucasian male and/or non-Black male.

119

641.     Because of, or in part because of, a combination of Plaintiff's male gender and Black race, Haitian ethnicity, national origin, and/or ancestry, Defendant City applied and held Plaintiff to less permissive (*i.e.*, more stringent and/or harsher) employment, conduct, discipline, speech standards, than Caucasian male and/or non-Black male correction officers and/or employees of DOC.

642.     Defendant City applied a two-tiered system of conduct, discipline, and speech standards, etc. -- one less permissive standard for Black male correction officers, like Plaintiff, and the other permissive standard for Caucasian and/or non-Black male correction officers.

643.     Defendant City treated Caucasian male and/or non-Black male correction officers and/or employees of DOC preferentially to Plaintiff because of, or in part because of, a combination of his male gender and Black race, Haitian ethnicity, national origin and/or ancestry, including, without limitation, in Defendant City's application and/or implementation of employment, conduct, discipline, or speech standards.

644.     As a result of Defendant City's discriminatory treatment, Plaintiff suffered numerous materially adverse actions as alleged in the Complaint, including, without limitation: (1) being suspended; (2) being transferred out of ID to an undesirable unsafe assignment on Rikers Island in which we was subjected to potentially life-threatening harassment; (3) being disciplined without the filing and prosecution of formal charges before OATH for more than a year resulting in his being denied employment opportunities or the possibility of promotion or transfer, all following his *non-public* and *truthful* communication about the conditions on Rikers Island; (4) bringing meritless internal DOC charges against Plaintiff for "conduct unbecoming" on or about October 5, 2021; (5) punitively holding open the investigation of Plaintiff regarding his private criticism of the Rikers Island conditions without bringing charges to OATH; (6)

placing Plaintiff on "chronic absent" status; (7) serving Plaintiff with two meritless retaliatory command disciplines; (8) reassigning Plaintiff to a midnight tour; (9) bringing a second meritless retaliatory OATH disciplinary charge that was added to the pending OATH proceeding against Plaintiff; (10) pressuring Plaintiff to accept a false plea to unsupported charges -- which Plaintiff did not do -- on more than one occasion; (11) informing Plaintiff that DOC would be seeking Plaintiff's termination (an unreasonable punishment in light of the charges at issue) at the OATH proceeding; and (12) constructively discharging him Plaintiff was subjected to disparate treatment because, or at least in part because, of his Black race, Haitian ethnicity, national origin and/or ancestry.

645.     A motivating factor in Plaintiff being subjected to a disparate treatment by Defendant City is because of his Black race, Haitian ethnicity, national origin and/or ancestry.

646.     Defendant City's conduct violated Title VII.

647.     Defendant City's illegal conduct proximately caused Plaintiff's injuries.

648.     As a direct result of Defendant City's unlawful and discriminatory conduct, Plaintiff has suffered and to is entitled to damages and/or any other relief that may be warranted, including, back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, and costs.

### SEVENTH CAUSE OF ACTION

**Retaliation in Violation of Title VII**

**(Brought on Behalf of Plaintiff Against Defendant City)**

649.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

650.     This claim is brought by Plaintiff on behalf of himself.

651.     Plaintiff engaged in protected activities, including, without limitation: (1) complaining about discrimination and retaliation to DOC Commissioner Schiraldi on or about September 27, 2021; (2) filing an EEOC Class Charge against Defendant City on or about August 15, 2022; (3) threatening (through counsel) on August 27, 2022 to file an Article 78 contesting the retaliatory and/or discriminatory failure to prosecute disciplinary charges against him at OATH; (4) filing an Article 78 proceeding contesting the retaliatory and/or discriminatory failure to prosecute disciplinary charges against him at OATH for more than a year; (5) providing the first EEOC Class Charge to Deputy Director Getman; (6) forwarding the first EEOC Class Charge to Deputy Director Getman on September 12, 2022; and (7) filing a Second EEOC Class Charge against Defendant City on or about October 3, 2022; and (8) forwarding the second Class EEOC Class Charge to Deputy Director Getman on October 3, 2022.

652.     Because of this protected activity, Defendant City took materially adverse actions against Plaintiff, including, but not limited to: (1) bringing meritless internal DOC charges against Plaintiff for "conduct unbecoming" on or about October 5, 2021; (2) punitively holding open the investigation of Plaintiff regarding his private criticism of the Rikers Island conditions without bringing charges to OATH; (3) placing Plaintiff on "chronic absent" status; (4) serving Plaintiff with two meritless retaliatory command disciplines; (5) reassigning Plaintiff to a midnight tour; (6) bringing a second meritless retaliatory OATH disciplinary charge that was added to the pending OATH proceeding against Plaintiff; (7) pressuring Plaintiff to accept a false plea to unsupported charges -- which Plaintiff did not do -- on more than one occasion; (8) informing Plaintiff that DOC would be seeking Plaintiff's termination (an unreasonable punishment in light of the charges at issue) at the OATH proceeding; (9) failing to provide Plaintiff with FMLA eligibility and designation notice within the requisite time period; (10)

delaying making a determination on his FMLA request; (11) constructively discharging him; and/or (12) denying him requested FMLA to which he was legally entitled.

653.    Defendant City's conduct could well have dissuaded a reasonable worker from engaging in protected activity.

654.    Defendant City's illegal conduct proximately caused Plaintiff's injuries.

655.    As a direct result of Defendant City's unlawful conduct, Plaintiff has suffered and is entitled to is entitled to damages and/or any other relief that may be warranted, including, back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## EIGHTH CAUSE OF ACTION

### Failure to Accommodate in Violation of the NYCHRL

### (Brought on Behalf of Plaintiff and Failure to Accommodate Class Against Defendant City)

656.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

657.    Plaintiff had disabilities within the meaning of the NYCHRL.

658.    Plaintiff had a physical impairment within the meaning of the NYCHRL.

659.    Upon information and belief, the Failure to Accommodate Class had impairments within the meaning of the NYCHRL.

660.    Plaintiff disclosed his disabilities to the City when requesting FMLA leave.

661.    Upon information and belief, the Failure to Accommodate Class disclosed their impairments and/or disabilities when they submitted medical certifications in support of their FMLA leave.

662.    The City knew, or should have known, that Plaintiff and the Failure to Accommodate Class had disabilities based on their requests for FMLA leave and/or disability-based accommodation of unpaid leave.

663.    The City failed to engage with Plaintiff, and upon information and belief, the Failure to Accommodate Class, in the required interactive process and/or cooperative dialogue regarding a reasonable accommodation of their disabilities  by declining to provide, offer, discuss, disclose the possibility of unpaid leave as a disability accommodation simultaneous with, in addition to, or as an alternative to FMLA leave.

664.    The City failed to engage, or fully engage, in the required interactive and/or cooperative dialogue with Plaintiff and the Failure to Accommodate Class.

665.    Providing Plaintiff and the Failure to Accommodate Class with unpaid leave as a reasonable accommodation would not have created an undue hardship for the City.

666.    The City had a policy, practice, custom, and/or procedure of denying requests for unpaid leave as a reasonable accommodation made as FMLA leave requests for self-care despite the absence of an undue hardship in granting such unpaid leave.

667.    The City denied Plaintiff and the Failure to Accommodate Class the reasonable accommodation of unpaid leave simultaneous with, or in addition to, or as an alternative to FMLA leave.

668.    Upon information and belief, the City, had a policy, pattern practice, custom, and/or standard operating procedure o failing to provide reasonable accommodations of unpaid leave to Plaintiff and the Failure to Accommodate Class.

669.    Upon information and belief, the City had a policy, pattern practice, custom, and/or standard operating procedure of failing to provide reasonable accommodations of unpaid

leave to Plaintiff and the Failure to Accommodate Class in response to a request for, and/or simultaneous with, in addition to, and/or as an alternative to FMLA leave.

670.    The City discriminated against Plaintiff and the Accommodation Denial Class by failing to reasonably accommodate their disabilities  with protected unpaid leave as an alternative to or simultaneous with FMLA unpaid leave.

671.    Plaintiff and the Failure to Accommodate Class, simultaneously with their request or FMLA self-care leave, asked the City for a reasonable accommodation of unpaid leave, which was denied.

672.    At all times during his employment with the City Plaintiff was qualified for and could perform the essential functions of his job with and/or without a reasonable accommodation.

673.    Upon information and belief, at all times relevant, the Failure to Accommodate Class C was qualified for and could perform the essential functions of their jobs with and/or without a reasonable accommodation.

674.    At all times during Plaintiff's employment, including in the year preceding such relevant times, the City had more than four employees and/or independent contractors in its employ.

675.    At all times during Plaintiff's employment with the City Plaintiff and the Failure to Accommodate Class were covered employees within the meaning of the NYCHRL

676.    At all times during Plaintiff's employment with the City, the City was a covered employer within the meaning of the NYCHRL.

677.    The City is vicariously liable for its employees Kory Brown, HR Profitt, and/or Deputy Director Getman's failures to accommodate pursuant to N.Y.C. Admin. Code § 8-107(13)(a), (15).

678.     The City is directly liable for its failures to accommodate, including but not limited to, because of its policies and/or practices concerning failure to accommodate, pursuant to NYCHRL § 8-107(15).

679.     At all times relevant to the Complaint, Plaintiff and the Failure to Accommodate Class were covered employees within the meaning of the NYCHRL.

680.     At all times relevant to the Complaint, Plaintiff and the Failure to Accommodate Class were each a "person" and/or "employee" within the meaning of the NYCHRL.

681.     The City proximately caused Plaintiff, and upon information and belief the Failure to Accommodate Class's injuries.

682.     Plaintiff, and upon information and belief, the Failure to Accommodate Class suffered damages as a result of the City's failure to accommodate.

683.     The City's failure to accommodate had an impact within New York City, including at EMTC.

684.     As a result of the City's failure to accommodate, including its policies, practices, customs, and/or procedures of unlawful employment practices, Plaintiff  and upon information and belief, the Failure to Accommodate Class, are entitled to damages, including, but not limited to, back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, expert fees, costs, and other compensation pursuant to NYC Admin. Code § 8- 502(a).

## NINTH CAUSE OF ACTION

### Failure to Engage in Cooperative Dialogue in Violation of the NYCHRL

### (Brought on Behalf of Plaintiff and the Failure to Accommodate Class Against Defendant City)

685.     Plaintiff realleges and incorporates by reference all allegations in the preceding

paragraphs.

686.     Plaintiff had, and continues to have, disabilities within the meaning of the

NYCHRL.

687.     Plaintiff has, and continues to have, an impairment within the meaning of the

NYCHRL.

688.     Upon information and belief, the Failure to Accommodate Class had impairments

within the meaning of the NYCHRL.

689.     Plaintiff, and upon information and belief the Failure to Accommodate Class, had

disabilities within the meaning of the NYCHRL.

690.     Plaintiff disclosed his disabilities to the City when requesting FMLA leave and/or

disability-based unpaid leave as an accommodation.

691.     Upon information and belief, the Failure to Accommodate Class disclosed their

disabilities when requesting FMLA leave and/or disability-based unpaid leave as an

accommodation.

692.     The City knew, or should have known, that Plaintiff and the Failure to

Accommodate Class had disabilities based on their requests for disability-based accommodations.

693.     The City failed to engage with Plaintiff in the required interactive process and/or

cooperative dialogue regarding a reasonable accommodation of Plaintiff's disabilities

694.     The City failed to engage, or fully engage, in the required interactive and/or

cooperative dialogue with Plaintiff and the Failure to Accommodate Class by failing, to provide,

offer, or disclose the possibility of unpaid leave as a disability accommodation in addition to,

simultaneous with, and/or as an alternative to FMLA leave for self-care.

695.     The City refused and/or failed to engage in good faith in a written or oral

dialogue concerning Plaintiff's and the Failure to Accommodate Class's accommodation needs, within a reasonable time, regarding his request for unpaid leave, requested via his request for FMLA leave, in violation of NYCHRL § 8-107(28).

696.    The City violated the NYCHRL by failing to initiate and/or engage with Plaintiff and the Failure to Accommodate Class, in the cooperative dialogue process required by NYCHRL § 8-107(28)(a), (d) after notice that they required, or may have required, a reasonable accommodation of unpaid leave concerning their disabilities.

697.    The City had a policy, practice, custom, and/or procedure of declining to consider, offer as an option, or discuss unpaid leave as a reasonable accommodation made as FMLA leave requests for self-care despite the absence of an undue hardship in granting such unpaid leave

698.    The City had a policy, practice, custom, and/or procedure of failing to engage in, or fully engage in, the cooperative dialogue required by the NYCHRL, by failing to offer or discuss alternative accommodations simultaneously with or in addition to FMLA self-care leave ,and/or after denial of requests for FMLA self-care leave.

699.    Plaintiff and the Failure to Accommodate Class, simultaneously with their request or FMLA self-care leave, asked the City for a reasonable accommodation of unpaid leave, which was denied.

700.    At all times during his employment with the City Plaintiff was qualified for and could perform the essential functions of his job with and/or without a reasonable accommodation.

701.    Upon information and belief, the Failure to Accommodate Class could perform the essential functions of their jobs with and/or without a reasonable accommodation.

702.    At all times during Plaintiff's employment, including in the year preceding such

relevant times, the city had more than four employees and/or independent contractors in its employ.

703. At all times during Plaintiff's employment with the City, Plaintiff and the Failure to Accommodate Class, were covered employees within the meaning of the NYCHRL.

704. At all times during Plaintiff's employment with the City, the City was a covered employer and/or joint employer within the meaning of the NYCHRL.

705. The City is vicariously liable for Kory Brown, HR Profitt, and/or Deputy Director Getman's failure to engage in the cooperative dialogue pursuant to N.Y.C. Admin. Code § 8-107(13)(a), (28).

706. The City is directly liable for its discrimination, including, but not limited to, because of its policies and/or practices, pursuant to NYCHRL § 8-107(28).

707. The City proximately caused Plaintiff and the Failure to Accommodate Class's injuries.

708. Plaintiff, and upon information and belief the Failure to Accommodate Class, suffered damages as a result of the City's failure to engage in the cooperative dialogue.

709. The City's failure to engage in the cooperative dialogue had an impact within New York City, including at EMTC.

710. As a result of the City's failure to engage in the cooperative dialogue, Plaintiff and the Failure to Accommodate Class are entitled to back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, expert fees, costs, and other compensation pursuant to NYC Admin. Code § 8-502(a).

## TENTH CAUSE OF ACTION

**Disparate Treatment, Hostile Work Environment, Harassment, and/or Stereotyping Race and/or Ancestry Discrimination in Violation of the NYCHRL**

**(Brought on Behalf of Plaintiff Against Defendant City, Defendant Townsend, and Defendant Benitez)**

711.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

712.    This claim is brought by Plaintiff on behalf of himself.

713.    Defendant Townsend and Defendant Benitez were employees of Defendant City.

714.    Defendant Townsend and Defendant Benitez were managerial employees of Defendant City.

715.    Defendant City, Defendant Townsend, and Defendant Benitez subjected Plaintiff to a race-based, ancestry-based, national-origin-based, and/or ethnicity-based disparate treatment, harassment, hostile work environment, and/or stereotyping discrimination, because, or in part because of, his Black race, Haitian ethnicity, national origin, and/or ancestry.

716.    Defendant City, Defendant Townsend, and Defendant Benitez treated Plaintiff less well than other employees, because of, or in part because of, his Black race, Haitian ethnicity, national origin, and/or ancestry, and/or because he was not Caucasian and/or non-Black.

717.    Because of, or in part because of, Plaintiff's Black race, Haitian ethnicity, national origin, and/or ancestry, Defendant City, Defendant Townsend, and/or Defendant Benitez applied and held Plaintiff to less permissive (*i.e.*, more stringent and/or harsher) employment, conduct, discipline, speech standards, etc. than Caucasian and/or non-Black correction officers and/or employees of DOC.

718.    Defendant City, Defendant Townsend and/or Defendant Benitez applied a two-tiered system of conduct, discipline, and speech standards -- one less permissive standard for Black correction officers, like Plaintiff, and the other permissive standard for Caucasian and/or non-

130

Black correction officers.

719.    Defendant City, Defendant Townsend, and/or Defendant Benitez treated Caucasian and/or non-Black correction officers and/or employees of DOC preferentially to Plaintiff because of, or in part because of, his Black race, Haitian ethnicity, national origin and/or ancestry, including, without limitation, in their application and/or implementation of employment, conduct, discipline, or speech standards.

720.    Defendant City, Defendant Townsend, and Defendant Benitez's creation of a hostile work environment based on Plaintiff's Black race, Haitian ethnicity, national origin, and/or ancestry was a continuing violation.

721.    Defendant City, Defendant Townsend, and Defendant Benitez engaged in harassment of Plaintiff because of, or in part because of, his Black race, Haitian ethnicity, national origin, and/or ancestry.

722.    Defendant City, Defendant Townsend, and Defendant Benitez engaged in stereotyping discrimination against Plaintiff.

723.    Defendant City, Defendant Townsend, and/or Defendant Benitez's conduct rose above the level of petty slights and/or trivial inconveniences.

724.    Defendant City is strictly liable for Defendant Townsend and Defendant Benitez's discrimination pursuant to N.Y.C. Admin. Code §§ 8-107(1), 8-107(13)(b).

725.    Defendant Townsend and Defendant Benitez exercised managerial or supervisory responsibility for Defendant City and/or exercised managerial or supervisory responsibility over Plaintiff.

726.    Defendant Townsend and Defendant Benitez were hired by and/or worked for Defendant City to carry out work in furtherance of Defendant City's business enterprise.

727.     Defendant Townsend and Defendant Benitez's conduct was committed in the course of their work for and/or employment with Defendant City and, upon information and belief, Defendant City had actual knowledge of and acquiesced to such conduct.

728.     Upon information and belief, Defendant City knew of Defendant Townsend and Defendant Benitez's discriminatory conduct and acquiesced to such conduct, and/or failed to take immediate and appropriate corrective action.

729.     Defendant City should have known of Defendant Townsend and Defendant Benitez's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

730.     Defendant Townsend and Defendant Benitez knew of some or all of each others' discriminatory conduct, and acquiesced in such conduct and/or failed to take immediate and appropriate corrective action.

731.     Defendant Townsend and Defendant Benitez each directly participated in the discrimination against Plaintiff.

732.     Defendant City, Defendant Townsend, and/or Defendant Benitez took discriminatory adverse and/or materially adverse actions against Plaintiff and otherwise treated Plaintiff less well because of his race, including but not limited to disproportionately and/or pretextually disciplining Plaintiff, transferring Plaintiff from ID to work in unsafe conditions in Rikers, and subjecting Plaintiff to a two-tiered set of conduct (including speech) and performance standards favoring Caucasians and/or Caucasian males and disfavoring Black and/or Black males.

733.     Plaintiff suffered adverse, materially adverse, and/or less well treatments because of his race, or in part because of his race, including but not limited to: (1) being suspended; (2)

132

being transferred out of ID to an undesirable unsafe assignment on Rikers Island in which we

was subjected to potentially life-threatening harassment; (3) being disciplined without the filing

and prosecution of formal charges before OATH for more than a year resulting in his being

denied employment opportunities or the possibility of promotion or transfer, all following his

*non-public* and *truthful* communication about the conditions on Rikers Island; (4) bringing

meritless internal DOC charges against Plaintiff for "conduct unbecoming" on or about October

5, 2021; (5) punitively holding open the investigation of Plaintiff regarding his private criticism

of the Rikers Island conditions without bringing charges to OATH; (6) placing Plaintiff on

"chronic absent" status; (7) serving Plaintiff with two meritless retaliatory command disciplines;

(8) reassigning Plaintiff to a midnight tour; (9) bringing a second meritless retaliatory OATH

disciplinary charge that was added to the pending OATH proceeding against Plaintiff; (10)

pressuring Plaintiff to accept a false plea to unsupported charges -- which Plaintiff did not do --

on more than one occasion; (11) informing Plaintiff that DOC would be seeking Plaintiff's

termination (an unreasonable punishment in light of the charges at issue) at the OATH

proceeding; and (12) constructively discharging him.

734.    Defendant City, Defendant Townsend, and Defendant Benitez's conduct violated

the NYCHRL.

735.    Defendant Townsend, and Defendant Benitez's conduct constituted willful or

wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct

so reckless as to amount to such disregard.

736.    Defendant City, Defendant Townsend, and Defendant Benitez proximately caused

Plaintiff's injuries.

737.    As a direct and proximate result of Defendant City, Defendant Townsend and

Defendant Benitez's unlawful employment practices and discriminatory actions, Plaintiff has suffered and is entitled to damages and/or any other relief that may be warranted, including, but not limited to, back pay, front pay and/or reinstatement, compensatory damages, attorney's fees, costs, and expert fees, as well as punitive damages against Defendant Townsend and Defendant Benitez.

## ELEVENTH CAUSE OF ACTION

**Disparate Treatment, Hostile Work Environment, Harassment, and/or Stereotyping Race and/or Ethnicity Plus Gender Discrimination (Black Male) in Violation of the NYCHRL**

**(Brought on Behalf of Plaintiff Against Defendant City, Defendant Townsend, and Defendant Benitez)**

738.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

739.    This claim is brought by Plaintiff on behalf of himself.

740.    Defendant Townsend and Defendant Benitez were employees of Defendant City.

741.    Defendant Townsend and Defendant Benitez were managerial employees of Defendant City.

742.    Defendant City, Defendant Townsend, and Defendant Benitez subjected Plaintiff to a combination of gender and race-based, ancestry-based, national-origin-based, and/or ethnicity-based disparate treatment, harassment, hostile work environment, and/or stereotyping discrimination, because, or in part because of, a combination of his male gender and Black race, Haitian ethnicity, national origin, and/or ancestry.

743.    Defendant City, Defendant Townsend, and Defendant Benitez treated Plaintiff less well than other employees, because of, or in part because of, a combination of his male gender and his Black race, Haitian ethnicity, national origin, and/or ancestry, and/or because he

was not a Caucasian male and/or a non-Black male.

744.    Because of, or in part because of, a combination of Plaintiff's male gender and his Black race, Haitian ethnicity, national origin, and/or ancestry, Defendant City, Defendant Townsend, and/or Defendant Benitez applied and held Plaintiff to less permissive (*i.e.*, more stringent and/or harsher) employment, conduct, discipline, speech standards than Caucasian male and/or non-Black male correction officers and/or employees of DOC.

745.    Defendant City, Defendant Townsend and/or Defendant Benitez applied a two-tiered system of conduct, discipline, and speech standards, etc. -- one less permissive standard for Black male correction officers, like Plaintiff, and the other more permissive standard for Caucasian male and/or non-Black male correction officers.

746.    Defendant City, Defendant Townsend, and/or Defendant Benitez treated Caucasian male and/or non-Black male correction officers and/or employees of DOC preferentially to Plaintiff because of, or in part because of, a combination of his male gender and Black race, Haitian ethnicity, national origin and/or ancestry, including, without limitation, in their application and/or implementation of employment, conduct, discipline, speech standards.

747.    Defendant City, Defendant Townsend, and Defendant Benitez's creation of a hostile work environment based on a combination of Plaintiff's male gender and Black race, Haitian ethnicity, national origin, and/or ancestry was a continuing violation.

748.    Defendant City, Defendant Townsend, and Defendant Benitez engaged in harassment of Plaintiff because of, or in part because of, his male gender and Black race, Haitian ethnicity, national origin, and/or ancestry.

749.    Defendant Townsend and Defendant Benitez each directly participated in the NYCHRL violations against Plaintiff.

750.     Defendant City, Defendant Townsend, and Defendant Benitez engaged in stereotyping discrimination against Plaintiff because of, or in part because of, his male gender and Black race, Haitian ethnicity, national origin, and/or ancestry.

751.     Defendant City, Defendant Townsend, and/or Defendant Benitez took discriminatory adverse and/or materially adverse actions against Plaintiff and otherwise treated Plaintiff less well because of a combination of his Black race plus male gender, including but not limited to disproportionately and/or pretextually disciplining Plaintiff, transferring Plaintiff from ID to work in unsafe conditions in Rikers, and subjecting Plaintiff to a two-tiered set of conduct (including speech) and performance standards favoring Caucasians and/or Caucasian males and disfavoring Black persons and/or Black males.

752.     Plaintiff suffered adverse, materially adverse, and/or less well treatments because of his race, or in part because of a combination of his Black race plus male gender, including but not limited to: (1) being suspended; (2) being transferred out of ID to an undesirable unsafe assignment on Rikers Island in which we was subjected to potentially life-threatening harassment; (3) being disciplined without the filing and prosecution of formal charges before OATH for more than a year resulting in his being denied employment opportunities or the possibility of promotion or transfer, all following his *non-public* and *truthful* communication about the conditions on Rikers Island; (4) bringing meritless internal DOC charges against Plaintiff for "conduct unbecoming" on or about October 5, 2021; (5) punitively holding open the investigation of Plaintiff regarding his private criticism of the Rikers Island conditions without bringing charges to OATH; (6) placing Plaintiff on "chronic absent" status; (7) serving Plaintiff with two meritless retaliatory command disciplines; (8) reassigning Plaintiff to a midnight tour; (9) bringing a second meritless retaliatory OATH disciplinary charge that was added to the

pending OATH proceeding against Plaintiff; (10) pressuring Plaintiff to accept a false plea to unsupported charges -- which Plaintiff did not do -- on more than one occasion; (11) informing Plaintiff that DOC would be seeking Plaintiff's termination (an unreasonable punishment in light of the charges at issue) at the OATH proceeding; and (12) constructively discharging him

753.    Defendant City, Defendant Townsend, and/or Defendant Benitez's conduct rose above the level of petty slights and/or trivial inconveniences.

754.    Defendant City is strictly liable for Defendant Townsend and Defendant Benitez's discrimination pursuant to N.Y.C. Admin. Code §§ 8-107(1), 8-107(13)(b).

755.    Defendant Townsend and Defendant Benitez exercised managerial or supervisory responsibility for Defendant City and/or exercised managerial or supervisory responsibility over Plaintiff.

756.    Defendant Townsend and Defendant Benitez were hired by and/or worked for Defendant City to carry out work in furtherance of Defendant City's business enterprise.

757.    Defendant Townsend and Defendant Benitez's conduct was committed in the course of their work for and/or employment with Defendant City and, upon information and belief, Defendant City had actual knowledge of and acquiesced to such conduct.

758.    Upon information and belief, Defendant City knew of Defendant Townsend and Defendant Benitez's discriminatory conduct and acquiesced to such conduct, and/or failed to take immediate and appropriate corrective action.

759.    Defendant City should have known of Defendant Townsend and Defendant Benitez's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

760.    Defendant Townsend and Defendant Benitez knew of some or all of each others'

discriminatory conduct, and acquiesced in such conduct and/or failed to take immediate and appropriate corrective action.

761.     Defendant City, Defendant Townsend, and Defendant Benitez's conduct violated the NYCHRL.

762.     Defendant City, Defendant Townsend, and Defendant Benitez took discriminatory adverse and/or materially adverse actions against Plaintiff and otherwise treated Plaintiff less well because of his race plus gender, including but not limited to, disproportionately and/or pretextually disciplining Plaintiff, transferring Plaintiff from ID to work in unsafe conditions in Rikers, and subjecting Plaintiff to a two-tiered set of conduct (including speech) and performance standards favoring Caucasians and/or Caucasian males and disfavoring Black and/or Black males.

763.     Defendant Townsend and Defendant Benitez's conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

764.     Defendant City, Defendant Townsend, and Defendant Benitez proximately caused Plaintiff's injuries.

765.     As a direct and proximate result of Defendant City, Defendant Townsend and Defendant Benitez's unlawful employment practices and discriminatory actions, Plaintiff has suffered and is entitled to damages and/or any other relief that may be warranted, including, but not limited to, back pay, front pay and/or reinstatement, compensatory damages, attorney's fees, costs, and expert fees, as well as punitive damages against Defendant Townsend and Defendant Benitez.

## TWELFTH CAUSE OF ACTION

**Retaliation in Violation of the NYCHRL**

**(Brought on Behalf of Plaintiff Against Defendant City, Defendant Townsend, and Defendant Benitez)**

766.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

767.     This claim is brought by Plaintiff on behalf of himself.

768.     Defendant Townsend and Defendant Benitez were each a person within the meaning of the NYCHRL.

769.     Plaintiff engaged in protected activities, including, without limitation: (1) complaining about discrimination and retaliation to DOC Commissioner Schiraldi on or about September 27, 2021; (2) filing an EEOC Class Charge against Defendant City on or about August 15, 2022; (3) threatening (through counsel) on August 27, 2022 to file an Article 78 contesting the retaliatory and/or discriminatory failure to prosecute disciplinary charges against him at OATH; (4) filing of an Article 78 proceeding contesting the retaliatory and/or discriminatory failure to prosecute disciplinary charges against him at OATH; (5) forwarding the First EEOC Class Charge to Deputy Director Getman on September 12, 2022; (6) filing a Second EEOC Class Charge against Defendant City on or about October 3, 2022; and (8) forwarding the second Class EEOC Class Charge to Deputy Director Getman on October 3, 2022.

770.     Defendants were aware that Plaintiff engaged in protected activities.

771.     Because of, or in part because of, this protected activity, Defendant City, Defendant Townsend, and/or Defendant Benitez, engaged in adverse actions against Plaintiff and/or engaged in conduct reasonably likely to deter a person from engaging protected activity, including, but not limited to: (1) bringing meritless internal DOC charges against Plaintiff for "conduct unbecoming" on or about October 5, 2021; (2) punitively holding open the investigation of Plaintiff regarding

his private criticism of the Rikers Island conditions without bringing charges to OATH; (3) placing Plaintiff on "chronic absent" status; (4) serving Plaintiff with two meritless retaliatory command disciplines; (5) reassigning Plaintiff to a midnight tour; (6) bringing a second meritless retaliatory OATH disciplinary charge that was added to the pending OATH proceeding against Plaintiff; (7) pressuring Plaintiff to accept a false plea to unsupported charges -- which Plaintiff did not do -- on more than one occasion; (8) informing Plaintiff that DOC would be seeking Plaintiff's termination (an unreasonable punishment in light of the charges at issue) at the OATH proceeding; (9) failing to provide him with FMLA designation notice within the requisite time period; (10) delaying making a determination on his FMLA request; (111) constructively discharging him; and/or (12) denying him FMLA.

772.    The above-described retaliatory conduct could well have dissuaded a reasonable worker from engaging in protected activity.

773.    A causal connection exists between Plaintiff's protected activity and Defendants' retaliatory and/or adverse actions.

774.    Defendants' conduct rose above the level of petty slights and/or trivial inconveniences.

775.    Defendant City, Defendant Townsend, and Defendant Benitez took retaliatory adverse actions against Plaintiff.

776.    Defendant Townsend and Defendant Benitez each directly participated in the NYCHRL violations against Plaintiff.

777.    Defendant City is strictly liable for the retaliation of Defendant Townsend, Defendant Benitez, and Director Pal pursuant to NYCHRL §§ 8-107(7), 8-107(13)(a).

778.    Defendant City is liable for its retaliation and/or policy and/or practice of

140

retaliation, pursuant to NYCHRL § 8-107(7).

779.   Defendant Townsend and Defendant Benitez's conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

780.   As a direct and proximate result of Defendant City, Defendant Townsend and Defendant Benitez's unlawful employment practices and retaliatory actions, Plaintiff has suffered is entitled to damages and/or any other relief that may be warranted, including, but not limited to, back pay, front pay and/or reinstatement, compensatory damages, attorney's fees, costs, and expert fees, as well as punitive damages against Defendant Townsend and Defendant Benitez.

### THIRTEENTH CAUSE OF ACTION
**Aiding, Abetting, Inciting, Compelling, and/or Coercing and Attempt to Aid, Abet, Incite, Compel, and/or Coerce in Violation of the NYCHRL**

**(Brought on Behalf of Plaintiff Against Defendant Townsend and Defendant Benitez)**

781.   Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

782.   This claim is brought by Plaintiff on behalf of himself.

783.   Defendant Townsend and Defendant Benitez were each a person within the meaning of the NYCHRL.

784.   Defendant Townsend and Defendant Benitez each aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite, compel, and/or coerce each other's and Defendant City's above-described NYCHRL violations against Plaintiff.

785.   Defendant Townsend and Defendant Benitez each provided assistance to each other's and Defendant City's NYCHRL violations against Plaintiff described herein.

786.   Defendant Townsend and Defendant Benitez, knew, should have known, were

aware, and/or should have been aware, of each other's and/or Defendant City's violations of NYCHRL.

787.    Defendant Townsend and Defendant Benitez provided assistance and/or attempted to provide assistance to Defendant City's and each other's NYCHRL violations against Plaintiff described herein.

788.    Defendant Townsend and Defendant Benitez are individually liable to Plaintiff for their NYCHRL violations.

789.    Defendant Townsend and Defendant Benitez each directly participated in the NYCHRL violations against Plaintiff.

790.    Defendant Townsend and Defendant Benitez's conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

791.    As a direct and proximate result of Defendant Townsend and Defendant Benitez's violations of NYCHRL § 8-107(6), Plaintiff has suffered is entitled to damages and/or any other relief that may be warranted, including, but not limited to, back pay, front pay and/or reinstatement, compensatory damages, attorney's fees, costs, expert fees, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually, and on behalf of the FMLA Denial Classes, FMLA Notice Classes, and the Failure to Accommodate Class, seeks the following relief:

(a)    Certification of the above-described Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)    Designation of Plaintiff as class representative of the above-described Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(c)    Designation of Plaintiff's counsel as class counsel of the above-described Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(d)     Issuance of a declaratory judgment, on behalf of the of the above-described Classes, declaring the acts complained of herein are in violation of the FMLA, Rehabilitation Act, and the NYCHRL, and that Defendant City is liable for any damages resulting therefrom;

(e)     Injunctive relief including an injunction permanently restraining the above-described violations**;**

(f)     Reinstatement;

(g)     Compensatory damages against Defendant City, Defendant Townsend, and Defendant Benitez;

(h)     Back pay against Defendant City, Defendant Townsend, and Defendant Benitez;

(i)     Front pay against Defendant City, Defendant Townsend, and Defendant Benitez;

(j)     Liquidated damages against Defendant City;

(k)     Pre-judgment interest against Defendant City, Defendant Townsend, and Defendant Benitez;

(l)     Post-judgment interest against Defendant City, Defendant Townsend, and Defendant Benitez;

(m)    Punitive damages against Defendant Townsend and Defendant Benitez;

(n)     Nominal damages against Defendant City;

(o)     Actual damages against Defendant City, Defendant Townsend, and Defendant Benitez;

(p)     Attorneys' fees;

(q)     Expert fees;

(r)     Costs; and

(s)     All such other and further relief as the Court deems necessary and proper.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Dated: June 23, 2024
       Long Island City, New York

                                   Respectfully submitted,


By:       /s/ Cyrus E. Dugger
                Cyrus E. Dugger

**THE DUGGER LAW FIRM, PLLC**
28-07 Jackson Ave., 5th Fl.
Long Island City,
New York 11101
Tel: (646) 560-3208
Fax: (646) 390-4524
cd@theduggerlawfirm.com

***Attorneys for Plaintiff Leo P. Roland
and the Putative Classes***

144